UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| DENNIS J. SOLOMON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 07-1811-EGS |
| | ) |
| UNIVERSITY OF SOUTHERN | ) |
| CALIFORNIA, et. al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT EVANS & SUTHERLAND COMPUTER CORPORATION'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

Defendant Evans & Sutherland Computer Corporation ("E&S") hereby moves this Court to dismiss Plaintiff's Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure with prejudice.  In support of this motion, E&S submits the accompanying Memorandum of Law in Support of its Motion to Dismiss.

Wherefore, E&S respectfully requests that this Court enter an order dismissing Plaintiff's Complaint with prejudice.

Dated: January 28, 2008

_____
Brian W. Craver
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C.  20006
(202) 466-4416

Attorneys for Defendant
Evans & Sutherland Computer Corporation

## CERTIFICATE OF SERVICE

I, Brian W. Craver, attorney for defendant Evans & Sutherland Computer Corporation, hereby certify that a true and correct copy of the foregoing Defendant Evans & Sutherland Computer Corporation's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), with accompanying Memorandum of Law In Support and proposed Order, was served this 28th day of January, 2008, by first class mail, postage prepaid upon:

> Dennis J. Solomon
> P.O. Box 289
> Yarmouth Port, MA 02675

Brian W. Craver

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DENNIS J. SOLOMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1811-EGS |
| | ) | |
| UNIVERSITY OF SOUTHERN | ) | |
| CALIFORNIA, et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT EVANS & SUTHERLAND COMPUTER
CORPORATION'S MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P. 12(b)(6)**

Defendant Evans & Sutherland Computer Corporation ("E&S"), by counsel,
submits this memorandum of law in support of its motion pursuant to Fed. R. Civ. P.
12(b)(6) to dismiss the Complaint filed by Plaintiff Dennis J. Solomon with prejudice.
In support of its motion, E&S states as follows:

**I.     STATEMENT OF FACTS**

Defendant E&S is a Utah corporation that develops state-of-the-art visual display
systems. E&S has no contractual or other relationship with Plaintiff, and never has.
Plaintiff does not allege otherwise. Nevertheless, on November 30, 2007, Plaintiff filed a
rambling, five-count Complaint against ten defendants, including E&S, seeking damages
of $3,000,000. The Complaint strings together various unexplained and disjointed
assertions loosely relating to Plaintiff's alleged efforts to register the trademark
"HoloDeck." The Complaint names as defendants, among others, the "Trademark Trial
and Appeal Board" and the "United States Trademark Office."

Only two sentences in the entire Complaint even mention defendant E&S. Count III of the Complaint, titled "Attempt to Monopolize, Interference With Interstate Commerce," contains the assertion that "[Defendants] Edelman, Macedonia, and Evan [sic] & Sutherland engaged in an unlawful conspiracy to personal [sic] enrichment [sic] themselves through a series of unlawful schemes to obtain the trademark HoloDeck." (Compl. ¶ 35.) Plaintiff does not explain what the alleged "schemes" were, what their aim was, why they were "unlawful," how this relates to an "attempt to monopolize," or indeed what any of this means.

The only other allegation in the Complaint specifically mentioning Defendant E&S, also in Count III, is that "Evans & Sutherland, a defense contractor, agreed to license the trademark HoloDeck to Macedonia in return for continued government funding." (Compl. ¶ 39.) Again, this statement appears to be unrelated to the subject of Count III, which is an alleged "attempt to monopolize" and an "interference with interstate commerce." The statement that E&S agreed to license a trademark does not describe an illegal or actionable act or omission, and the assertion does not appear to be related to the other assertions in Count III, or to anything else in the Complaint.

On balance, the allegations against E&S in Count III sound as though Plaintiff is just spinning out legal-sounding buzz words he picked up somewhere, such as "interstate commerce," that he hopes add up to a cause of action. Read separately or construed as a whole, Plaintiff's allegations about E&S do not describe any tort, breach of contract, or other cognizable cause of action, and overall are just unintelligible. The allegations do not describe or constitute claims for which relief can be granted.

This is extremely prejudicial to E&S, since E&S is now placed in the position of retaining counsel to defend its interests, and thereby expending attorney fees. Yet E&S can only guess at what Plaintiff is contending about E&S, if anything, that would yield civil liability of $3 million. As noted below, Plaintiff has made a practice of representing himself in lawsuits containing unsupported, "blunderbuss" accusations against corporate and other defendants. Plaintiff is presently engaged in an abuse of the federal courts, and this Complaint should be dismissed with prejudice.

## II.     ARGUMENT

### A.  The Complaint Should Be Dismissed Because Plaintiff's Complaint Fails to Meet Its Pleading Burden As Set Forth in the Federal Rules of Civil Procedure

The Federal Rules of Civil Procedure provide that a complaint must set forth "a short, plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "The purpose of pleading is to give an adverse party fair notice of the claim so as to permit the party the opportunity to file a responsive answer [and] prepare an adequate defense." Shirk v. Garrow, 505 F. Supp. 2d 169, 172 (D.C. 2007). Plaintiff's Complaint fails to state a claim against E&S and as a result, E&S is unable to file a responsive answer or prepare an adequate defense.

In order for a complaint to survive a motion to dismiss for failure to state a claim upon which relief can be granted, the plaintiff must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. at 173. Defendant makes two factual assertions against E&S. The first allegation is that "Edelman, Macedonia and Evan [sic] & Sutherland engaged in an unlawful conspiracy to personal [sic] enrichment [sic] themselves through a series of unlawful schemes to obtain the

3

trademark HoloDeck." (Compl. ¶ 35.)  Plaintiff does not offer any specific information, such as dates, people or places, that would inform E&S as to what this allegation refers, or permit a factual investigation and preparation of a defense.  Defendant is unable to determine from the Complaint what actions, if any, it participated in that could even be described as an "unlawful conspiracy."  Likewise, Plaintiff has not described any "unlawful schemes" or provided any details related to this conclusory assertion.  E&S cannot ascertain from the Complaint what Plaintiff's claim is or whether Plaintiff even has a legally cognizable claim.

Plaintiff's second allegation against E&S also fails to state an actionable claim. Plaintiff states that E&S "agreed to license the trademark HoloDeck to Macedonia in return for continued government funding." (Compl. ¶ 39.)  Plaintiff offers no source for this information, such as a contract with Dr. Macedonia, or any other details.  Even taking this assertion as true, there is nothing per se wrong with licensing a trademark to another person.  Without more, Plaintiff has failed to state an actionable claim.

Dismissal of a complaint is appropriate when it contains "vague and conclusory accusations and no specific facts regarding alleged wrongdoing [and] does not allow a defendant to frame a defense."  Shirk, 505 F. Supp. 2d 173.  In the Shirk case, the counter-plaintiff failed to identify any statutory or common law basis for the defendant's liability, and also failed to assert facts that would outline elements of a cause of action. Id.  As in Shirk, this Motion should be granted because Mr. Solomon has not identified any legal basis for his claims or any facts that could amount to a legal claim.  Plaintiff's Complaint is so "confused, ambiguous, vague, [and] otherwise unintelligible that its true substance, if any, is well disguised."  Ciralsky v. CIA, 355 F.3d 661 (D.C. Cir 2004).

Even if viewed with charity, Plaintiff's allegations still are little more than legal conclusions. This is inadequate to satisfy Plaintiff's pleading burden under Rule 8. <u>Shirk</u>, 505 F. Supp. 2d 173 (assertion of mere legal conclusions is inadequate to satisfy Rule 8); <u>see also</u> <u>Vicom, Inc. v. Harbridge Merch. Servs., Inc.</u>, 20 F.3d 771, 775 (7th Cir. 1994) (opposing party must be able "to understand whether a valid claim is alleged and if so what it is"). Accordingly, the Complaint should be dismissed with prejudice.

### B. **Plaintiff Solomon Is Engaged In An Abuse Of The Federal Court System**

E&S has determined that Plaintiff makes a practice of filing similarly nonspecific and legally inadequate Complaints in other federal courts against corporate defendants, always representing himself. Attached hereto as Exhibit A is a Complaint filed by the Plaintiff herein, Dennis J. Solomon, in the U.S. District Court for the District of Massachusetts. Mr. Solomon named 44 Defendants, plus 10 John Doe defendants. Just as in this case, the Exhibit A complaint describes a multiplicity of dark "schemes," "conspiracies," and suspicions of improper conduct by the defendants that allegedly injured Plaintiff's interests. Just as in the present suit, the Exhibit A complaint contains few actual facts, and is mostly comprised of attempts by Plaintiff to state conclusions of "law."

Mr. Solomon has also sued Raytheon, Inc. in the same federal court for various alleged "torts" and "monopolistic" behavior, and always in the most conclusory terms possible. <u>See</u> Exhibit B.

In another action against several dozen defendants filed in the United States District Court for the District of Massachusetts, Mr. Solomon's complaint was dismissed by the Court with prejudice, and he was enjoined from filing further complaints related to

the same subject matter, apparently because the Court viewed his behavior as harassing and improper. <u>See</u> Exhibit C at 2. In dismissing Mr. Solomon's complaint, the Court noted with apparent approval the comment of one of the defendants that Mr. Solomon is "a serial filer in the federal courts." The Court characterized the allegations of conspiracy in the dismissed complaint as follows:

> The conspiracy, which traces its origins to senior officials in the Nixon administration, has had its hand in a plethora of nefarious deeds, among them murder, assassination, skullduggery, and base intrigue. It is peopled with a colorful cast of prominent personalities that includes judges, professors, public officials, organized crime figures, spies, and international terrorists.

Exhibit C at l.

These complaints are very similar to the Complaint filed in the instant action in that many grievances and dark suspicions are asserted against a multitude of defendants, but few actual facts are offered. The Complaint in this action, to say the very least, is not supported by a reasonable investigation of the facts and thereby violates Fed. R. Civ. P. 11. Plaintiff is plainly engaged in an abuse of the federal court system, to the prejudice of all defendants, including Evans & Sutherland. This should not be tolerated by this Court, and the instant Complaint should be dismissed with prejudice.

WHEREFORE, Defendant Evans & Sutherland Computer Corporation respectfully requests this Court to dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted,

Date:  January 28, 2008

Brian W. Craver
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C.  20006
(202) 466-4434 (Tel.)

Attorneys for Defendant
Evans & Sutherland Computer
Corporation

EXHIBIT A

1:07-cv-01811-EGS

UNITED STATE DISTRICT COURT
DISTRICT OF EASTERN MASSACHUSETTS

_____

DENNIS J. SOLOMON,
                Plaintiff

                v.                                    Civil Action No.

CHARLES VEST
MIT
LITA NELSON
RAYTHEON, INC.
DENNIS PICARD
TELEDYNE, INC.
RICHARD SIMMONS
NATASHA LISMAN
ROBERT LAWLESS
ACTUALITY SYSTEMS, INC.
GREG FAVALORA
ROBERT RYAN
THE OFFICE/ELLIS OFFICE SYSTEMS
TEXAS INSTRUMENTS, INC.
PRODUCTIVITY SYSTEMS, INC.
DANA DUDLEY
PAUL KILLEEN
ALAN MORSE
STEPHEN MINDICH
ORIT GADIESH
MARY WOLFSON
PATRICK E. MALLOY
MICHAEL A. MCMANUS
WERNER ERHARTD/EST/LES
MARK MORDECAI
KEITH LONG
JOHN VINTON
CRAN BARRY, INC.
ROBERT ELLIS
RICHARD PLOTKIN
ALTMAN, INC.
ROBERT GOLDEN
RODNEY GOULD
ELLIE ALTMAN
ROBERT PUJOL
RODNEY GOULD
LIGHTSPACE, INC.
ALAN SULLIVAN
SUNRISE SYSTEMS, INC.
MICROVISION, INC.
RICHARD RUTKOWSKI

1

JOEL KOLLIN
UNIVERSITY OF SOUTHERN CALIFORNIA
SCOTT EDELMAN
JOHN AND JANE DOE 1-10
          DEFENDANTS.

---

COMPLAINT

DEMAND FOR JURY TRIAL

Plaintiff Dennis J. Solomon hereby demands a jury trial and avers as follows:

PARTIES

Plaintiff

1.  Plaintiff Dennis J. Solomon is an inventor with a residence in Yarmouth Port, MA. He attended Massachusetts Institute of Technology (MIT) as an undergraduate and the MIT Sloan Graduate School of Management Executive Program in 1988 and 1989. During the 1980's, Solomon developed an advanced three dimensional display with broad applications including medical imaging, air traffic control and missile defense. During 1989, the Secretary of the Navy deemed Solomon's technology of critical importance, and during 1992, a United States Air Force review concluded the architecture was substantially superior to the Defendants' existing technology.

2.  Solomon was a vocal supporter of MIT Professor Theodore Postol — a major critic of Raytheon's Patriot Missile program, and independently involved in a dispute with Raytheon in 1993 over the related system for airspace object identification and missile control. In the matter of Volumetric Imaging, Inc. v Raytheon et al., USDC 97-11817-GAO, Solomon moved [USDC Docket , Paper 38-1, Addendum Exhibit 2] to modify the protective order for the sole purpose of presenting information related to the deficiencies in Patriot control system in camera to the select United States Senate Armed Services committee. Judge O'Toole denied the motion on June 3, 1998. Implementation of the recommendations would have prevented the "friendly fire" deaths of three coalition pilots. [See Exhibit One]. As a result of the success of Solomon's inventions, his inventions and economic efforts have been drawn into this economic, political and actual war between the corrupt Defendants and various governments and agencies.

Defendants

3.  Defendants are members in an ongoing corrupt organization engaged in unlawful schemes to defraud the United States, endanger its citizens, and unlawfully interfere with the interstate commercial activities of the Plaintiff and others. All the defendants are directly connected though the Atlantis Weathergear persons, including former Assistant to President Reagan Michael McManus, their interstate banking and medical activities, or their investments in MIT 3D holographic and display technology.

2

4. Defendant Charles Vest is a politically active administrator and holographer without any significant patents or other leading technological achievements. From 1968 to 1990 he was associates with the University of Michigan. From 1990 to the present, he has been employed by M.I.T. as president. On June 27, 1990, MIT Tech Talk published the MIT Collective investigation of Vest as "very political …a Teflon administrator … [and] nebish technocrat". He knowingly and criminally received bribes and promises of future employment in consideration for mounting an attack on the credibility and attempting the entrapment of MIT Professor Theodore Postol.

5. Defendant Massachusetts Institute of Technology (MIT) is a non-profit, educational institution. In 1990 and 1991, MIT licensed two unclaimed patents issued in 1980 and 1987, respectively, to Solomon for the remainder of their term.

6. Defendant Teledyne is believed to be a Delaware corporation with offices in Massachusetts, New Hampshire, and California.

7. Defendant Richard Simmons has been employed as in the administration of the Teledyne companies as President.

8. Defendant Microvision, Inc. is believed to be a Washington corporation with office in Seattle, Washington.

9. Defendant Richard Rutkowski has been employed as in the administration of the Microvision, Inc. of the State of Washington as President. Previously, he was an officer of Data Display Corporation of Dallas, TX. Rutkowski paid $200,000 to Defendant Sunrise to obtain Solomon's trade secrets.

10. Defendant Joel Kollin claims to be the original patentor associated with Microvision, Inc. He previously studied at MIT under Stephen Benton where he was acquainted with agents of Morse. He is also believed to have worked with Adam Weinberg, formerly of Reebok on advertising displays. Kollin received detailed information regarding Solomon's inventions from parties' associates with Hahn, Morse and others.

11. Defendant Alan B. Morse is a former President of U.S. Trust Company of Boston, president of Harvard Community Health Plan during its bankruptcy, and Massachusetts banking commissioner doing the investigation of U.S. Trust Company. Morse was presented at meeting in 1982 where Solomon presented his HoloDeck Volumetric technology. From 1982 to the present, he has conspired with the Defendants including his niece and nephew, Katherine and Robert Hahn, children to the late Yale Mathematics Professor Otto Hahn, to obtain and convert Solomon's trade secrets.

12. Defendant University of Southern California is a non-profit, educational institution. It does not manufacture or sell 3D displays. USC, with no direct standing or financial interest, knowingly and willfully conspired with the other Defendants to unlawfully opposed the grant of the trademark HoloDeck when they know or should have known that a majority of its relevant staff had no prior recognition of the trademark, and amended for the unlawful purpose of obtaining Solomon's trade secrets and to interfere the business relations of Solomon.

13. Defendant Scott Edelman is believed to be an attorney with the firm Gibson, Dunn and Crutcher, representing Teledyne and USC.

14. Defendant Actuality Systems, Inc. is believed to be a Massachusetts corporation with office in Burlington, MA.

15. Defendant Robert Ryan is believed to be the principal financier and Chairman of the Board of Actuality Systems, Inc. Prior to Actuality he was employed by Digital Equipment, Inc. and founded Ascent.

16. Defendant Greg Favolora is believed to be a resident of Massachusetts and a founder of Actuality Systems, Inc. While a student at Yale, he received information from associates of Morse regarding Solomon's inventions and pending patents. He fraudulently claimed and promoted Solomon's technology as his own.

3

17. Defendant Lightspace Technologies, Inc. (hereinafter referred to as "Lightspace") is believed to be a foreign corporation with employees and agents in Massachusetts and offices in Connecticut and Sweden.

18. Defendant Alan Sullivan is believed to be a founder and employee of Lightspace. Sullivan knowingly conspired with Texas Instruments, Inc. to mislead the relevant consumers regarding the origin and invention of technology developed by Solomon by fraudulently conveying, suggesting, supporting and funding an MIT thesis project incorporating Solomon's technology.

19. Defendant Raytheon is believed to be a Massachusetts corporation with offices in Waltham, MA.

20. Defendant Dennis Picard has been employed during the relevant period as president of the Raytheon.

21. Defendant Stephen Mindich of Newton, MA is believed to be the owner of the Boston Phoenix (formerly Boston After Dark), a Boston tabloid, husband to former Judge Maria Lopez and a close friend of Mary Wolfson. In the early 1970's, Solomon supported Mindich's competitors, the Cambridge Phoenix and the Real Paper. Since the 1970's, Mindich has maintained a dossier on the drug use of Boston area students, especially at Harvard's Law and Business Schools, and used the Atlantis cartel to provide drugs to politicians, judges, rock stars, and other personalities.

22. Defendant Mary Wolfson of Boston, MA is believed to be a close friend and business partner of former Judge Maria Lopez and Stephen Mindich. In 1995, Wolfson introduced herself to Solomon at a seminar on the Israeli evaluation of the Patriot Missile.

23. Orit Gadiesh is believed to be a close friend of Stephen Mindich and Maria Lopez, and the former president of Bain and Company. In 2004, Gadiesh failed to respond to a written request for clarification by Solomon. Gadiesh is believed to have used her Bain and personal contacts to unlawfully conspire to obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

24. Sunrise Systems, Inc. (hereinafter called "Sunrise") is believed to be a Massachusetts corporation manufacturing LED signs. During the 1990's, Sunrise manufactured HoloDeck Volumetric Displays and other experimental items for Solomon.

25. Defendant Michael A. McManus, Jr. is believed to have been born in Boston, MA and regularly visits the Commonwealth of Massachusetts. In 1976, McManus, an attorney, counseled his close friend, Patrick E. Malloy III in the unlawful freeze-out the Solomon and other minority shareholders in Atlantis Weathergear, a company Solomon founded. During the period from 1975-1977, McManus was special counsel to Rogers Morton, Secretary of Commerce and a Maryland boat builder. McManus has been identified as a principal player in the Inslaw software scandal involving the murder of Daniel Casolaro.

26. Patrick E. Malloy III is believed to be a resident of Southampton, N.Y. and the developer of Malloy Wharf in Sag Harbor. During the 1980's, Malloy was a major participant in the famous Amazon Club, a nightclub on Malloy Wharf, owned in part by Preston Powell, grandson to Congressman Adam Clayton Powell.

27. Mark Mordecai, raised in Newton, MA was a shareholder of Atlantis and operated the Atlantis Cartel for Malloy, a major narcotics trafficking operation involving Palestinian, Pakistani, Moroccan, and Malaysian operatives. In 1985, he instructed his parents, Herbert and Eileen Mordecai to move to Yarmouth Port, MA, less than 1 mile from a summer residence of Solomon.

28. Productivity Systems, Inc. is believed to be a Texas corporation, a wholly-controlled, subsidiary of Texas Instruments, Inc. and during the relevant period, the TI required source for the Discovery products.

29. Dana Dudley is believed to an employee of Texas Instruments, Inc. responsible for the Discovery DMD program.

30. Altman Stage Lighting Company (hereinafter called "Altman") is believed a New York corporation engaged in the manufacture and sale of lighting fixtures for stage, theater, television and the music industry.

31. Elle Altman is believed to be an owner of Altman.

32. Roger Pujol is believed to be an employee of Altman.

33. Werner Erhard is believed to be a foreign resident and during the relevant period conspired and directed his disciples and associates in EST and Landmark to unlawfully obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

34. Landmark Educational Corporation is believed to a wholly control corrupt organization of Erhard and a conspirator to unlawfully obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

35. John and Jane Doe 1-25 are believed to be co-conspirators and agents of the Defendants.

36. The "Atlantis Cartel" is an ongoing corrupt organization engaged in interstate narcotics trafficking, and the interference with interstate commerce by acts of violence, intimidation, theft, and destruction of property in violation of 18 USC 1961 et al.  The criminal organization evolved from the merger of the Mordecai cartel of the late 1960s involving the trafficking of hashish from Morocco through Palestinian and Lebanese affiliates, and the Malloy/McManus cartel trafficking heroin from Southeast Asia in the mid-1970s.  The principal trafficking parties, Mordecai, Malloy, McManus, Altman, Werner Erhard, and Mindich have known each other for decades. The principal industrial parties came together after McManus, former Assistant to President Reagan, and Malloy participated in the Aga Khan's Sardinia Cup sailboat race in 1980, and financed in part the Center for Islamic Architecture and the Media Lab at MIT. McManus has been implicated in the PROMIS scandal by former Attorney General Elliot Richardson, once his superior at the Commerce Department, and the unlawful misappropriation of U.S. funds to billionaire Rafik Hariri, former prime minister of Lebanon.  In the late 1980's, members of the Atlantis Cartel were indicted and convicted of trafficking over $700 million dollars in hashish from Pakistan to the northeast United States.

## NATURE OF ACTION

37. In this action, Solomon seeks a declaratory judgment of patent noninfringement, invalidity, and unenforceability of the herein named United States Patents pursuant to the Declaratory Judgment Act, 28 U.S.C. $5 2201-02, and the Patent Laws of the United States, 35 U.S.C. 100 et seq., and such other relief as the Court deems just and proper.

38. This action also seeks a permanent injunction prohibiting the Defendants from engaging in further unlawful schemes and redress for fraudulent schemes to steal trade secrets, interfere with present and future beneficial relationships, other unfair business practices, injure to Solomon's business and property, and such other relief as the Court deems just and proper.

39. Solomon also avers that the Defendants, knowingly and fully aware of the consequences, engaged in a conspiracy and ongoing interstate, criminal enterprise ("the Atlantis Cartel") of interference with government research, contracting and acquisition, and the unlawful acts against and intimidation of competitors by violence, theft mail and wire fraud.  This acts directly resulted in the criminally negligent murder of three U.S. and British coalition pilots by Raytheon's Patriot missiles in 2003, (reported in the CBS 60 Minutes presentation the deaths of at least 14 U.S. National Guard in Saudi Arabia in 1991, and attempted entrapment of MIT Professor Theodore Postol, and former CIA Director John Deutch. Solomon seeks a permanent injunction prohibiting the Defendants from engaging in further unlawful schemes, conspiracies, entrapments, violence and threats of violence and redress for injure suffered to his business and property.

## JURISDICTION

40. This Court has subject matter jurisdiction over the subject matter of this action under 28 U.S.C. § 2201-02 and 28 U.S.C. § 1331, 1332 and 1338(a).

## VENUE

41. Venue is proper in this judicial district under 28 U.S.C. § 1391, 1965. Personal jurisdiction exists in Massachusetts over MIT, Raytheon, TI, Teledyne, Actuality Systems, Vest, Picard, Favalora, Altman and other defendants by virtue of residence in or substantial commercial contact with this District.

## BACKGROUND

42. Exhibit 1 is a true and accurate copy of the transcript of a CBS 60 Minutes presentation,

43. During the early 1970s, the Plaintiff Solomon was employed by EMS, Inc. (Eastern Mountain Sports, Inc.) in various capacities including at times as Director of Research, Design, & Development, Director of Advertising, and Boston Store Co-Manager. As Director of Advertising, Solomon supported the Cambridge Phoenix newspaper as opposed to Boston After Dark, owned by Stephen Mindich. In the battle after Mindich's purchase of the Phoenix, Solomon supported its competitor, the Real Paper. Solomon's partner in Atlantis Weathergear, defendant Mordecai, supported Mindich.

44. As Director of New Products, Solomon visited Grand Rapids, MI to develop down products manufacturing – a project which came to the attention of Congressman Gerald Ford. Solomon left EMS in 1973 to found Atlantis Weathergear – whose designs received accolades from the America's Cup teams in 1974. Atlantis products were manufactured by Alb, Inc., a Somerville, MA police, fire coat and L.L. Bean outerwear manufacturer with friendly ties to the Winter Hill mob of Whitey Bulger, and Monsoon, Inc. of Richford, Vermont, an outerwear manufacturer with ties to Space Research Company owned by "Super gun" scientist, Gerald Bull. Atlantis' success came to the attention of Michael A. McManus, Boston born attorney who was special counsel to Ford's Secretary of Commerce, Rogers Morton, also a boat builder from Maryland, and then Elliot Richardson. McManus's close friend and partner, Patrick E. Malloy III, approached Atlantis to anchor a marine wharf development in the center of Sag Harbor, N.Y. Malloy subsequently invested in Atlantis.

45. During the fall of 1975, defendants Malloy, McManus, and Mordecai devised a scheme to freeze-out Solomon. Timothy Davis of Stowe, VT, the general manager of Atlantis at the time, was a Harvard Business School classmate of the present President George W. Bush. At a special stockholder's meeting called by Malloy and Mordecai on January 19, 1976, Davis reported that the company was during extremely well: growing at 400% and showing its first profit. Malloy, contradicted Davis, and claimed the company was in "dire straits" and threatened to call short term demand notes due him secretly executed by Mordecai and Malloy two months earlier to replace revolving inventory and receivables bank financing. When Solomon asked that the meeting be suspended for 10 days for an accounting, Malloy objected and with Mordecai's vote, sold all the assets to himself. Litigation ensued, and Solomon's expert witness, MIT Sloan Professor Michael van Breda testified that the company was a typical "successful start-up" with sufficient resources to continue without additional financing for at least 6 months. The Court found for Solomon and stated that the sale of assets "displayed itself as a badge of fraud."

46. Following the "freeze-out" of minority shareholders in Atlantis, Solomon returned to MIT and the Marine Biological Laboratories in Woods Hole, MA, where he studied marine biology.

6

47. Malloy, through his sister-in-law, contacted defendant Werner Erhardt, founder of EST and Landmark Educational Associates. Acting through a number of post-doctoral scientists at the Marine Biological Laboratories, Erhardt invited Solomon to attend with 1980 America's Cup aboard the flying bridge of famed yachtsman, Richard "Dick" Bertram. Solomon attended and an intellectual fight ensued with Erhardt.

48. At the time, Solomon was consulting to CB Sports, Inc. of Bennington, VT, a skiwear manufacturer with close ties to the Portillo Ski Resort in Portillo, Chile. The operational executive, Wayne Wetzel, a Harvard Business School graduate from Warwick, RI, maintained close ties to Raymond Patriarca, Jr., a son of the RI Mafia head. Following the success of Solomon's designs at the 1980 America's Cup, Wetzel unilaterally repudiated the royalty provision of the contract.

## The Atlantis Cartel

49. From 1973 to the present, Mordecai, and later Malloy, McManus, Kollin, Wetzel, Vinton, Plotkin and other persons, conspired in an ongoing criminal narcotic enterprise for personal enrichment including the importation of substantial amounts of hashish through Lebanon and Morocco, and, continuing during McManus's employment as Assistant to the President of the United States from 1982-1985, exchanging arms for drugs and currency support of anti-Soviet mujhadden in Afghanistan including Usama Bin Laden. From 1988 to the present, the Defendants have engaged in narcotics trafficking with U.S.-based Israeli, Palestinian, and Egyptian terrorists, including Yonkers, NY World Trade Center bombers, Mohammed Saleh, Ramzi Yosef, and Khalid Mohammed.

50. This corrupt enterprise is known as the "Atlantis cartel" and evolved from the Harvard Law School-based enterprise providing recreational narcotics to the Cambridge and Boston colleges through the Boston Tea Party, a nightclub owned by Harvard Law graduate, Circuit Judge Roy Riepen.

51. In order to prevent their indictment, the Defendants double-crossed two of their expendable satellite groups involving Sidney Lewis of Falmouth, MA and Stuart Newton of Jamestown, RI. Both Lewis and Newton were indicted and convicted of narcotics trafficking from Pakistan in excess of $100 million dollars. Principal distribution of said narcotics was through the Amazon nightclub located in the Atlantis complex on Malloy's Wharf, Sag Harbor, New York, the Compass Lounge in Yarmouth, MA, the Boston Phoenix paper distribution, the adjoining Boston Cab Company and other affiliates of the Defendants. Among the individuals indicted were persons appearing in the 1974 Atlantis Weathergear catalog. Following their release, the individuals assembled an extensive dossier on corrupt officials and their associates, including their detailed phone and bank records. Among the individuals named are: Supreme Court Justice Stephen Breyer, Boston lawyer John Rehnquist, and former Massachusetts Judge Maria Lopez.

52. The Atlantis Cartel was also responsible for the entrapment of Vermont Supreme Court Justices Gibson, Hayes and Hill and their subsequent conviction or reprimand.

53. The Defendants also operated an illegal enterprise engaged in the trafficking of cocaine from South America. Distributors included John Zaccaro (the "pharmacist"), son of Geraldine Ferraro, then a student at Middlebury College. Principal method of transport involved ocean tugs employed by the oil industry. Presently, Ferraro remains a corporate director of Goodrich Petroleum, a publicly traded oil exploration company in the Gulf of Mexico, controlled by Defendant Malloy.

54. The Defendants' criminal enterprise entwined itself with the U.S and foreign intelligence communities including the Irish UNFIL soldiers, German, Italian, Russian, Lebanon and Israeli agents. These connections were publicized by activities of the late Attorney General Elliot Richardson following the appointment of a special prosecutor in the PROMIS affair.

Commencing with the indictments of the Atlantis Newton cartel in the late 1980s, the Defendant's systematically double-crossed their collaborators resulting in the deaths of at least five UNIFIL Irish soldiers, numerous Israelis, Lebanese, Canadians and Americans.

55. The Defendants, including McManus, whose activities include the research and development of biological warfare agents and equipment related to cell transformation (cancer) and cardiac arrhythmias (heart attacks), has been implicated in the deaths of journalist Daniel Casolaro, arms scientist Gerald Bull, attorney Barbara Salken, Dutch intelligence officer Sjord Lundberg, and Harvard scientist Dr. J. Morris Weinberg.

56. On or about May of 1997, Solomon advised the FBI that Yonkers-related WTC terrorists were actively involved in continuing narcotics trafficking through the Atlantis Cartel and clubs such as the "Golden Nugget" in Yonkers, NY; interested Ultralight and glider aircraft motors, and developing Boston connections. Khalid Shaikh Mohammed, the disco-loving, North Carolina educated, mastermind of 9/11 was a related member of this wing, with contacts at the Boston Cab Company and in Newton Highlands, MA.

57. On or about May of 1999, Solomon advised the FBI, U.S. Representative Michael Meehan and other government officials of his knowledge and belief that adversaries of the Atlantis Cartel were assembling sophisticated missile guidance modules using Dutch and German electronic components.

58. It is the Plaintiff's belief and opinion that Defendants' criminal acts directed at MIT Professor Theodore Postol has caused the spontaneous involvement of over 80% of the academic, scientific and engineering community to independently devise methods to neutralize the Defendant corporations, Raytheon, Teledyne and Texas Instruments. Historically, among these methods has been the introduction of undocumented exceptions and "back doors" in critical software. The relevant complexity of government operations are described in the novel "Where the Sun Don't Shine" by Fred Wefer and other publications.

59. It is the Plaintiff's belief and opinion that the Mindich and the Atlantis Cartel have maintained dossiers on the recreational narcotic use by public officials, judges and attorneys , especially law students at Boston College, Harvard and Yale, including Allan Desherwitz, Stephen Breyer, John Kerry, Robert Lawless, John Zaccaro, John Buckley, George W. Bush, Jeb Bush, John Rehnquist, Eugene Scalia, William LeBlond and many others, which have been used to unlawfully influence their official actions.

60. It is the Plaintiff's belief and opinion that with the increasing the revenue stream from the narcotics trade falling under European government and intelligence community control, where certain recreational narcotics are legal and widely available, and has resulted in substantial competition for the "Atlantis Cartel". Simultaneously, the independence of the Bush administration has resulted in a substantially reducing the Defendants' ability to intimidate or influence high government officials. Further, the complicated and deadly results of the Defendants' corrupt activities involving the national and international intelligence community, have created a series of dynamic alliances which are systematically assassinating the Defendants and their co-conspirators using the most sophisticated technology available, and planning terrorist activities against the United States including sophisticated cruise missiles armed with bio-terror agents aimed at specific offices.

### Declaratory Judgment: Patents

## COUNT I (RAYTHEON, TEXAS INSTRUMENTS)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of Actuality U.S. Patents)

61. Aforementioned paragraphs are incorporated by reference as if stated fully herein.
62. On May 31, 1994, Solomon filed a U.S. Patent Application entitled Three Dimensional Volumetric Display System with Polarizing Enclosure. Figure 11 of said application teaches Solomon's earlier invention of a "system for increasing the control of visual intensities from digital shutter projection devices" wherein digital shutter array is sequentially illuminated by different intensities encoded "in a binary scheme of 1,2,4,8 ...etc  A variation is the rotating color shutter on the light source with a binary scheme for each color."
63. The '94 application restates material presented by Solomon to Texas Instruments and Raytheon engineers during the period from approximately March 1990 to June 1993.
64. On December 21, 1994, Raytheon filed U.S. Patent Application 08/360,870, now U.S. Patent 5,903,323 entitled a "Full Color Sequential Image Projection System Incorporating Time Modulated Illumination."  Said '323 patent claims a binary modulation system identical to that disclosed to Raytheon by Solomon more than a year earlier.
65. Raytheon had a duty to and intentionally failed to disclose Solomon's identical prior art to the U.S. Patent office during the prosecution of the '323 patent.
66. Raytheon has claimed to Solomon and others that U.S. Patent '323 is valid and enforceable.
67. Solomon has a reasonable apprehension of being subject to a suit for infringement of said patent due to the prior notice of enforceability by Raytheon.


## COUNT II (ACTUALITY)

(Declaratory Judgment Action for a Declaration of Non-infringement, Invalidity, and Unenforceability of Actuality U.S. Patents)

68. The aforementioned paragraphs are incorporated by reference as if stated fully herein.
69. Favalora and Actuality claim to be the true and original inventors of the following inventions: U.S. Patent No. 6,570,681; 6,554,430; 6,512,498; 6,489,961; 6,487,020; 6,183,088
70. Solomon is manufacturing and offering for sale an Integrated HoloDeck Volumetric Autostereoscopic Display and Projector System
71. Actuality has communicated that Solomon's Integrated HoloDeck Volumetric Autostereoscopic Display System infringes on Actuality patents and that it will rigorously prosecute infringers.
72. Solomon believes that the Actuality patents read upon or incorporate his earlier-filed inventions described in his U.S. patent applications filed in 1985 and thereafter.
73. Solomon has a reasonable apprehension that Actuality will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Actuality and Solomon within the meaning of 28 U.S.C. § 2201
74. Solomon has not infringed any valid and enforceable claim of the aforementioned patents, either literally or under the doctrine of equivalents
75. The Actuality patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Actuality had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.
76. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.
77. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

COUNT III
(MICROVISION, INC., UNIV. OF WASHINGTON, KOLLIN, ET AL)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and
Unenforceability of Actuality U.S. Patents)

78. The aforementioned paragraphs are incorporated by reference as if stated fully herein.
79. From 1984, Solomon disclosed his invention of retinal scanning displays with dynamic accommodation and resonant scanners to staff and faculty at MIT.
80. Joel Kollin was a student at MIT and had access to Solomon's inventions disclosed at MIT including Solomon retinal scanning system. On or about September, 1989, Kollin left MIT for the University of Washington, Seattle.
81. Richard Rutkowski is the president of Microvision of Seattle, WA, a licensor of retinal scanning patents granted to Kollin.
82. Prior to Microvision, during the late 1980s and early 1990s, Rutkowski was an officer of Data Display, Inc. of Texas, a customer of Sunrise Systems, Inc. of Pembroke, MA., whom Rutkowski regularly visited.
83. In the early 1990s, Sunrise Systems manufactured prototypes of LED based experiments for Solomon including retinal scanning displays.
84. Solomon's relevant inventions and experiments were known to Defendants', their staff, employees, faculty, agents and others prior to their filing the relevant patent applications.
85. In 1995, Rutkowski paid Sunrise Systems, Inc. over $200,000 for having provided unlawful access to Solomon's trade secrets related to displays and retinal scanning.
86. Microvision and the University of Washington claim to have the assignment of, or to be the true and original inventors of the following inventions by the Defendants:
6,768,588; 6,762,867; 6,755,536; 6,752,496; 6,734,835; 6,719,425; 6,714,331; 6,710,342; 6,700,552; 6,700,552; 6,687,034; 6,682,192; 6,674,993; 6,661,393; 6,654,158; 6,653,621; 6,650,877; 6,639,719; 6,639,570; 6,612,355; 6,605,805; 6,583,772; 6,563,105; 6,563,105; 6,560,028; 6,538,625; 6,535,325; 6,535,183; 6,525,310; 6,515,781; 6,515,278; 6,512,622; 6,497,649; 6,445,362; 6,433,907; 6,417,502; 6,396,461; 6,392,231; 6,388,641; 6,384,406; 6,369,953; 6,362,912; 6,352,344; 6,331,909; 6,324,007; 6,317,103; 6,294,775; 6,294,775; 6,285,505; 6,285,489; 6,281,862; 6,256,131; 6,250,755; 6,245,590; 6,243,186; 6,220,711; 6,204,832; 6,204,829; 6,196,226; 6,188,832; 6,166,841; 6,157,352; 6,157,352; 6,154,321; 6,151,167; 6,145,986; 6,140,979; 6,097,353; 6,069,725; 6,061,163; 6,049,407; 6,046,720; 6,043,799; 6,008,781; 5,995,264; 5,982,555; 5,982,528; 5,969,871; 5,958,919; 5,903,397; 5,903,397; 5,903,397; 5,719,784; 5,701,132; 5,659,327; 5,596,339; 5,560,360; 5,467,104; 5,171,267.
87. Solomon is manufacturing and offering for sale an Integrated HMD Autostereoscopic Display and Projector System
88. Defendants have communicated that Solomon's Integrated HMD Autostereoscopic Display System infringes on Defendants patents and that it will rigorously prosecute infringers.
89. Solomon believes that the Defendants' patents read upon or incorporate his earlier-filed inventions described in U.S. patent applications filed in 1990 and thereafter.
90. Solomon has a reasonable apprehension that Defendants' will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201
91. Solomon has not infringed any valid and enforceable claim of the patents, either literally or under the doctrine of equivalents
92. The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed

to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

93. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

94. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

### COUNT IV
### (Lightspace)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of U.S. Patents)

95. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

96. Solomon is manufacturing and offering for sale an Integrated SS Autostereoscopic Display and Projector System

97. Defendants have communicated that Solomon's Integrated SS Autostereoscopic Display System infringes on Defendants patents and that it will rigorously prosecute infringers.

98. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

99. Solomon believes that the Defendants patents read upon or incorporate his earlier-filed inventions described in U.S. patent applications filed in 1990 and thereafter.

100. Solomon has a reasonable apprehension that Defendants will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201.

101. Solomon has not infringed any valid and enforceable claim of the Defendants' patents 6,466,185, 6,377,229, 6,100,862, either literally or under the doctrine of equivalents.

102. The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

103. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

### COUNT V
### (Altman, Pujol, Golden Et Al)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of related Altman Patents)

104. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

105. Solomon is manufacturing and offering for sale an Integrated SS Autostereoscopic Display and Projector System.

106. Altman owns U.S. Patents 6,671,005 and 6,412,972.

107. Solomon has a reasonable apprehension that Defendants will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201.

108.    Solomon has not infringed any valid and enforceable claim of the Defendants' patents, either literally or under the doctrine of equivalents.

109.    The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

110.    A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

COUNT V
(Altman, Golden, Gould Et Al)

(Declaratory Judgment Action for a Declaration of Re-assignment of Solomon's Patent and infringement)

111.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

112.    Solomon has been independently involved in concert lighting and effects from the late 1960s.

113.    Solomon is the independent inventor of U.S. Patents 4,958,265, 4,897,770, 4,893,225, 4,811,182, 4,777,568, 4,729,071, 4,706,006 related to lighting systems.

114.    In 1985, Altman principally sold lighting fixtures to traditional stage, theater, film and television customers. During the period from 1984-1990, Solomon entered into a number of contracts, all of which by explicit agreements, differentiated between traditional stage, theater, film, television applications and rock (in the broad context) concert applications.

115.    Altman fraudulently induced Solomon to license and assign said patents to Altman by explicating stating that Altman would bay a royalty of 5% of sales or lease fees, plus the preferred involvement use or equivalent income, on all use, sale or lease of Solomon's inventions for rock concerts, when in fact Altman had no intention to due so.

116.    On or about 1995, Altman unilaterally repudiated said contracts. Thereafter, all use of the Altman fixtures represented the infringement of Solomon's patents.

117.    Said terms of said contracts were not severable.

118.    Thereafter, Altman continued to use Solomon's invention for the rock concert applications including but not limited to the band PHISH. Altman or its agents provided an operator at all such concerts.

119.    On 6/14/2002 and other occasions, Altman used and infringed upon Solomon's inventions by transporting said Altman fixtures to the Tweeter Center in Massachusetts and using same in the performance of the band PHISH.

120.    The minimum damages for each said performance instance of infringement would be $12,000. During the past six years, Altman has infringed at least 400 times.

121.    Robert Golden and Rodney Gould aided and abetted said infringement by intentionally misleading Solomon into believing that said Altman fixtures were not used by the band PHISH.

122.    Altman, Robert Golden and Rodney Gould furthered conspired to damage Solomon's by organizing schemes to obtain Solomon's trade secrets.

·

12

123.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

### Abuse of Process, Interference with Present and Prospective Commercial Relations, Scheme to Obtain Trade Secrets

### COUNT VI
### (All Defendants, USC, Edelman)

124.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

125.    On August 23, 1993, Solomon filed a U.S Trademark application for the stylized word "HoloDeck" for 3D display systems. On May 30, 2000, the application was published for opposition and shortly thereafter the Defendant USC filed an opposition on the grounds the term was generic.

126.    USC counsel testified the Dr. Michael Macedonia, the civilian director of the U.S. Army Simulation Lab and principal grantor in the a $50 million U.S. DOD grant to USC, requested that USC filed the opposition so that he and others could form a private corporation in competition with Solomon.

127.    During discovery, a majority of the relevant staff at USC testified that they were unfamiliar with the term prior to their employment at USC.

128.    Thereafter, Defendants USC acting on behalf of certain government officials, Edelman, Lisman, Lawless, Teledyne TI/PSI and Raytheon agreed to conspire to interfere with the business relations of Solomon by inducing TI/PSI to defraud Solomon by falsely claiming full support and an ongoing solution to the Discovery timing problem.

129.    Shortly thereafter, USC filed an amended opposition claiming failure non-use in commerce and additional discovery for all business records.

130.    Defendant Edelman failed to disclose that his firm represents Defendant Teledyne, a direct competitor of Solomon.

131.    The aforementioned Defendants used the process of opposition as an unlawful scheme to obtain Solomon's trade secrets.

132.    The aforementioned Defendants used the process of opposition as to interfere with the ability of Solomon to raise funds and enter into beneficial contracts for his business.

133.    The aforementioned Defendants knew that Solomon has continuously used the mark "HoloDeck" in interstate commerce, including regular exhibiting at the major U.S. computer graphics show held biannually in Los Angles, a few block from USC.

134.    The aforementioned Defendants engaged in said unlawful activities to defraud the U.S. government of at $50 million dollars and endanger U.S. soldiers and citizens by asserting in their request to the U.S. Government for payment of funds that their display technology was the most appropriate when in fact they knew that their technology was defective and inferior to Solomon's.

135.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

### Fraud, Conspiracy, Interference with Present and Prospective Commercial Relations, Breach of Contract: All Defendants

### COUNT VI
### (TI, PSI)

(Conspiracy, Interference with Present and Prospective Commercial Relations)

136.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

137.    Paragraphs 1 through 40 are incorporated by reference as if stated fully herein.

138.    From 1987 to 1994, Solomon corresponded with Texas Instruments, Inc. regarding the applications of TI's DMD digital shutter array. The parties exchanged non-disclosure agreements but no contract ensued at that time.

139.    Exhibit 2 is a true and accurate copy of a letter dated February 14, 1991 from Texas Instruments to Solomon regarding the development of his 3D volumetric imaging technology.

140.    During the period, Raytheon unlawfully obtained Solomon's trade secrets related to the USAF JSTAR C4I proposal for real-time missile tracking and control. Raytheon, then teamed with TI, and used said technology in its USAF proposal. Solomon protested the project award. As a result, neither TI nor Raytheon would engage in further business with Solomon.

141.    At some time in 2002, TI concluded that Solomon's HoloDeck Volumetric technology was superior to its present clients, Actuality and Lightspace. TI's product manager, Dana Dudley invited and induced Solomon to develop his technology using the TI DMD product.

142.    Solomon informed Dudley of his previous contacts with TI, and explicitly stated that he (Solomon) would do so only if TI guaranteed full and equal development assistance and pricing in relation to all the other DMD projection competitors.

143.    Dudley agreed and explicitly stated to Solomon that TI was interested in fully assisting the development of new and improved technologies using the DMD.

144.    A direct result of Dudley's guarantees, Solomon contracted with TI, through its subsidiary, PSI, to construct real-time, triggerable Discovery system with an advertised rate of at least 4 KHz.

145.    Solomon paid PSI at least $25,000 for the system and expended at least $50,000 in the direct development of the DMD project.

146.    Following the payments, Solomon discovered that the TI/PSI product was defective. He informed PSI and TI of the problem, and both agreed to solve the problem.

147.    However, TI and PSI willfully and intentionally delayed providing a solution, refused to release the technical details which would permit Solomon to identify the problem, and made fraudulent and misleading statements regarding the reasons for the delay.

148.    As a direct and intentional result, Solomon was unable to conduct business with prospective client Boeing, Daimler-Benz and others. Further Solomon was unable present his system at SIGGRAPH 2003.

149.    TI and PSI continued to mislead Solomon during the fall of 2003 and into 2004.

150.    On or about June, 2004, PSI employee Becky Bell stated as a result of an internal dispute with TI, it had ordered PSI to close it doors, and required the transferred all its assets to TI.

151.    During July 2004, Solomon made demand upon TI for technical assistance or replacement. TI refused, claimed that PSI was a separate company, and that TI is not liable for PSI breach of contract.

152.    On or about August 24, 2004, Solomon received a letter from Boston attorney Paul Killeen stating that TI has requested that "any further correspondence about TI and/or its products" be directed to him.

153.    Shortly thereafter Solomon communicated with Killeen and requested the name of the authorizing party at TI. Killeen refused to provide said information.

154.    As a direct and intentional result, Solomon was unable to present his system at SIGGRAPH 2004 and future events..

155.    During the period from July 2003 to the present, Solomon was substantially damaged by the willful and intentional fraudulent inducement and breach of contract, by TI/PSI in an amount in excess of $50,000.

156.    During the period from July 2003 to the present, Solomon was substantially damaged by TI/PSI scheme to obtain trade secrets in an amount in excess of $50,000.

14

157.    During the period from July 2003 to the present, Solomon was substantially damaged by TI/PSI scheme to interfere with business relations in an amount in excess of $50,000.

158.    From August, 2004 to present, Solomon's professional reputation was damaged by TI and Killeen's false statements to representatives of MIT and other public figures.

159.    TI and Killeen engaged in the aforementioned unlawful behavior in conspiracy with the other Defendants to defraud the armed services and agencies of the United States by knowingly promoting inferior products for critical defense, security and medical applications.

160.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## COUNT IV
## (TI, TELEDYNE, LISMAN, LAWLESS, MIT, VEST, RAYTHEON, ACTUALITY, LIGHTSPACE)

(Fraud, Bribery, Conspiracy, Scheme to Obtain Trade Secrets, Interference with Present and Prospective Commercial Relations, Commercial Disparagement)

161.    Aforementioned paragraphs are incorporated by reference as if stated fully herein.

162.    From 1989 to the present, Teledyne, Raytheon, Texas Instruments, Actuality and Lightspace engaged in an unlawful conspiracy to interfere with the interstate commerce of Solomon by fraudulently inducing Solomon, individually, or in his executive capacity, to enter into contracts with the Defendants for goods or services using the U.S. mail and interstate wires, intentionally breaching or repudiating said contracts, and disparaging Solomon's business reputation.

163.    In a first instance, MIT offered Solomon an exclusive license for the Kollin patent, Teledyne offered to manufacture the components, but, when success was insured which would have removed Raytheon from competition, Teledyne breached said contract by supplying defective, uncertified components, and MIT unilaterally repudiated the license on fraudulent and specious grounds.

164.    Teledyne Technologies, Inc., a 1st tier subcontractor to Raytheon, Inc. for simulation systems for the Patriot Missile.[1]

165.    Richard Simmons was the President of Allegheny Teledyne, Inc., parent company of Teledyne Technologies, Inc. During the relevant period of November of 1999, Richard Simmons donated $20 million dollars to MIT.[2]

166.    In consideration for the $20 million dollars and other consideration, Vest authorized MIT to unilaterally repudiate its licensing agreement with Volumetric Imaging, Inc., causing direct injury to Solomon.

167.    In consideration for the $20 million dollars and other consideration, Vest authorized MIT to knowingly promote the fraudulently obtained products of Favalora and Actuality Systems.

168.    In consideration for the $20 million dollars and other consideration, Vest and Morse induced Robert Ryan, Navigator Ventures, Halliburton, Apache Oil to invest in the manufacture of the fraudulently obtained products of Favalora and Actuality Systems.

169.    In a second instance in the period from 2002-2004, TI, in conspiracy with Raytheon and the other Defendants, contracted to supply a high speed shutter system and intentionally to Solomon individually, intentionally supplied a defective product and intentionally obstructed and delayed its perfection.

170.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

---

[1] Teledyne Technologies Annual Report 2003, Pg. 14-15
[2] MIT News, November 17, 1999

## COUNT VIX
### (All Defendants)

(Scheme to Obtain Trade Secrets)

171.    From 1980 to the present, the Defendants including but not limited to Altman, Wolfson, Plotkin, Ellis, Gadiesh, Mindich, Morse, Teledyne, Raytheon, Texas Instruments, Vest, Actuality and Lightspace, engaged in an unlawful conspiracy to obtain the trade secrets of Solomon by fraudulently inducing Solomon to enter into contracts with the Defendants for goods or services using the U.S. mail and interstate wires.

172.    In 1996, Defendants changed strategy through Mindich, Morse, Gadiesh, induced Wolfson to engage in schemes to obtain Solomon's trade secrets related to his pending U.S. Patent applications and other research.

173.    Said acts include, but are not limited to, plying Solomon with liquor at a private dinner with her woman friend, Myra Huff, and suggesting sex in exchange for designs involving TI DMD technology related to displays, 3D and lighting.

174.    On another occasion, Wolfson unlawfully obtained Solomon's house and automobile keys by conspiring with her repairperson, and transferred the same to other Defendants, in a scheme to obtain detailed research in the truck of Solomon's car.

175.    On another occasion Wolfson schemed to obtain Solomon's trade secrets by obtaining detailed information on the security systems on Solomon's notebook computer and transferring said information to the other Defendants.

176.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## COUNT VI
### (All Defendants)

(RICO Violence and Threats of Violence)

177.    Aforementioned paragraphs are incorporated by reference as if stated fully herein.

178.    In the aforementioned disputes, the Defendants have conspired with persons known and unknown to intimidate Solomon by threats of violence to his person or friends, damage to his property, and assault and battery. The following are major acts of intimidation, assault or theft of trade secrets and other interference with interstate commerce.

179.    On or about January, 1982, during the appeal by the defendants in the first Atlantis litigation, Solomon's co-plaintiff Dean Meledones, suffered two broken legs from a skiing assault by a John Pistilli, whose father had beneficial relations with the Defendants.

180.    Shortly thereafter in March, 1982, Solomon was assaulted in Newton, MA., by a Michael P. White, a participant in the Atlantis Cartel. Twenty-two years later, White was again arrested for assault on his girl friend, within a few miles of Solomon's present residence.

181.    On or about June, 1985, Solomon left Altman Stage Lighting Company in Yonkers, NY for a flight from LaGuardia Airport to Burlington, Vermont where he had planned to meet with Cheney and transfer information related to the futures trading activities of Malloy and others. As he approach the turn-off to the airport, he was struck in the rear by a young female, Jean C. Brana of Jackson Hts, NY with an infant driving an older Cadillac registered to Bio-Medical Clinical Laboratories, Inc., 287 Rockaway Turnpike, Lawrence, NY 11559.

182.    On or about June 1986, the Solomon was assaulted by a John Manley of Falmouth, MA. Mr. Manley later indicated that he was asked by the Atlantis to intimidate the plaintiff. Manley was arrested and accord and satisfaction agreement was reached.

183.    Another criminal act occurred on January 24, 1988 when Solomon, on the invitation of Altman, was struck by a John Thompson of New York, New York, while skiing at Sugarbush Valley, Waitsfield, Vermont. An official report was filed.

184.    Another unlawful act occurred on August 21, 1992 when a William Hennessey of Bridgeport, CN. Struck the plaintiff in the rear on North Road, Chilmark, MA driving a car owned by Edward Wise. A Rachel Wise, daughter of Edward Wise of Chilmark, MA was accompanying Hennessey. An official report was filed.

185.    Another unlawful act of the conspiracy occurred on November, 1992 at the installment of directors of B'nai B'rith when Neosignian Towing, affiliates of the Defendants, of Newton towed the Solomon's car from a lot used by the B'nai B'rith precipitating a confrontation with Boston Police Officer Tracy over photographs of the towing and witnesses. Officer Tracy called in "officer in trouble" resulting in plaintiff's detention. The President of B'nai B'rith who was across the street negotiated a resolution whereby Solomon relinquished his film. No other action was taken.

186.    Another unlawful act occurred on June 16, 1996, when a male identifying himself as a Yonkers Police Officer driving a Chevy van, plate # NY WJJ 865, pushed Solomon from behind while shopping early Sunday morning at Bosun's Marine Store, Mashpee, MA.

187.    On or about August, 1996, Solomon filed a letter complaint regarding Altman with the Boston station of the F.B.I. Shortly thereafter, the incidents of direct assault ceased.

188.    Defendants changed strategy through Mindich, induced Wolfson to engage in schemes to obtain Solomon's trade secrets related to his pending U.S. Patent applications and other research, said acts include, but are not limited to, plying Solomon with liquor at a private dinner with her woman friend, Myra Huff, and suggesting sex in exchange for designs involving TI DMD technology related to displays, 3D and lighting, unlawfully obtaining Solomon's house and automobile keys and transferring same to other Defendants, and obtaining detailed information on the security systems on Solomon's notebook computer.

189.    From 1998 to 2001, Defendants conspired with Plotkin to obtain Solomon's trade secrets by offering secure office space and misappropriating research related to weathergear designs, lighting systems and display technology.

190.    On July 4, 2002, Defendants, though Mindich, engaged in renewed assaults and intimidation including an attempted assault with an automobile in Provincetown, MA prompting Solomon to contact local police.

191.    On August 26, 2004, Defendants caused the operator of a vehicle, plate NY # CPW 3427 to follow, tailgated and intimidate Solomon near his residence in Yarmouth Port, MA.

192.    On or about October 14, 2004 Defendants caused two individuals, one a car dealer named "Cookie", to push and shove Solomon and suggest that he not interfere with Altman, during the performance of the TICKS, a popular comedic, all woman trio, at a restaurant near Solomon's residence in Yarmouth Port, MA.

193.    These events have occurred with greater frequency during critical periods of litigation.

194.    Defendants are engaged in an ongoing unlawful scheme to obtain Solomon's trade secrets. The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

195.    As a direct result, Solomon has been substantially damaged in an amount greater than $75,000, to be determined at trial.

## COUNT VII
### (All Defendants)

### (False Designation – Lantham Act)

196.    Aforementioned paragraphs are incorporated by reference as if stated fully herein.

17

197.   Defendants are engaged in an ongoing unlawful scheme to mislead the public as to the inventorship and origin of their products.

198.   Actuality engaged in a series of fraudulent or misleading statements which have misled the consumer as to the relevant origin, quality, and value of said display products.

199.   Microvision engaged in a series of fraudulent or misleading statements which have misled the consumer as to the relevant origin, quality, and value of said display products.

200.   Altman engaged in a series of fraudulent or misleading statements which have misled the consumer as to the relevant origin, quality, and value of said lighting products.

201.   Vinton, CranBarry and Atlantis Weathergear engaged in a series of fraudulent or misleading statements, including numerous postings to their website, publications to industry press, and publications to the industry buyers, which have mislead the consumer as to the relevant origin, quality, and value of said weathergear products.

202.   As a direct result, Solomon has been substantially damaged in an amount greater than $50,000, to be determined at trial.

## REQUEST FOR RELIEF

203.   Solomon requests a judicial declaration of non-infringement, invalidity, and unenforceability of the patents listed herein.

204.   Solomon requests that this Court award him actual, compensatory and punitive damages for the Defendants' interference in his commercial activities and other unlawful acts, in an amount greater than $75,000, exact amount to be determined at trial.

205.   Solomon requests that this Court enjoin the defendants from engaging in further criminal acts against Solomon, his family and associates, including but not limited to intimidation and schemes to obtain trade secrets.

206.   Solomon requests that this Court grant other relief as it deems just and proper.

207.   Solomon requests a jury trial of all matters.


Respectfully submitted,




Dennis J. Solomon
PO Box 289
Yarmouth Port, MA 02675

18

**EXHIBIT B**

**Volumetric Imaging Information Release**
**COMPLAINT - VI v. RAYTHEON - USDC, Boston**

**1:07-cv-01811-EGS**

For Further Information Contact:

Volumetric Imaging     2200 One Kendall Square     Cambridge, MA 02139
**Tel:** 508 394 9221     **e-mail:** volumetric@aol.com
**URL:** http://members.aol.com/volumetric

---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS J. SOLOMON, INDIVIDUAL | ) |
| DENNIS J. SOLOMON, STOCKHOLDER | ) |
| DENNIS J. SOLOMON d/b/a VOLUMETRIC IMAGING | ) |
| VOLUMETRIC IMAGING, INC., | ) |
| Plaintiffs | ) |
| | ) |
| V. | ) Civil No. 97-11817-GAO |
| | ) |
| RAYTHEON, INC. d/b/a RAYTHEON | ) |
| TEXAS INSTRUMENTS d/b/a/ TI | ) |
| Defendants. | ) |

COMPLAINT

PRELIMINARY STATEMENT

This action is brought by Dennis J. Solomon, a well-known inventor of advanced computer systems used in air traffic control and defense, and Volumetric Imaging, a research & development group which has licensed technology for a three dimensional air traffic and medical displays from Solomon and M.I.T., against Raytheon and Texas Instruments, two large, collaborating defense contractors.

Volumetric Imaging and Texas Instruments had been designated as the only approved 3D imaging suppliers for an advanced air defense system called VISTA. Raytheon, interested in maintaining its position as prime defense contract in radar and air traffic control systems reviewed the public Volumetric and TI products. In order to gain access to proprietary construction and strategic secrets, Raytheon entered into an agreement with Volumetric to jointly submit a proposal with Raytheon as prime contractor, with the condition that Volumetric would not independently compete. Volumetric disclosed to Raytheon trade secrets, strategies and other details necessary for a competitive proposal. Less than one week before the proposal deadline, Raytheon sent Volumetric a signed contract containing the two operational signatures. Raytheon told Volumetric that they would submit the proposal by hand through their Pentagon office. The following week Raytheon refused to answer Volumetric's calls. After about ten days, Raytheon informed Volumetric that during the last day, Raytheon decided to team with TI.

Volumetric claims that Raytheon and TI intentionally and jointly engaged in the contract to interfere

with, restrain and delay interstate commerce, to further their monopolistic and anti-trust practices, to access secret information concerning the Plaintiff's business and to infringe the plaintiffs' United States patents.

## PARTIES

1. Dennis J. Solomon, individual, is a resident of Yarmouth Port, MA in the county of Barnstable, Massachusetts. During the past decade, Solomon has conducted a business known as "Volumetric Imaging" (hereinafter called "Volumetric")
2. The plaintiff, Volumetric Imaging, Inc., provides banking for certain agreements with M.I.T., maintains a financial office at 2200 One Kendall Square, Cambridge, MA and has contracted certain activities with Solomon and Volumetric.
3. Dennis J. Solomon, is a stockholder of Volumetric Imaging, Inc. Volumetric Imaging, Inc, is without sufficient funds to pursue this litigation, and Solomon, in a derivative action on behalf of all stockholders of Volumetric Imaging, Inc. has been conveyed the rights to pursue this litigation.
4. The defendant, Raytheon, Inc. is a Delaware Corporation with principal offices and manufacturing facilities in Lexington, Massachusetts (hereinafter called "Raytheon")
5. The defendant, Texas Instruments, Inc. is a Delaware corporation with principal offices and manufacturing facilities in Dallas, Texas and North Andover, Massachusetts (hereinafter called "TI")
6.

## JURISDICTION

The court has jurisdiction over this matter pursuant to M.G.L. Sec. 93 § 5, Sec. 223 and other statutes, the acts took place in Massachusetts, the defendants maintain principal or substantial business offices in Massachusetts, and the principal plaintiff resides in Barnstable County.

## COMPLAINT

7. Solomon has invented and developed advanced imaging and control systems during the last twenty years and is well-known in the field. One related patent issued to Solomon is U.S. Letters Patent 4,670,678.
8. On May 22, 1989, Solomon received a letter from the Secretary of the Navy encouraging the further development of Solomon's technologies. (See Exhibit 1 attached hereto and incorporated herein).
9. In 1990, Volumetric was incorporated to managed certain advanced computer imaging technologies developed at the Massachusetts Institute of Technology. One invention, owned by Mr. Berlin and assigned to MIT and licensed by MIT to Volumetric, is patented under U.S. Patent 4,160,973, (hereinafter referred to as the MIT patent)
10. During 1990, TI and Solomon discussed a joint venture. On February 14, 1991, a Gary Honeycutt of TI sent Solomon a letter suspending discussions. (See Exhibit 2 attached hereto and incorporated herein)
11. During the summer of 1992, a technology known as the Volumetric Matrix Imager, attracted the attention of US DOD personnel, engaged in the fields of air traffic control, C4I, and related imaging. After review by DOD, VI was listed as a hardware supplier of VISTA VIDI Refined Prototypes, Ref: US Solicitation No. F49650-93-R-0310.
12. Defendant Texas Instruments was developing a competitive system named the "OmniView". (See

Exhibit 3A,B attached hereto and incorporated herein).

13. In the spring of 1993, Raytheon personnel contacted Solomon with regard to partnering on the aforementioned proposal.

14. In May of 1993, IEEE Computer Graphics Journal, the premier scientific journal in the field, published an article authored by USAF and Mitre Corporation showing the Solomon's designs outperformed competitive systems by the US Navy and Texas Instruments.

15. At an early meeting with Mr. Piantigni, Norm Delisle and others, Raytheon indicated a desire to submit a joint proposal with the stipulation that the plaintiffs not compete as a prime contractor on same solicitation. The plaintiffs agreed.

16. Following this agreement, the plaintiffs disclosed information and engaged in a series of technical meetings and conversations on issues only available to proposal partners.

17. On June 25, 1993, Raytheon faxed a signed Statement of Work. (See Exhibit 4 attached hereto and incorporated herein)

18. Communications continued until the 30th of June, 1993 with the specific statement made that the Raytheon Washington office "would hand deliver the proposal prior to the deadline" of July 1, 1993.

19. Calls made to Raytheon on July 2, 1993 were not returned, nor during the following days.

20. After ten days, Solomon was informed that, on the last day before the deadline, Raytheon had decided to partner with Texas Instruments. This action prevented the plaintiffs to timely submit a competitive proposal.

21. Said actions have placed Raytheon and TI in an unfair competitive position with regard to future government and commercial contracts, and resulted in the US DOD receiving an inferior technology.

22. On or about January 1, 1994, Volumetric was awarded a U.S. Department of Defense contract to conduct the research and development of more advanced, high performance, computer graphics volumetric imager which included certain licensed features under the MIT patent.

23. It was believed in certain DOD circles that Solomon's technology had applications in precision missile guidance systems.

24. Also, during the winter of 1994, a Gary Feathers of TI and Solomon renewed conversations related to Solomon's HoloDeck. (See Exhibit 5 attached hereto and incorporated herein)

25. Shortly thereafter, a Paul Monico, an employee of Raytheon Missile Division contacted Solomon about partnering on certain US DOD contracts and suggested a meeting. Solomon informed Monico of the previously averred matter with Raytheon, and Monico stated the "missile division was entirely separate."

26. On the basis of that representation, Solomon agreed to meet with Monico and Raytheon employees, a Robert Lee and a Rod Spencer on 6/21/94 at One Kendall Square.

27. At some point about an hour into the meeting, Spencer moved the focus to computer architecture. After a few moments, he said, "Oh, you are using a XXXXXX structure" describing a structure Solomon proposed to DOD in an earlier proposal. A few minutes thereafter, Spencer departed. (Structure Proprietary to US DOD)

28. It is the plaintiff's belief and opinion that Spencer received confidential information of the plaintiffs previously submitted to DOD and used the meeting to "demonstrate to Solomon " his independent discovery.

29. As a direct and proximate result of the defendants' action, the plaintiffs, together with their major computer systems partners, have been denied the position as principal competitor with a superior technology for the Advanced Air Traffic Control contracts awarded Raytheon with a value of $816 million dollars.

30. As a direct and proximate result of the defendants' action, Volumetric Imaging, together with its major computer systems partners, have been denied the position as principal competitor with a superior technology for other US Government and commercial contracts.

31. On or about March, 1997, Solomon conversed with a Dr. Steven Charles, of the Baylor Medical

Center and was informed that TI has developed, using DOD and government funds under the VISTA proposal, a volumetric imager infringing on the plaintiff's patents. This was the plaintiffs' first confirmation of the current existence of the Raytheon/TI Imager.

## COUNT I

## BREACH OF CONTRACT

32. The plaintiffs reallege the allegations contained in paragraphs 1-30 and incorporates them herein.
33. By the aforementioned actions, Raytheon has breached its contract with the plaintiffs violating, among others, U.C.C. Section 1-203 which provides; "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement."
34. As a result of the breach of the contract by the Raytheon, the plaintiffs have sustained damages.

## COUNT II

## MONOPOLISTIC, ANTI-TRUST, UNFAIR AND DECEPTIVE TRADE PRACTICES

35. The plaintiffs reallege the allegations contained in paragraphs 1-30 and incorporate them herein.
36. The plaintiffs states that the aforementioned acts and practices are monopolistic, anti-competitive, false and deceptive within the meaning of M.G.L. Chap. 93, 93A § 2 & 11, 15 USCA 22, Sherman and Clayton Acts.
37. Said acts were done willfully and knowingly by Raytheon and TI.
38. The plaintiffs were damaged as a result of the unlawful monopolistic, anti-competitive, false and deceptive trade practices of Raytheon.
39. As a result of false and deceptive trade practices, The plaintiffs have been damaged monetarily, plus interest and costs.

## COUNT III

## VIOLATION OF A PATENT

40. The plaintiffs realleges the allegations contained in paragraphs 1-37 and incorporate them 1~erein.
41. On or about October 11, 1977, United States Letters Patent 4,160,973, was duly and lawfully issued to Edward Berlin. The patent was later assigned to MIT and thereafter MIT licensed it exclusively to Volumetric Imaging, Inc.
42. As a result of the license, Volumetric Imaging, Inc. is the owner of the equitable title to United States Patent No 4,160,973 and possesses all rights of action for infringement since the issuance thereof.
43. Sometime after February, 1994, TI developed a Matrix Imager which violates the Patent 4,160,973.
44. Such infringement is, and at all times herein has been, deliberate, willful, intentional, and with full knowledge of the existence and validity of the plaintiffs' patents.

## COUNT IV

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

45. The plaintiffs reallege the allegations contained in paragraphs 1-30 and incorporate them herein.
46. At certain relevant times, the plaintiffs had a valid contractual relationship with and request from the United States Department of Defense.
47. The defendants had with improper motive and/or by improper means breached the agreement and have attempted to use information gained to contract directly with the Department of Defense.
48. Raytheon's interference was intentional and improperly motivated.
49. As a direct and proximate result of Raytheon's acts of tortious interference and TI participation, the plaintiffs have suffered substantial and irreparable harm.

## REQUEST FOR RELIEF

WHEREFORE, The plaintiffs respectfully requests that his honorable court:

1. Award the plaintiffs monetary damages, in an amount to be proven at trial, for the economic injury it has sustained as a consequence of Raytheons' breach of contract;
2. Award the plaintiffs monetary damages, in an amount to be proven at trial, for the economic injury it has sustained as a consequence of Raytheon's unfair and deceptive trade practices,
3. Award the plaintiffs monetary damages, in an amount to be proven at trial, for the economic injury it has sustained as a consequence of Raytheon and TI's patent infringement;
4. Award the plaintiffs monetary damages, in an amount to be proven at trial, for the economic injury it has sustained as a consequence of Raytheon and TI's tortious interference with plaintiffs' contractual relationship with the Department of Defense;
5. Award the plaintiffs punitive damages, on account of the deliberate, willful, and intentional misconduct;
6. Award the plaintiffs attorney's fees incurred in connection with this action;
7. Such other relief as this Honorable Court deems fair and just.

PLAINTIFF DEMANDS TRIAL BY JURY

Respectfully submitted,

Dennis J. Solomon
PO Box 289
Yarmouth Port, MA 02675
508 394 9221

APPENDED EXHIBITS:

1. US Navy, Secretary of the Navy, to Solomon, 22 May 1989
2. Texas Instruments to Solomon, 14 Feb 1991
3. Texas Instruments OmniView, 1993
4. USAF Amendment of RFP F49650-93-R-0310, 17 Jun 93
5. Raytheon Statement of Work to Volumetric Imaging, 23 June 1993
6. Texas Instruments to Solomon, on HoloDeck, 16 Mar 1994

7. Raytheon Employee Cards

**EXHIBIT C**

**1:07-cv-01811-EGS**

11 of 19 DOCUMENTS

**DENNIS SOLOMON v. TEXAS INSTRUMENTS, INC.**

**CIVIL ACTION NO. 06-CV-11307-RGS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS**

*2007 U.S. Dist. LEXIS 1946*

**January 10, 2007, Decided**

**COUNSEL:** [*1] Dennis J. Solomon, Plaintiff, Pro se, Yarmouthport, MA.

For Texas Instruments, Inc., Defendant: Deborah E. Barnard, LEAD ATTORNEY, Tara J. Myslinski, Holland & Knight, LLP, Boston, MA.

**JUDGES:** Richard G. Stearns, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Richard G. Stearns

**OPINION**

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

STEARNS, D.J.

On July 28, 2006, Dennis Solomon, a self-described scientist, inventor, and investigative journalist, filed this Complaint against Texas Instruments, Inc., and forty-one other defendants, including Productivity Systems, Inc. (PSI), alleging that they, together with various companies, universities, and persons named and unnamed, had hatched a long-running plot to damage and destroy his business and reputation. [1] The conspiracy, which traces its origins to senior officials in the Nixon administration, has had its hand in a plethora of nefarious deeds, among them murder, assassination, skullduggery, and base intrigue. It is peopled with a colorful cast of prominent personalities that includes judges, professors, public officials, organized crime figures, spies, and international terrorists.

1 It is unclear from a reading of the Complaint whether the larger conspiracy picture is offered for background purposes or is included as support for the claims set out in the Complaint. For instance, P 8, which is listed under the heading of "Extraordinary Matter[s] of Concern" makes the following allegations against the defendant Robert Lawless, but does not explain how they relate to any specific cause of action.

In 1995, when Solomon was represented by Defendant Robert Lawless, a relation of Solomon's, Regine Choukroun, the famous French singer, restaurateur and Resistance operative of WWII, was arrested in Boston when an "incident" aboard an American Airlines Non-Stop Paris - Miami flight resulted in its "emergency" diversion. Lawless explicitly told Solomon that it was a "set-up" by McManus to obtain the address book and other personal information from Regine to probe the organization - nominally known as "The Ten Million" - a historic, extra-governmental alliance of anti-fascists which is alleged to include Nobel Laureates, Prime Ministers, Generals, Leaders of Industry, Judges and many others of all walks of life. This act was likely seen as a prelude to the murder of their members - and they

likely have taken appropriate steps.

[*2] On December 18, 2006, Texas Instruments filed a motion to dismiss the Complaint, arguing that its allegations are barred by res judicata, as they virtually replicate the allegations contained in two previous Complaints filed by Solomon in this court, both of which resulted in judgments for Texas Instruments. See Solomon v. Texas Instruments, et al., 97-11817-GAO, and Solomon v. Texas Instruments, et al., 04-12499-WGY. [2] Texas Instruments also argues that the Complaint fails to satisfy the minimum requirements of *Fed. R. Civ. P. 8(e)(1)* that averments be "simple, concise, and direct," or the requirement of *Fed. R. Civ. P. 9* that averments of fraud be stated with particularity. Finally, Texas Instruments argues that many of Solomon's claims are barred by the applicable statute of limitations.

> [2]   Solomon's 1997 Complaint was dismissed on the merits. The dismissal was subsequently affirmed by the First Circuit Court of Appeals. Solomon's 2004 Complaint was dismissed on March 28, 2005, for failure to prosecute. His appeal was later dismissed for failing to pay the appellate filing fee. This second dismissal was also on the merits. See *Owens v. Kaiser Foundation Health Plan, Inc., 244 F.3d 708, 714 (9th Cir. 2001).*

[*3] Solomon does not dispute that the present Complaint is derivative of the prior Complaints. Instead, he argues that the motion should be denied because eleven of the 191 paragraphs in the instant Complaint set out "new" allegations. These paragraphs, as characterized in the opposition to the motion to dismiss, allege that in 2001, Solomon purchased two Texas Instruments "discovery boards" from PSI for $ 25,000, that the boards proved defective, that in 2003 and 2004, Solomon was misled by an employee of PSI (Becky Bell) into returning the boards in the belief that they would be repaired, and that Texas Instruments thereafter sold them to "other customers," thereby committing a "grand larceny by deception." [3]

> [3]   Ms. Bell is variously alleged to be an

employee of Texas Instruments, PSI, or Tyrex, Inc. Texas Instruments states that she is not one of its employees, but rather an employee of PSI. Texas Instruments also notes that PSI is not one of its subsidiaries, but rather an independent distributor of its products. Absent some plausible basis for holding Texas Instruments vicariously liable for the actions of PSI, there is no conceivable cause of action for conversion against Texas Instruments.

[*4] The motion to dismiss will be ALLOWED. Almost all of the claims set out in the instant Complaint have been previously adjudicated adversely to Solomon on the merits. Relitigation of those claims is therefore barred by res judicata. *Massachusetts School of Law Andover, Inc. v. American Bar Association, 142 F.3d 26, 37-38 (1st Cir. 1998).* The doctrine of res judicata extinguishes not only claims that have been previously adjudicated on the merits, but also the litigation of claims arising from the same set of operative facts that "could have been raised in the prior proceeding." *Wolf v. Gruntal & Co., Inc., 45 F.3d 524, 527-528 (1st Cir. 1995).* As Solomon's "conversion" claim could have been raised by a *timely* motion to amend the 2004 Complaint, he is barred from litigating it now.

ORDER

For the foregoing reasons, Texas Instrument's motion to dismiss is ALLOWED with prejudice as to all defendants. Because this is the third time that Texas Instruments has been forced to defend itself in this court against the same meritless claims, Dennis Solomon is hereby ENJOINED from filing any further Complaints regarding the same or related [*5] subject matter without prior leave of court. The Clerk is directed to post Dennis Solomon on the court's list of enjoined litigants. [4]

> [4]   Texas Instrument notes that Solomon is a serial filer in the federal courts.

SO ORDERED.

/s/ Richard G. Stearns

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

DENNIS J. SOLOMON,                          )
                                            )
              Plaintiff,                     )
                                            )
v.                                          )          Civil Action No. 07-1811-EGS
                                            )
UNIVERSITY OF SOUTHERN                       )
CALIFORNIA, et. al.,                         )
                                            )
              Defendants.                    )
_____)

### ORDER

AND NOW, this        day of                    , 2008, upon consideration of

the motion of Defendant Evans & Sutherland Computer Corporation to dismiss Plaintiff

Dennis J. Solomon's Complaint with prejudice, and Plaintiff's response thereto, it is

hereby ORDERED and DECREED that Defendant's motion is GRANTED and the

Complaint is dismissed with prejudice.

SO ORDERED.

BY THE COURT:

_____

Emmet G. Sullivan, J.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

DENNIS J. SOLOMON,               )
                                )
             Plaintiff,          )
                                )
v.                              )        Civil Action No. 07-1811-EGS
                                )
UNIVERSITY OF SOUTHERN           )
CALIFORNIA, et. al.,             )
                                )
             Defendants.         )
_____)

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTERESTS

Defendant Evans & Sutherland Computer Corporation ("E&S"), by counsel, hereby files this Certificate of Corporate Affiliations and Financial Interests pursuant to LCvR 7.1 of the Local Rules of the United States District Court for the District of Columbia:

I, the undersigned, counsel of record for E&S, certify that to the best of my knowledge and belief, E&S has no parent companies, subsidiaries or affiliates which have any outstanding securities in the hands of the public.

These representations are made in order that judges of this court may determine the need for recusal.

Respectfully Submitted,

Dated: January 28, 2008

Brian W. Craver
Person & Craver LLP
1801 K Street, N.W.
Washington, D.C.  20006
(202) 466-4416

Attorneys for Defendant
Evans & Sutherland Computer Corporation