## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DENNIS J. SOLOMON,

*Plaintiff*,

v.

UNIVERSITY OF SOUTHERN
CALIFORNIA *et al*.,

*Defendants*.

No. 1:07-cv-01811-EGS

**DECLARATION OF
HOWARD S. HOGAN**

Howard S. Hogan hereby declares as follows:

1.   I am a member of the bar of this Court and an associate of the law firm of Gibson,

Dunn & Crutcher LLP, attorneys for University of Southern California ("USC").  I submit this

declaration in support of USC's motion to dismiss the complaint in this action filed by plaintiff

Dennis J. Solomon.  All records attached to this declaration are true and correct copies of public

records, of which this Court may take judicial notice pursuant to Rule 201 of the Federal Rules

of Evidence.

2.   Attached as Exhibit 1 is a true and correct copy of the complaint in the above-

captioned matter, dated October 4, 2007, as it was served on USC.

3.   Attached as Exhibit 2 is a true and correct copy of an order of the Trademark Trial

and Appeal Board ("TTAB") of the United States Patent and Trademark Office, dated August 9,

2007, denying Mr. Solomon's motion for reconsideration of the rejection of his application to

register the word "HoloDeck" as a trademark.

4.    Attached as Exhibit 3 is a true and correct copy of the Memorandum and Order on Defendant's Motion to Dismiss, issued by the United States District Court for the District of Massachusetts in the matter of *Solomon v. Texas Instruments, Inc., et al.*, dated January 10, 2007.

5.    Attached as Exhibit 4 is a true and correct copy of the Complaint in the matter of *Solomon v. Texas Instruments, Inc., et al.*, dated July 24, 2006, and marked as filed on July 28, 2006.

6.    Attached as Exhibit 5 is a true and correct copy of the Order of dismissal issued by the United States Court of Appeals for the Federal Circuit in the matter of *Solomon v. Vest, et al.*, for failure to pay the docketing fee, dated November 22, 2005.

7.    Attached as Exhibit 6 is a true and correct copy of the Judgment issued by the United States Court of Appeals for the First Circuit in the matter of *Solomon v. Vest, et al.*, transferring the case to the United States Court of Appeals for the Federal Circuit, dated October 25, 2005.

8.    Attached as Exhibit 7 is a true and correct copy of the Order of Dismissal issued by the United States District Court for the District of Massachusetts in the matter of *Solomon v. Vest, et al.*, dated March 28, 2005.

9.    Attached as Exhibit 8 is a true and correct copy of the Complaint in the matter of *Solomon v. Vest, et al.*, marked as filed on November 29, 2004, without exhibits.

10.  Attached as Exhibit 9 is a true and correct copy of Mr. Solomon's Request for Reconsideration, dated September 7, 2004, in support of his application to register the word "HoloDeck" as a trademark.

11.  Attached as Exhibit 10 is a true and correct copy of the Order of the TTAB, dated August 6, 2004, dismissing Mr. Solomon's application to register the word "HoloDeck" as a trademark.

12. Attached as Exhibit 11 is a true and correct copy of USC's Motion for Default Judgment and Motion for Discovery Sanctions, dated June 18, 2003, in opposition to Mr. Solomon's application to register the word "HoloDeck" as a trademark, without exhibits.

13. Attached as Exhibit 12 is a true and correct copy of the TTAB's order, dated March 6, 2003, granting USC's motion to amend and motion to compel discovery, in opposition to Mr. Solomon's application to register the word "HoloDeck" as a trademark.

14. Attached as Exhibit 13 is a true and correct copy of a printout obtained from the PTO's website setting forth the docket sheet for TTAB opposition proceeding concerning Mr. Solomon's application to register the word "HoloDeck" as a trademark.

15. Attached as Exhibit 14 is a true and correct copy of a printout obtained from the PTO's website setting forth the trademark prosecution history for Mr. Solomon's application to register the word "HoloDeck" as a trademark.

16. Attached as Exhibit 15 is a true and correct copy of the Complaint filed by Dennis J. Solomon before the United States District Court for the Western District of Washington in the matter of *Solomon v. University of Washington, et al.*, dated February 17, 1998, without exhibits.

17. Attached as Exhibit 16 is a true and correct copy of printouts of searches for cases filed by Mr. Solomon in electronic databases of court records.

I hereby declare, under penalty of perjury, that the foregoing is true and correct.

Dated:  January 28, 2008.


    /s/ Howard S. Hogan    
        Howard S. Hogan

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2008, I caused copies of the foregoing to be transmitted via overnight and first class U.S. Mail to opposing party:

Dennis J. Solomon
P.O. Box 289
Yarmouth Port, MA 02675
Telephone: (508) 394-9221


                         /s/ Howard S. Hogan
                         Howard Hogan

EXHIBIT 1

UNITED STATE DISTRICT COURT
DISTRICT OF COLUMBIA

DENNIS J. SOLOMON,
PLAINTIFF.

v.                                        Civil Action No.   07-1811-EGS

UNIVERSITY OF SOUTHERN CALIFORNIA
MICHAEL MACEDONIA
SCOTT EDELMAN
EVANS & SUTHERLAND
MR. QUINN,
MR. HAIRSTON,
MR. HOLTZMAN
TRADEMARK TRIAL AND APPEAL BOARD
JON DUDAS
UNITED STATES TRADEMARK OFFICE

DEFENDANTS.

# COMPLAINT

# DEMAND FOR JURY TRIAL

Plaintiff Dennis J. Solomon hereby demands a jury trial and avers as follows:

## SUMMARY OF THIS ACTION

The plaintiff, Dennis J. Solomon, filed an application for registration of the trademark 'HoloDeck' on August 23, 1993, which was granted on May 30, 2000. USC opposed the registration on the grounds the term 'holodeck' was generic and was being used to describe a $200 million US Army-USC simulation project which began in 1999, under the direction of U.S. Army officer Macedonia. Following depositions, a majority of the participating USC scientists testified that they had no knowledge of the term 'holodeck' prior to employment by USC. USC also testified that Macedonia demanded that USC file the opposition.

The United States Air Force had been funding a competitive project with Solomon since 1993.

USC subsequently amended the opposition to claim that there was no 'use in commerce'. Solomon provided sales materials, published advertisements and conference

1

publications. USC demanded detailed customer lists, engineering plans and manuals. Solomon objected on the grounds that USC counsel, Scott Edelman, was a direct competitor. USC filed a motion for a default judgment as a discovery sanction. The TTAB granted the default judgment without trial on the discovery evidence provided.

The USC opposition was part of an unlawful scheme to monopolize funding and commercialization of advanced C4I and Simulation technologies.

# PARTIES

## <u>Plaintiff</u>

1. Dennis J. Solomon is a Massachusetts resident and the applicant for the trademark HoloDeck.

## <u>Defendants</u>

2. University of Southern California, hereinafter referred to as 'USC', is a non-profit educational institution with a permanent facility at 701 Pennsylvania Avenue, Washington, D.C. 2004

3. Scott Edelman is believed to be an attorney with Gibson, Dunn & Crutcher in California.

4. Evans and Sutherland is believed to be a Utah corporation

5. Michael Macedonia is believed to be a resident of the District of Columbia and a contracting officer for the U.S. Army.

6. Mr. Quinn is believed to be an administrative trademark judge on the TTAB.

7. Mr. Hairston is believed to be an administrative trademark judge on the TTAB.

8. Mr. Holtzman is believed to be an administrative trademark judge on the TTAB.

9. Mr. Dudas is believed to the Director of the USPTO.

10. The Trademark Trial and Appeal Board 'TTAB' is a division of United States Patent and Trademark Office of the Department of Commerce of the United States.

# Jurisdiction

11. This Court has subject matter jurisdiction under 15 USC 1071, 28 USC 1331, and 28 USC 1332.

## Venue

12. This District is the appropriate venue. The Opposer USC maintains a facility and conducts regular business activities within the District.  Most of the other parties are employees of the Department of Commerce, headquartered within the District.

## STATEMENT OF FACTS

13. Plaintiff Dennis J. Solomon was educated at MIT, and has been actively involved in the science of lasers and holography since the 1970s.  In 1973, he purchased a 43' ketch which he named Starship, and formed an enterprise by that name.  His associates coined the term 'virtual reality' and fanciful names with the prefix 'holo' at the time.

14. From 1978 to 1984, Solomon was actively engaged in imaging and holography imaging at MIT including activities with MIT's famous holographers, Stephen Benton and Harriet Casdin-Silver.

15. In 1985, Solomon filed his first independent three-dimensional United States patent application.  Shortly thereafter, in conjunction with projects known to Bran Ferren at Disney, he began using the fanciful term 'holodeck display'.  On or about 1989 Solomon began the commercial development of a three dimensional display.

16. On August 23, 1993, Solomon formally applied for the stylized 'HoloDeck' trademark in Class 009 to identify the source of his three dimensional displays. Solomon did not search other classes, and was unaware of any other filings.

17. On 1995, Solomon displayed the trademark Holodeck in his booth at the SIGGRAPH computer show.  Attorneys for Paramount Pictures, believed to be Scott Edelman, sent Solomon a cease and desist letter.  Solomon responded and Paramount took no further action.  Shortly thereafter, the Paramount application expired and was not renewed.

18. On December 13, 1996, Evans and Sutherland filed an application for the trademark 'HOLODECK' in class 9 for virtual reality rooms.

19. On May 30, 2000, the Trademark Office granted Solomon registration of the HoloDeck trademark for class 9.

20. On or about June 30, 2000, USC, through attorney Edelman at Gibson, Dunn and Crutcher, filed a motion for extension of time to opposition claiming the term was generic.

21. Discussions between Solomon and USC ensued, and USC offered to withdraw the opposition, if USC could use the term for its US Department of Defense project and obscured in the contract language - claim and apply for a secondary meaning.

22. Solomon stated that he would agree to license the trademark to USC for a nominal fee for limited use on the U.S. Army project but would not agree to the secondary meaning clause.

23. USC formally filed the opposition.

24. On or about 1999, USC had received $250 million dollars from the U.S. Army to build a holographic, virtual reality space which they were calling the holodeck.

25. USC took extensive depositions in person and thorough discovery. Solomon conducted a few hours telephonically, during which a majority of USC personnel testified that they had no knowledge of the term 'holodeck' until arriving at USC.

26. USC then amended the opposition to include 'failure to use in commerce'.

27. Solomon responded by producing photographs, sales flyers and advertisements including publication in the SIGGRAPH Journals, original copies of which are available in the USC library.

28. USC requested customer lists, detailed plans, and manuals. Solomon requested a protective order and agreed to produce the same to an independent outside attorney.

29. Edelman filed a motion to compel the production to himself. Solomon opposed the motion on the grounds that Edelman was not an independent, outside attorney, and documented the fact that Edelman and his firm had close ties to Solomon's direct competitors, including Teledyne, and was the regular USC attorney for trademarks. Nonetheless, the motion was granted.

4

30. During discussions to find a compromise on the subject and without prior notice to Solomon, Edelman filed a motion for a default judgment was the TTAB. Solomon opposed the motion on the previous grounds, and further, that the appropriate sanction was exclusion at trial. The motion for default was granted, and reconsideration denied.

**In the following Counts the aforementioned facts are incorporated:**

**Count I. Error, Violation of Civil Rights, Due Process**

31. Exclusion of evidence is the appropriate sanction for limited discovery non-production.

32. The TTAB erred in granting a default judgment without trial, and violated the Constitutional, due process and civil rights of the Plaintiff.

**Count II. Lacking to Standing**

33. USC would suffer no damages from the grant of the trademark to Solomon.

34. USC lacks standing to bring an opposition.

**Count III. Attempt to Monopolize, Interference with Interstate Commerce**

35. Edelman, Macedonia and Evan & Sutherland engaged in an unlawful conspiracy to personal enrichment themselves through a series of unlawful schemes to obtain the trademark HoloDeck.

36. Macedonia unlawfully required USC to file the opposition in order to continue to receive U.S. Army funding.

37. Edelman knowingly participated in said scheme to generate fees for his firm.

38. Edelman knowingly engaged in a criminal scheme to obtain trade secrets which he planned to convey to USC

39. Evans & Sutherland, a defense contractor, agreed to license the trademark HoloDeck to Macedonia in return for continued government funding.

**Count IV Fraud**

40. In the seven years since the filing of this opposition, USC has been unable to build a three dimensional, virtual reality space.

5

41. USC, Edelman and Macedonia conspired to defraud the U.S. Government by submitting proposals based on unlawful obtained designs of Solomon.

**Count V. Interference with Business Relations, Unfair Competition**

42. Macedonia, as an agent of the U.S. Army, unlawfully attempted to use the opposition proceeding to obtain detailed knowledge of Solomon's classified U.S. Air Force projects, in order to obtain further funding.

43. Macedonia conspired with UCS and Edelman to further damage Solomon and unjustly enrich themselves.

**All Counts: Damages**

44. Said aforementioned actions caused substantial harm and damage to the soldiers of the U.S. Army placing them in harm's way without adequate training and with inferior equipment.

45. Said aforementioned actions caused substantial monetary damage to Solomon in excess of $3,000,000.

Wherefore, the Plaintiff, Dennis J. Solomon respectfully requests that this Court:

1. vacate the TTAB judgment of default,
2. find USC without standing to oppose,
3. allow the grant of the registration trademark HoloDeck to Solomon to stand,
4. and award damages and costs as the Court deems appropriate.

Respectfully submitted on October 4, 2007.

Dennis J. Solomon, pro se.
PO BOX 289
Yarmouth Port, MA 02675
(508) 394-9221

6

This packaging is the property of the U.S. Postal Service ® and is ...



## UNITED STATES POSTAL SERVICE ®    Click-N-Ship®

**P**

www.usps.com    0103 8555 7492 2006 8726 0046 0000 0889 0089
**$4.60**
US POSTAGE
Flat Rate Env



11/26/07    0 lb 8 oz    Mailed from 02875    071V00552025

# USPS PRIORITY MAIL®

DENNIS SOLOMON
PO BOX 289
YARMOUTH PORT MA 02675-0289

SHIP
TO:  STEVEN B. SAMPLE
UNIVERSITY OF SOUTHERN CALIFORNIA
UNIVERSITY PARK CAMPUS
LOS ANGELES CA 90089-0001



## ZIP - e/ USPS DELIVERY CONFIRMATION™

420 90089 9101 0385 5574 9220 0687 26

Electronic Rate Approved #038555749



1. COMPLETE ,
Type or print .
addressee inf
in designated
or on label.



2. PAYMENT M
Affix postage
indicated in u,



3. ATTACH LAB
Remove label
affix in design

4. Bring your Prir
a post office, ,
or call 1-800-,
Stamped mail
collection box
than 16 ounc



Dennis J Solomon
PO Box 289
Yarmouth Port, MA 02675

EXHIBIT 2

UNITED STATES PATENT AND TRADEMARK OFFICE
Trademark Trial and Appeal Board
P.O. Box 1451
Alexandria, VA  22313-1451

JST/MBA

Mailed:  August 9, 2007

Opposition No. 91119754

University of Southern
California

v.

Dennis J. Solomon

**Before Quinn, Hairston and Holtzman, Administrative Trademark Judges.**

By the Board:

On August 6, 2004, the Board issued an order granting opposer's motion for default judgment and discovery sanctions.  In that order, the Board entered judgment against applicant and sustained the opposition based on applicant's failure to: (1) answer the amended notice of opposition; and (2) comply with the Board's March 6, 2003 order granting opposer's motion to compel responses to discovery requests.  On September 7, 2004, applicant filed a motion for reconsideration of the Board's decision, which opposer has opposed.[1]

---

[1]  Unfortunately, this matter did not come to the Board's attention until only recently.  The Board regrets the delay in considering applicant's motion for reconsideration.

Opposition No. 91119754

By his jumbled motion for reconsideration applicant contends that: (1) the Board misconstrued applicant's failures to comply with Board orders and went too far in granting default judgment; (2) he was the first to file and use the mark at issue; (3) opposer's attorneys are not "independent" and cannot be trusted with confidential information, even after issuance of the Board's protective order of March 6, 2003; (4) the Board's August 13, 2003 order suspending proceedings in light of opposer's motion for default judgment and discovery sanctions excused applicant from answering the notice of opposition or responding to opposer's discovery requests; and (5) applicant believed, based on representations of nonparties, that the opposition would be withdrawn.

Opposer contends that applicant's "request for reconsideration is simply another attempt to delay these proceedings and increase the burden of litigation on both the Board and Opposer." Opposer further contends that applicant "has not shown that the Board erred in reaching its decision," and that applicant "simply reargues the points he raised" in opposing the motion for default judgment and sanctions.

A motion for reconsideration "may not properly be used to introduce additional evidence, nor should it be devoted simply to a reargument of the points presented in a brief on

Opposition No. 91119754

the original motion." TBMP § 518 (2d ed. rev. 2004).

Instead, a motion for reconsideration "should be limited to a demonstration that based on the facts before it and the applicable law, the Board's ruling is in error and requires appropriate change." Id.

In this case, applicant's motion for reconsideration comprises an inappropriate reargument of the points applicant raised in his brief in opposition to opposer's motion for default judgment and discovery sanctions, and unsupported allegations having no relevance whatsoever to the Board's August 6, 2004 order. Applicant's motion utterly fails to address either of the issues on which the Board's order was based, namely, applicant's failure to respond to the amended notice of opposition and applicant's failure to comply with the Board's order compelling discovery. Therefore, applicant's motion fails to allege any error in the Board's order.

We will nonetheless briefly address applicant's request for reconsideration on the merits. Applicant's contention that the Board went too far in granting default judgment is incorrect. As the Board stated in its order, "[a]pplicant admits that he has not answered the amended notice of opposition and has not served further discovery responses as ordered by the Board," and applicant's failures were "the result of willful conduct or gross neglect." Accordingly,

Opposition No. 91119754

applicant's failures made the sanction of default judgment
particularly appropriate.  MHW Ltd. V. Simex,
Aussenhandelsgesellschaft Savelsberg KG, 59 USPQ2d 1477,
1478 (TTAB 2001); Baron Philippe de Rothschild S.A. v. Styl-
Rite Optical, 55 USPQ2d 1848, 1854 (TTAB 2000).

Applicant's mere allegation that he was the first to
file and use the mark at issue does not explain why
applicant failed to answer the notice of opposition or why
applicant failed to comply with the Board's order compelling
discovery.  Quite simply, this unsupported allegation does
not set forth any error in the Board's order of August 6,
2004.

Applicant's contentions about the confidentiality of
certain information and opposer's counsel's lack of
"independence" are merely a regurgitation of arguments made
in response to opposer's motion for default judgment and
sanctions.  The Board specifically informed applicant that
it would not further consider such arguments.  Order of
August 6, 2004 pp. 4-6.  Therefore, these contentions fail
to establish that the Board erred.

Applicant's contention that the Board's suspension
order of August 13, 2003 excused his failure to answer the
notice of opposition or opposer's discovery requests is
disingenuous -- applicant was fully aware that his failures
on both counts formed the basis of opposer's motion for

Opposition No. 91119754

default judgment and sanctions, and that the suspension
order applied to issues <u>other than</u> applicant's failure to
answer the notice of opposition or opposer's discovery
requests.  This alleged basis for reconsideration is
therefore rejected.

Applicant's belief that the opposition would be
withdrawn was based on alleged statements by nonparties, and
therefore unjustified — only the opposer could withdraw this
proceeding.  Perhaps more importantly, even if applicant
truly believed that opposer would withdraw the opposition
based on the representation of a nonparty, this is
immaterial to whether the Board erred in granting opposer's
motion for default judgment and sanctions based on
applicant's failure to answer the notice of opposition or
respond to opposer's discovery requests.

For all of these reasons, applicant's request for
reconsideration of the Board's August 6, 2004 order is
**DENIED**.

EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 06-CV-11307-RGS

DENNIS SOLOMON

v.

TEXAS INSTRUMENTS, INC.

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

January 10, 2007

STEARNS, D.J.

On July 28, 2006, Dennis Solomon, a self-described scientist, inventor, and investigative journalist, filed this Complaint against Texas Instruments, Inc., and forty-one other defendants, including Productivity Systems, Inc. (PSI), alleging that they, together with various companies, universities, and persons named and unnamed, had hatched a long-running plot to damage and destroy his business and reputation.[1]  The conspiracy,

---

[1]It is unclear from a reading of the Complaint whether the larger conspiracy picture is offered for background purposes or is included as support for the claims set out in the Complaint.  For instance, ¶ 8, which is listed under the heading of "Extraordinary Matter[s] of Concern" makes the following allegations against the defendant Robert Lawless, but does not explain how they relate to any specific cause of action.

In 1995, when Solomon was represented by Defendant Robert Lawless, a relation of Solomon's, Regine Choukroun, the famous French singer, restaurateur and Resistance operative of WWII, was arrested in Boston when an "incident" aboard an American Airlines Non-Stop Paris - Miami flight resulted in its "emergency" diversion.  Lawless explicitly told Solomon that it was a "set-up" by McManus to obtain the address book and other personal information from Regine to probe the organization - nominally known as "The Ten Million" - a historic, extra-governmental alliance of anti-fascists which

which traces its origins to senior officials in the Nixon administration, has had its hand in a plethora of nefarious deeds, among them murder, assassination, skullduggery, and base intrigue.  It is peopled with a colorful cast of prominent personalities that includes judges, professors, public officials, organized crime figures, spies, and international terrorists.

On December 18, 2006, Texas Instruments filed a motion to dismiss the Complaint, arguing that its allegations are barred by res judicata, as they virtually replicate the allegations contained in two previous Complaints filed by Solomon in this court, both of which resulted in judgments for Texas Instruments.  See Solomon v. Texas Instruments, et al., 97-11817-GAO, and Solomon v. Texas Instruments, et al., 04-12499-WGY.[2]  Texas Instruments also argues that the Complaint fails to satisfy the minimum requirements of Fed. R. Civ. P. 8(e)(1) that averments be "simple, concise, and direct," or the requirement of  Fed. R. Civ. P. 9 that averments of fraud be stated with particularity.  Finally, Texas Instruments argues that many of Solomon's claims are barred by the applicable statute of limitations.

Solomon does not dispute that the present Complaint is derivative of the prior Complaints.  Instead, he argues that the motion should be denied because eleven of the

---

is alleged to include Nobel Laureates, Prime Ministers, Generals, Leaders of Industry, Judges and many others of all walks of life. This act was likely seen as a prelude to the murder of their members - and they likely have taken appropriate steps.

[2]Solomon's 1997 Complaint was dismissed on the merits.  The dismissal was subsequently affirmed by the First Circuit Court of Appeals.  Solomon's 2004 Complaint was dismissed on March 28, 2005, for failure to prosecute.  His appeal was later dismissed for failing to pay the appellate filing fee.  This second dismissal was also on the merits. See Owens v. Kaiser Foundation Health Plan, Inc., 244 F.3d 708, 714 (9th Cir. 2001).

191 paragraphs in the instant Complaint set out "new" allegations. These paragraphs, as characterized in the opposition to the motion to dismiss, allege that in 2001, Solomon purchased two Texas Instruments "discovery boards" from PSI for $25,000, that the boards proved defective, that in 2003 and 2004, Solomon was misled by an employee of PSI (Becky Bell) into returning the boards in the belief that they would be repaired, and that Texas Instruments thereafter sold them to "other customers," thereby committing a "grand larceny by deception."[3]

The motion to dismiss will be <u>ALLOWED</u>. Almost all of the claims set out in the instant Complaint have been previously adjudicated adversely to Solomon on the merits. Relitigation of those claims is therefore barred by res judicata. <u>Massachusetts School of Law Andover, Inc. v. American Bar Association</u>, 142 F.3d 26, 37-38 (1st Cir. 1998). The doctrine of res judicata extinguishes not only claims that have been previously adjudicated on the merits, but also the litigation of claims arising from the same set of operative facts that "could have been raised in the prior proceeding." <u>Wolf v. Gruntal & Co., Inc.</u>, 45 F.3d 524, 527-528 (1st Cir. 1995). As Solomon's "conversion" claim could have been raised by a *timely* motion to amend the 2004 Complaint, he is barred from litigating it now.

<u>ORDER</u>

---

[3]Ms. Bell is variously alleged to be an employee of Texas Instruments, PSI, or Tyrex, Inc. Texas Instruments states that she is not one of its employees, but rather an employee of PSI. Texas Instruments also notes that PSI is not one of its subsidiaries, but rather an independent distributor of its products. Absent some plausible basis for holding Texas Instruments vicariously liable for the actions of PSI, there is no conceivable cause of action for conversion against Texas Instruments.

For the foregoing reasons, Texas Instrument's motion to dismiss is <u>ALLOWED</u> with prejudice as to all defendants.  Because this is the third time that Texas Instruments has been forced to defend itself in this court against the same meritless claims, Dennis Solomon is hereby <u>ENJOINED</u> from filing any further Complaints regarding the same or related subject matter without prior leave of court.  The Clerk is directed to post Dennis Solomon on the court's list of enjoined litigants.[4]

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

[4]Texas Instrument notes that Solomon is a serial filer in the federal courts.

4

EXHIBIT 4

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Dennis J Solomon

**DEFENDANTS**
Texas Instruments, Inc. et al

**(b)** County of Residence of First Listed Plaintiff  Barnstable
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
POB 289, Yarmouth Port, MA 02675 (508) 394 9221

Attorneys (If Known)

06 - 11307 RGS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☒ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)
Appeal to District Judge from Magistrate Judgment

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 USC 1, 15,

Brief description of cause:
Scheme to Inflate the Price of Air Defense Systems by Fraud, Larceny, and Intentional Interference

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)
JUDGE _____ DOCKET NUMBER _____

DATE
07/24/2006

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)____Dennis J Solomon v Texas Instruments, Inc. et al_____

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

| | | |
|---|---|---|
| ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
| ☑ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   *Also complete AO 120 or AO 121 for patent, trademark or copyright cases |
| ☑ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
| ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
| ☐ | V. | 150, 152, 153. |

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐   NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES ☐   NO ☑

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐   NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐   NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☑   NO ☐

A.   If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☑     Central Division ☐     Western Division ☐

B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐     Central Division ☐     Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐   NO ☑

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ___Dennis J Solomon (pro se)_____

ADDRESS ___POB 289, Yarmouth Port, MA 02675_____

TELEPHONE NO. ___508 394 9221_____

(CategoryForm.wpd - 5/2/05)

RECEIPT # _1414_____
AMOUNT $ _350_____
SUMMONS ISSUED _Y-32_____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. _____
DATE_____7-28-06_____

**UNITED STATE DISTRICT COURT**
**DISTRICT OF EASTERN MASSACHUSETTS**

FILED
IN CLERKS OFFICE

2006 JUL 28  P 2: 14

U.S. DISTRICT COURT
DISTRICT OF MASS.

DENNIS J. SOLOMON,
     Plaintiff

    v.

Civil Action No.

TEXAS INSTRUMENTS, INC.
PRODUCTIVITY SYSTEMS, INC.
DANA DUDLEY
RAYTHEON, INC.
TELEDYNE, INC.
ROBERT MEHRABIAN
MIT
CHARLES VEST
NATASHA LISMAN
ROBERT LAWLESS
PATRICK E. MALLOY
MICHAEL A. MCMANUS
WERNER ERHARD
LANDMARK EDUCATION, INC.
ALTMAN, INC
SUNRISE SYSTEMS, INC.
MICROVISION, INC.
RICHARD RUTKOWSKI
JOEL KOLLIN
TOM FURNESS
UNIVERSITY OF SOUTHERN CALIFORNIA
ACTUALITY SYSTEMS, INC.
STEPHEN MINDICH
ORIT GADIESH
MARY WOLFSON
CRAN BARRY, INC. / ATLANTIS WEATHERGEAR, INC.
MARK MORDECAI
LOUIS PECK
EILEEN "BUFFI" ROBBINS-MORDECAI
HOWARD PENN
J. DAVID CRAWFORD
JOHN AND JANE DOE 1-10
        Defendants.

**06 - 11307 RGS**

MAGISTRATE JUDGE _____J6D_____

1

## COMPLAINT

### DEMAND FOR JURY TRIAL

Plaintiff Dennis J. Solomon hereby demands a jury trial and avers as follows:

### SUMMARY OF THIS ACTION

The plaintiff, Dennis J. Solomon, avers that he was fraudulently induced by Texas Instruments, Inc. to enter into a Non-Disclosure Agreement, disclose valuable trade secrets, purchase two Texas Instruments ("TI") Discovery Kits and High Speed Boards which TI knew were defective, to direct considerable time and resources to the development of products utilizing the TI DMD, and, in 2004, to return said units to TI for repair or upgrade – whereupon TI refused to return operational units – constituting, among other unlawful acts: grand larceny, restraint of interstate commerce, fraudulent inducement, interstate wire and mail fraud, and intentional interference with business relations.

Further, he avers that the Texas Instruments, Raytheon, Teledyne, Charles Vest and the Defendants, individually, jointly, and as part of an ongoing enterprise and conspiracy, engaged in unlawful acts and schemes to artificially inflate the cost of airspace control and defense system to the United States and other customers,  by intentional committing unlawful acts to restrain interstate commerce, including but not limited to interstate mail and wire fraud, thefts of trade secrets, interference with business relations, the fraudulent claim and prosecution of U.S. Patents, intimidation, assault, battery and other injury to his person and property, vandalism, bribery, murder and the corruption of public officials.

The Plaintiff believes that these events are part of a continuation of a long-standing dispute directed in part by former Nixon administration lawyer, Michael A. McManus, Jr., subsequently Assistant to President Reagan (with Andrew Card and John Roberts), and recently, a member of the Olympic Committee during the Salt Lake City scandals.

The Plaintiff requests monetary damages and the declaration of invalidity of unlawfully obtained patents.

### JURISDICTION

1. This Court has subject matter jurisdiction over the subject matter of this action under 28 U.S.C. § 2201-02, 28 U.S.C. § 1331, 1332 and 1338(a) and other statutes.

### VENUE

2. Venue is proper in this judicial district under 28 U.S.C. § 1391, 1965 and other statutes.  Personal jurisdiction exists in Massachusetts over the defendants by virtue of residence in or substantial commercial contact with this District.

## EXTRAORDINARY MATTER OF CONCERN

3. The Plaintiff, Dennis J. Solomon, believes that this Court should be cognizant of the fact that certain defendants and their associates have been implicated in numerous murders, assassinations and other crimes by the late Attorney General Elliot Richardson and other officials.

4. From 1975 to 1981, the Atlantis defendants were also closely tied to the activities in Vermont and Belgium of Gerald Bull, the Canadian scientist best known for the Iraqi "Super-Gun" and assassinated in Uccle, Brussels, Belgium in March of 1990. In the 1970s, Atlantis Weathergear was manufactured in Richford, Vermont by an affiliate corporation of SRC, and the principals were entertained at the SRC Inn.

5. In 1983, Solomon's counsel, former Vermont Attorney General Kimberly Cheney advised Solomon that the Defendants Michael. A McManus, Jr. and Patrick E. Malloy III were 'dangerous" and that Solomon should reconsider going forward with an appeal to correct the amount of damages Solomon had been awarded based on expert Witness, Prof. van Breda of MIT. This admonition followed a "skiing accident" wherein a 17 year-old John Pistilli, whose father had associations with the defendants, broke both legs of Solomon's co-plaintiff's (Dean Meledones) in the Atlantis stockholders' litigation. When Solomon did so, Cheney withdrew from the case.

6. From 1971 to the present, the Atlantis defendants have been associated with the major drug and arms-for-drugs operations including but not limited to those involving the Afghan mujaheddin during the 1980s. At least six Atlantis associated persons have been indicted and convicted of US-Pakistan operations during the 1980s involving sums in excess of $2 Billion dollars.

7. In 1991, the late Attorney General Elliot Richardson intimated that McManus was also responsible for the strange death of Daniel Casolaro, a journalist covering the INSLAW Affair. Dr. John Nichols would testify that he believed McManus was at the center of the corrupt organization which included Dr. Earl Brian. The INSLAW software was developed in part and modified in Cambridge, MA by acquaintances of the Plaintiff.

8. In 1995, when Solomon was represented by Defendant Robert Lawless, a relation of Solomon's, Regine Choukroun, the famous French singer, restaurateur and Resistance operative of WWII, was arrested in Boston when an "incident" aboard an American Airlines Non-Stop Paris – Miami flight resulted in its "emergency" diversion. Lawless explicitly told Solomon that it was a "set-up" by McManus to obtain the address book and other personal information from Regine to probe the organization – nominally known as "The Ten Million" – a historic, extra-governmental alliance of anti-fascists which is alleged to include Nobel Laureates, Prime Ministers, Generals, Leaders of Industry, Judges and many others of all walks of life. This act was likely seen as a prelude to the murder of their members – and they likely have taken appropriate steps.

9. As Solomon advised this Court a few years ago, it is his belief and opinion that the criminal and duplicitous acts of the Defendants have lead many of the victimized individuals and organizations (including but not limited to U.S. Navy and Air Force fighter pilots, U.S. and foreign intelligence officers, Irish members of UNIFL, Lebanese Christians, Sardinian drug cartels who have suffered physical injuries and

3

deaths as a result) have forgo redress through the United States Courts. Instead they have likely successfully infiltrated the Defendants' corrupt organizations and are in the process of eliminating their dangerous members. Further, this has likely extended to a growing "fragging" (assassination of officers) of corrupt members of the Defense industry which may eventually compete with the official figure of 4,912 "fragging" deaths during the Vietnam War.

10. For some observers, the recent and untimely deaths of MIT Professors Stephen Benton, Michael Dertouzos, MIT alumni Paul Miller of Sunrise Systems LED and Kevin McCormick, LED Artist for Color Kinetics – all of whom represented a serious threat to the power and position of defendants Vest, Mehrabian, Picard power, in general, at MIT-CSAIL, - are suspicious and worthy of further investigation.

11. Solomon believes that as their criminal network disintegrates, certain Defendants including but not limited to McManus, Malloy, Vest and Mehrabian – each of whom is directly responsible for the deaths of U.S. and foreign airmen, soldiers and intelligence officers, and their subordinates, including but not limited to Robert Lawless, Natasha Lisman, USDC Judge O'Toole, and MA Sup. Ct. Judge Richard F. Connon, may behave desperately and attempt to bribe or intimidate this Court, insist insist on quashing based on fraudulent national security claims, and other illegal acts, in order to maintain their sense of power.

12. As the late Attorney General and Harvard Law professor intoned in the New York Times, October 21, 1991, regarding the murder of Daniel Casolaro (implicating McManus and his network),

> "I believe he was murdered, but even if that is no more than a possibility, it is a possibility with such sinister implications as to demand a serious effort to discover the truth."

## PARTIES

### Plaintiff

13. Plaintiff Dennis J. Solomon is a scientist, inventor and investigative journalist with a residence in Yarmouth Port, MA. He attended Massachusetts Institute of Technology (MIT) as an undergraduate and the MIT Sloan Graduate School of Management Executive Program in 1988 and 1989. He founded the EMS Research & Development Program, Atlantis Weathergear 1973, and was a co-author on the first MIT paper on multiple human cell tissue regeneration - 1979. During the 1980's, Solomon developed an advanced three dimensional display with broad applications including medical imaging, air traffic control and missile defense. During 1989, the Secretary of the Navy deemed Solomon's technology of critical importance, and during 1992, a United States Air Force review concluded the architecture was substantially superior to the Defendants' existing technology. Presently, the technology is at the leading edge of target prosecution and strategic analysis. Solomon is an out-spoken supporter of MIT Professor Theodore Postol – a major critic of Raytheon's Patriot Missile program, and independently involved in a dispute with Raytheon in 1993 over the related system for airspace object identification and missile control. In the matter of Volumetric Imaging, Inc. v Raytheon et al., USDC 97-11817-GAO, Solomon moved to modify the protective order for the sole purpose of presenting information related to the deficiencies in Patriot control system in camera to the select United States Senate Armed Services committee. Judge O'Toole denied the motion on June 3, 1998. Implementation of the

4

recommendations would have prevented the "friendly fire" deaths of three coalition pilots and nineteen other troops in the 2003 Iraq War.

Defendants

14. Defendant Texas Instruments is believed to a Texas corporation which manufactures and sells the Discovery DMD devices and technology.

15. Defendant Michael A. McManus, Jr., is a resident of New York and was co-director in FIDCO with Clint Murchison, Jr., former owner of the Dallas Cowboys. McManus was a young Nixon-era lawyer who served in the Ford and Reagan administrations, as Assistant to President Reagan, with special interests in rebuilding Lebanon and Honduras under Ambassador Negroponte in the 1980s, and directed the Williamsburg Summit with aides, Andrew Card and John Roberts. McManus was a senior VP of Pfizer, Inc., and is currently, President of Misonics, Inc., a United States Government biological warfare research organization. During the fall of 1975 and into January 1976, McManus planned and executed the fraudulent "freeze out" of minority stockholders including company founder Solomon, of Atlantis Weathergear, Inc, with co-conspirators, Mark Mordecai and Patrick E. Malloy III. The corporate manager at the time with Harvard Business School graduates Timothy Davis. Mordecai also oversaw the Atlantis cartel, Boston's principal illegal drug smuggling operation which evolved from the on-going Harvard Law School cartel of the Boston Tea Party (See ref. Judge Roy Riepen).   Subsequently, McManus and Malloy used Atlantis Weathergear as the corporate anchor for the development of the waterfront in Sag Harbor.  During the period from 1975-1977, McManus was special counsel to Rogers Morton, Secretary of Commerce and a Maryland boat builder.  During the 1980's, McManus directed Malloy's activities as the America team Captain to the Sardinia Cup, founded by Harvard graduate, Karim Aga Khan, who established the Center for Islamic Architecture at MIT, and contributed to MIT Media Lab founded by John Negroponte's brother, Nicholas.   An adjunct MIT Media Lab was also established in Sardinia. Also during the 1980s, McManus and Malloy also directed a constellation of rock music clubs used as drug distribution points, including but not limited to the Amazon Dock, Sag Harbor, NY; the Golden Nugget in Yonkers, NY; the Channel in Boston, MA; and the Compass Lounge in Yarmouth, MA. Among the convicted felons associated with the Atlantis cartel are Sidney Lewis of Falmouth, MA., Corkie Doperiella of Falmouth and Stuart Newton of Providence, convicted of importing over $1 Billion dollars in Pakistani hashish while supplying arms to the mujahaddin. McManus has also been identified by the late Attorney General Elliot Richardson as a principal player in the Inslaw software scandal involving the murder of Daniel Casolaro in 1991.

16. Defendant Productivity Systems, Inc. is believed to be a Texas corporation, a wholly-controlled, subsidiary of Texas Instruments, Inc. and during the relevant period, the TI required source for the Discovery products.

17. Defendant Tyrex, Inc. is believed to be a Texas corporation, a substantially controlled subsidiary of Texas Instruments.

18. Defendant Dana Dudley is believed to an employee of Texas Instruments, Inc., Tyrex and Productivity Systems, responsible for the Discovery DMD program.

19. Defendant Raytheon is believed to be a Massachusetts corporation with offices in Waltham, MA.

20. Defendant Charles Vest is a minor researcher in holography. From 1968 to 1990 he was associated with the University of Michigan. From 1990 to 2004, he was employed by M.I.T. as president. On June 27, 1990, MIT Tech Talk published the MIT Collective investigation of Vest as "very political ...a Teflon administrator ... [and] nebish technocrat". He knowingly and criminally-received promises of things of value from Raytheon in consideration for mounting an attack on the credibility and attempting the entrapment of MIT Professor Theodore Postol.

21. Defendant Massachusetts Institute of Technology (MIT) is a non-profit, educational institution. In 1990 and 1991, Solomon licensed two dormant patents issued in 1980 and 1987, respectively, from MIT for the remainder of their term.

22. Defendant Teledyne is believed to be a Delaware corporation with offices in Massachusetts, New Hampshire, and California.

23. Defendant Richard Mehrabian is employed as in the administration of the Teledyne companies as President. He attended MIT.

24. Defendant Microvision, Inc. is believed to be a Washington corporation with office in Seattle, Washington.

25. Defendant Richard Rutkowski was employed as President Microvision, Inc. of the State of Washington as President. Previously, he was an officer of Data Display Corporation of Dallas, TX. Rutkowski paid $200,000 to Defendant Sunrise to obtain Solomon's trade secrets.

26. Defendant Joel Kollin has ties to MIT where he was familiar with Solomon's work. He also has ties to University of Washington, Tom Furness, Richard Rutkowski, Microvision and Adam Weinberg, formerly of an advertising executive at Reebok on advertising displays. He filed a patent for a similar retinal scanning display one year after Solomon.

27. Defendant Alan B. Morse is a former President of U.S. Trust Company of Boston, president of Harvard Community Health Plan during its bankruptcy, and Massachusetts banking commissioner doing the investigation of U.S. Trust Company. Morse was present at meeting sponsored by U.S. Trust Company CEO Jack Sidel in 1982 where Solomon presented his HoloDeck Volumetric technology. Morse conspired with other Atlantis cartel associates to disrupt Sidel's personal and professional life.

28. Defendant University of Southern California is a non-profit, educational institution. It does not manufacture or sell 3D displays. USC knowingly and willfully conspired with the other Defendants to oppose the grant of the trademark HoloDeck for an unlawful purpose.

29. Defendant Actuality Systems, Inc. is believed to be a Massachusetts corporation with office in Burlington, MA. Defendant Robert Ryan is believed to be the principal financier and Chairman of the Board of Actuality Systems, Inc. Prior to Actuality he was employed by Digital Equipment, Inc. and founded Ascent. Defendant Greg Favolora is believed to be a resident of Massachusetts and a founder of Actuality Systems, Inc. While a student at Yale, he received information from associates of Morse regarding Solomon's inventions and pending patents. He fraudulently claimed and promoted Solomon's technology as his own.

30. Defendant Lightspace Technologies, Inc. (hereinafter referred to as "Lightspace") is believed to be a foreign corporation with employees and agents in Massachusetts and offices in Connecticut and Sweden. Defendant Alan Sullivan is believed to be a founder and employee of Lightspace. Sullivan knowingly conspired with Texas Instruments, Inc. to mislead the relevant consumers regarding the origin and invention of technology developed by Solomon by fraudulently conveying, suggesting, supporting and funding an MIT thesis project incorporating Solomon's technology.

31. Defendant Stephen Mindich of Newton, MA is believed to be the owner of the Boston Phoenix (formerly Boston After Dark), a Boston tabloid, husband to former Judge Maria Lopez and a close friend of Mary Wolfson. In the early 1970's, Solomon supported Mindich's competitors, the Cambridge Phoenix and the Real Paper. Since the 1970's, Mindich has maintained a dossier on the drug use of Boston area students, especially at Harvard's Law and Business Schools, and used the Atlantis cartel to provide drugs to politicians, judges, rock stars, and other personalities.

32. Defendant Mary Wolfson of Boston, MA is believed to be a close friend and business partner of former Judge Maria Lopez and Stephen Mindich. In 1995, Wolfson introduced herself to Solomon at a seminar on the Israeli evaluation of the Patriot Missile.

33. Orit Gadiesh is believed to be a close friend of Stephen Mindich and Maria Lopez, and the former president of Bain and Company. In 2004, Gadiesh failed to respond to a written request for clarification by Solomon. Gadiesh is believed to have used her Bain and personal contacts to unlawfully conspire to obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

34. Sunrise Systems, Inc. (hereinafter called "Sunrise") is believed to be a Massachusetts corporation manufacturing LED signs. During the 1990's, Sunrise manufactured HoloDeck Volumetric Displays and other experimental items for Solomon.

35. Patrick E. Malloy III is believed to be a resident of Southampton, N.Y. and the developer of Malloy Wharf in Sag Harbor. During the 1980's, Malloy was a major participant in the famous Amazon Club, a nightclub on Malloy Wharf, owned in part by Preston Powell, grandson to Congressman Adam Clayton Powell.

36. Defendant Louis Peck was a justice on the Vermont Supreme Court whose daughter was a participant in the Atlantis drug cartel, and, for her protection, has actively conspired to protect the Atlantis cartel unlawful activities.

37. Mark Mordecai, raised in Newton, MA was a shareholder of Atlantis and operated the Atlantis Cartel for Malloy, a major narcotics trafficking operation involving Palestinian, Pakistani, Moroccan, and Malaysian operatives. In 1985, he instructed his parents, Herbert and Eileen Mordecai to move to Yarmouth Port, MA, less than 1 mile from a summer residence of Solomon.

38. Howard Penn is believed to be the owner of Puritan Clothing, Inc., Hyannis, MA

39. J. David Crawford is believed to be a close friend of Defendants Penn and Vinton, and aided and abetted their scheme to disparage the business reputation of the Plaintiff.

40. Altman Stage Lighting Company (hereinafter called "Altman") is believed a New York corporation engaged in the manufacture and sale of lighting fixtures for stage, theater, television and the music industry. Robert, Randall and Elle Altman are believed to be the owners of Altman.

41. Werner Erhard (Zust), originally Jack Rosenberg is believed to be a foreign resident of the Cayman Islands, a close friend of Defendant Malloy's, who during the relevant period conspired and directed his disciples and associates in EST and Landmark to unlawfully obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

42. Landmark Educational Corporation is believed to a wholly control corrupt organization of Erhard and a conspirator to unlawfully obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

43. John and Jane Doe 1-25 are believed to be co-conspirators and agents of the Defendants engaged in the aforementioned unlawful activities.

## BACKGROUND

44. During the early 1970s, the Plaintiff Solomon was employed by EMS, Inc. (Eastern Mountain Sports, Inc.) in various capacities including at times as Director of Research, Design, & Development, Director of Advertising, and Boston Store Co-Manager. As Director of Advertising, Solomon supported the Cambridge Phoenix newspaper as opposed to Boston After Dark, owned by Stephen Mindich. In the battle after Mindich's purchase of the Phoenix, Solomon supported its competitor, the Real Paper. Solomon's partner in Atlantis Weathergear, defendant Mordecai, supported Mindich.

45. As Director of New Products, Solomon visited Grand Rapids, MI to develop down products manufacturing – a project which came to the attention of Congressman Gerald Ford. Solomon left EMS in 1973 to found Atlantis Weathergear – whose designs received accolades from the America's Cup teams in 1974. Atlantis products were manufactured by Alb, Inc., a Somerville, MA police, fire coat and L.L. Bean outerwear manufacturer with friendly ties to the Winter Hill mob of Whitey Bulger, and Monsoon, Inc. of Richford, Vermont, an outerwear manufacturer with ties to Space Research Company owned by "Super gun" scientist, Gerald Bull. Atlantis' success came to the attention of Michael A. McManus, Boston born attorney who was special counsel to Ford's Secretary of Commerce, Rogers Morton, also a boat builder from Maryland, and then Elliot Richardson. McManus's close friend and partner, Patrick E. Malloy III, approached Atlantis to anchor a marine wharf development in the center of Sag Harbor, N.Y. Malloy subsequently invested in Atlantis.

46. During the fall of 1975, defendants Malloy, McManus, and Mordecai devised a scheme to freeze-out Solomon. Timothy Davis of Stowe, VT, the general manager of Atlantis at the time, was a Harvard Business School classmate of the present President George W. Bush. At a special stockholder's meeting called by Malloy and Mordecai on January 19, 1976, Davis reported that the company was during extremely well: growing at 400% and showing its first profit. Malloy, contradicted

8

Davis, and claimed the company was in "dire straits" and threatened to call short term demand notes due him secretly executed by Mordecai and Malloy two months earlier to replace revolving inventory and receivables bank financing. When Solomon asked that the meeting be suspended for 10 days for an accounting, Malloy objected and with Mordecai's vote, sold all the assets to himself. Litigation ensued, and Solomon's expert witness, MIT Sloan Professor Michael van Breda testified that the company was a typical "successful start-up" with sufficient resources to continue without additional financing for at least 6 months. The Court found for Solomon and stated that the sale of assets "displayed itself as a badge of fraud."

47. Following the "freeze-out" of minority shareholders in Atlantis, Solomon returned to MIT and the Marine Biological Laboratories in Woods Hole, MA, where he studied marine biology.

48. Malloy, through his sister-in-law, contacted defendant Werner Erhardt, founder of EST and Landmark Educational Associates. Acting through a number of post-doctoral scientists at the Marine Biological Laboratories, Erhardt invited Solomon to attend with 1980 America's Cup aboard the flying bridge of famed yachtsman, Richard "Dick" Bertram. Solomon attended and an intellectual fight ensued with Erhardt.

49. At the time, Solomon was consulting to CB Sports, Inc. of Bennington, VT, a skiwear manufacturer with close ties to the Portillo Ski Resort in Portillo, Chile. The operational executive, Wayne Wetzel, a Harvard Business School graduate from Warwick, RI, maintained close ties to Raymond Patriarca, Jr., a son of the RI Mafia head. Following the success of Solomon's designs at the 1980 America's Cup, Wetzel unilaterally repudiated the royalty provision of the contract.

### THE ATLANTIS CARTEL & BRIBERY OF PUBLIC OFFICIALS

50. From 1973 to the present, Mordecai, and later Malloy, McManus, Kollin, Wetzel, Vinton, Plotkin and other persons, conspired in an ongoing criminal narcotic enterprise for personal enrichment including the importation of substantial amounts of hashish from Lebanon, Morocco and Pakistan into Sag Harbor, New York City and other ports of entry. During McManus's employment as Assistant to the President of the United States from 1982-1985, exchanging arms for drugs and currency support of anti-Soviet mujahaddin in Afghanistan including Usama Bin Laden. From 1988 to the present, the Defendants have engaged in narcotics trafficking with U.S.-based Israeli, Palestinian, and Egyptian terrorists, including Yonkers, NY World Trade Center bombers, Mohammed Saleh, Ramzi Yosef, and Khalid Sheikh Mohammed.

51. This corrupt enterprise is known as the "Atlantis cartel" and evolved from the Harvard Law School-based enterprise providing recreational narcotics to the Cambridge and Boston colleges through the Boston Tea Party, a nightclub owned by Harvard Law graduate, Circuit Judge Roy Riepen.

52. In order to prevent their indictment, the Defendants double-crossed two of their expendable satellite groups involving Sidney Lewis of Falmouth, MA and Stuart Newton of Jamestown, RI. Both Lewis and Newton were indicted and convicted of narcotics trafficking from Pakistan in excess of $100 million dollars. Principal distribution of said narcotics was through the Amazon nightclub located in the

9

Atlantis complex on Malloy's Wharf, Sag Harbor, New York; the Compass Lounge in Yarmouth, MA, the Boston Phoenix paper distribution, the adjoining Boston Cab Company and other affiliates of the Defendants. Among the individuals indicted were persons appearing in the 1974 Atlantis Weathergear catalog.

53. The Atlantis cartel, operated under the protection of Vermont Justice Peck, whose daughter was involved in recreational drug use, and the late William Rehnquist of Greensboro, who son, John, a Massachusetts resident, has been actively involved.

54. The Defendants also operated an illegal enterprise engaged in the trafficking of cocaine from South America. Distributors included John Zaccaro (the "pharmacist"), son of Geraldine Ferraro, then a student at Middlebury College. A principal method of transport involved ocean tugs employed by the oil industry. Presently, Ferraro remains a corporate director of Goodrich Petroleum, a publicly traded oil exploration company in the Gulf of Mexico, controlled by Defendant Malloy.

55. The Defendants' criminal enterprise entwined itself with the U.S and foreign intelligence communities including the Irish UNFIL soldiers, German, Italian, Russian, Lebanon and Israeli agents. These connections were publicized by activities of the late Attorney General Elliot Richardson following the appointment of a special prosecutor in the PROMIS affair. Commencing with the indictments of the Atlantis Newton cartel in the late 1980s, the Defendant's systematically double-crossed their collaborators resulting in the deaths of at least five UNIFIL Irish soldiers, numerous Israelis, Lebanese, Canadians and Americans.

56. The Defendants, including McManus, whose activities include the research and development of biological warfare agents and equipment related to cell transformation (cancer) and cardiac arrhythmias (heart attacks), has been implicated in the deaths of journalist Daniel Casolaro, arms scientist Gerald Bull, attorney Barbara Salken, Dutch intelligence officer Sjord Lundberg, and Harvard scientist Dr. J. Morris Weinberg.

57. On or about May of 1997, Solomon advised the FBI that Yonkers-related WTC terrorists were actively involved in continuing narcotics trafficking through the Atlantis Cartel and clubs such as the "Golden Nugget" in Yonkers, NY; interested Ultralight and glider aircraft motors, and developing Boston connections. Khalid Shaikh Mohammed, the disco-loving, North Carolina educated, mastermind of 9/11 was a related member of this wing, with contacts at the Boston Cab Company and in Newton Highlands, MA.

58. On or about May of 1999, Solomon advised the FBI, U.S. Representative Michael Meehan and other government officials of his knowledge and belief that adversaries of the Atlantis Cartel were assembling sophisticated missile guidance modules using Dutch and German electronic components.

59. It is the Plaintiff's belief and opinion that Defendants' criminal acts directed at MIT Professor Theodore Postol has caused the spontaneous involvement of over 80% of the academic, scientific and engineering community to independently devise methods to neutralize the Defendant corporations, Raytheon, Teledyne and Texas Instruments. Historically, among these methods has been the introduction of undocumented exceptions and "back doors" in critical software. The relevant complexity of government operations are described in the novel "Where the Sun Don't Shine" by Fred Wefer of the Mitre Corporation and other publications.

60. It is the Plaintiff's belief and opinion that the Mindich and the Atlantis Cartel have maintained dossiers on the recreational narcotic use by public officials, judges and attorneys , especially law students at Boston College, Harvard and Yale, including Allan Desherwitz, Stephen Breyer, John Kerry, Robert Lawless, John Zaccaro, John Buckley, George W. Bush, Jeb Bush, John Rehnquist, Eugene Scalia, William LeBlond and many others, which have been used to unlawfully influence their official actions.

## BACKGROUND: AIR DEFENSE & CONTROL SYSTEMS

61. For the past twenty years, Solomon has consistently invented the most accurate and practical missile and air control systems.  His technology was developed in part through Volumetric Imaging, Inc., a Delaware corporation, in which he was an officer and director.

62. During 1989, the Secretary of the Navy directed that the USN and FAA incorporate Solomon's technology in the advanced planning.

63. On Solomon further augmented his related IP portfolio by licensing the Berlin patent from MIT.

64. During the spring of 1991, the U.S. Department of Defense requested proposals for the Joint Surveillance & Tactical Attack Radar System.

65. At the time, the principal competitors were Defendants Raytheon, Inc., Texas Instruments, Inc. and Teledyne Microelectronics, Inc.

66. After evaluation the proposals, Solomon's technology was judged superior.  On Raytheon Corporation, a long-standing partner with Texas Instruments, Inc., contact Solomon and offered to switch to his technology.  Extensive discussions and disclosures of Solomon's trade secret information ensued.

67. Two days before the deadline, Raytheon assured Solomon the required formal proposal was be submitted from Raytheon's Pentagon office.  Over a week later, Solomon was informed that the "night before" the deadline, Raytheon decided to switch back to its "former" partner, Texas Instruments, Inc.  Solomon formally protested the actions and the U.S. Department of Defense cancelled the project award.

68. Subsequently, the U.S. Department of Defense Joint National Intelligence Group funded Solomon to further develop his technology, one aspect of which could constructively utilize a Teledyne Microelectronics product and other the Texas Instruments, Inc. DMD (digital micromirror device) chip.  Both technologies were sole source at the time.

69. Solomon (though Volumetric Imaging, Inc.) entered into an agreement with Teledyne Microelectronics, Inc., who breached the agreement and attempted to induce Solomon to incorporate defective and inferior components in his project.  During related meeting in California, Teledyne employee Robert Kennedy invited Solomon to dinner at a restaurant, Marina Del Rey, suggesting that this was a favorite for former White House aide, Michael McManus, the target of an investigation by former Attorney General Elliot Richardson.

70. Discussions ensued and on May 13, 1994, Solomon and Texas Instruments, Inc. executed bilateral NDA agreements and commence discussions.  Following Solomon's disclosure of part of his pending patent applications, Texas Instruments

11

unilaterally terminated the discussions.   Shortly thereafter, the Texas Instruments
Defense Display group was purchased by Raytheon.  No further discussions ensued
until 2002.

## CONTEMPORARY ACTS: TEXAS INSTRUMENTS

71. During the summer of 2001, Solomon exhibited his technology at SIGGRAPH in Los
Angles.   Dana Dudley, TI DMD New Products manager, approached Solomon and
induced Solomon to incorporate the TI DMD chips in his new projects and products
by offering full support and access through a new TI program called DISCOVERY,
administered by TI's subsidiary, Productivity Systems, Inc, (www.prodsys.com).

72. A direct result of Dudley's guarantees, Solomon contracted with TI, through its
subsidiary, PSI, to construct real-time, triggerable Discovery system with an
advertised rate of at least 4 KHz.

73. Solomon paid PSI at least $25,000 for the system and expended at least $150,000 in
the direct development of the DMD project.

74. Following the payments, Solomon discovered that the TI/PSI product was defective.
He informed PSI and TI of the problem, and both agreed to solve the problem.

75. However, TI and PSI willfully and intentionally delayed providing a solution, refused
to release the technical details which would permit Solomon to identify the problem,
and made fraudulent and misleading statements regarding the reasons for the delay.

76. As a direct and intentional result, Solomon was unable to conduct business with
prospective client Boeing, Daimler-Benz and others. Further Solomon was unable
present his system at SIGGRAPH 2003.

77. TI and PSI continued to mislead Solomon during the fall of 2003 and into 2004.

78. On or about June, 2004, PSI employee Becky Bell stated as a result of an internal
dispute with TI, it had ordered PSI to close it doors, and required the transferred all
its assets to TI.

79. During July 2004, Solomon made demand upon TI for technical assistance or
replacement.  TI refused, claimed that PSI was a separate company, and that TI is not
liable for PSI breach of contract.

80. On August 17, 2004, by electronic communication, Solomon received instructions
from Becky Bell, Discovery Sales Manager for TI, Tyrex and PSI, to return the TI
Discovery board.

81. Solomon returned the board for replacement.

82. On or about August 24, 2004, Solomon received a letter from Boston attorney Paul
Killeen stating that TI has requested that "any further correspondence about TI and/or
its products" be directed to him.

83. Shortly thereafter Solomon communicated with Killeen and requested the name of the
authorizing party at TI.  Killeen refused to provide said information.

84. As a direct and intentional result, Solomon was unable to present his system at SIGGRAPH 2004 and future events...

85. From August, 2004 to present, Solomon's professional reputation was damaged by TI and Killeen's false statements to representatives of MIT and other public figures.

86. TI and Killeen engaged in the aforementioned unlawful behavior in conspiracy with the other Defendants to defraud the armed services and agencies of the United States by knowingly promoting inferior products for critical defense, security and medical applications.

87. The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## COUNT I
### (TI –RESTRAINT OF INTERSTATE COMMERCES -LARCENY)

88. Aforementioned paragraphs are incorporated by reference as if stated fully herein.

89. TI intentionally directed Bell to instruct Solomon using interstate wire communications, to return the Discovery boards under the false pretense of replacement or upgrade, when in fact, TI intend to retain the Discovery boards to prevent Solomon from competing with TI's subsidiaries.

90. The aforementioned acts restrained interstate commerce and artificially inflated the price of air defense systems to the United States government.

91. Said TI-Raytheon systems are inferior to competitive systems.

92. The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## COUNT II
### (Trademark, Conspiracy to Obtain Trade Secrets, All Defendants)

93. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

94. On August 23, 1993, Solomon filed a U.S Trademark application for the stylized word "HoloDeck" for 3D display systems. On May 30, 2000, the application was published for opposition and shortly thereafter the Defendant USC filed an opposition on the grounds the term was generic.

95. USC counsel testified the Dr. Michael Macedonia, the civilian director of the U.S. Army Simulation Lab and principal grantor in the a $50 million U.S. DOD grant to USC, requested that USC filed the opposition so that he and others could form a private corporation in competition with Solomon.

96. During discovery, a majority of the relevant staff at USC testified that they were unfamiliar with the term prior to their employment at USC.

97. Thereafter, Defendants USC acting on behalf of certain government officials, Edelman, Lisman, Lawless, Teledyne TI/PSI and Raytheon agreed to conspire to interfere with the business relations of Solomon by inducing TI/PSI to defraud Solomon by falsely claiming full support and an ongoing solution to the Discovery timing problem.

98. Shortly thereafter, USC filed an amended opposition claiming failure non-use in commerce and additional discovery for all business records.

13

99. Defendant Edelman failed to disclose that his firm represents Defendant Teledyne, a direct competitor of Solomon.

100.  The aforementioned Defendants used the process of opposition as an unlawful scheme to obtain Solomon's trade secrets.

101.  The aforementioned Defendants used the process of opposition as to interfere with the ability of Solomon to raise funds and enter into beneficial contracts for his business.

102.  The aforementioned Defendants knew that Solomon has continuously used the mark "HoloDeck" in interstate commerce, including regular exhibiting at the major U.S. computer graphics show held biannually in Los Angles, a few block from USC.

103.  The aforementioned Defendants engaged in said unlawful activities to defraud the U.S. government of at least $50 million dollars and endanger U.S. soldiers and citizens by asserting in their request to the U.S. Government for payment of funds that their display technology was the most appropriate when in fact they knew that their technology was defective and inferior to Solomon's.

104.  The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## COUNT III
### (Ti, Teledyne, Lisman, Lawless, MIT, Vest, Raytheon, Actuality, Lightspace)

(Fraud, Bribery, Conspiracy, Scheme to Obtain Trade Secrets, Interference with Present and Prospective Commercial Relations, Commercial Disparagement)

105.  Aforementioned paragraphs are incorporated by reference as if stated fully herein.

106.  From 1989 to the present, Teledyne, Raytheon, Texas Instruments, Actuality and Lightspace engaged in an unlawful conspiracy to interfere with the interstate commerce of Solomon by fraudulently inducing Solomon, individually, or in his executive capacity, to enter into contracts with the Defendants for goods or services using the U.S. mail and interstate wires, intentionally breaching or repudiating said contracts, and disparaging Solomon's business reputation.

107.  In a first instance, MIT offered Solomon an exclusive license for the Kollin patent, Teledyne offered to manufacture the components, but, when success was insured which would have removed Raytheon from competition, Teledyne breached said contract by supplying defective, uncertified components, and MIT unilaterally repudiated the license on fraudulent and specious grounds.

108.  Teledyne Technologies, Inc., a 1st tier subcontractor to Raytheon, Inc. for simulation systems for the Patriot Missile.[1]

109.  Richard Simmons was the President of Allegheny Teledyne, Inc., parent company of Teledyne Technologies, Inc.  During the relevant period of November of 1999, Richard Simmons donated $20 million dollars to MIT.[2]

110.  In consideration for the $20 million dollars and other consideration, Vest authorized MIT to unilaterally repudiate its licensing agreement with Volumetric Imaging, Inc., causing direct injury to Solomon.

---

[1] Teledyne Technologies Annual Report 2003, Pg. 14-15
[2] MIT News, November 17, 1999

14

111.    In consideration for the $20 million dollars and other consideration, Vest
authorized MIT to knowingly promote the fraudulently obtained products of Favalora
and Actuality Systems.

112.    In consideration for the $20 million dollars and other consideration, Vest and
Morse induced Robert Ryan, Navigator Ventures, Halliburton, Apache Oil to invest
in the manufacture of the fraudulently obtained products of Favalora and Actuality
Systems.

113.    In a second instance in the period from 2002-2004, TI, in conspiracy with
Raytheon and the other Defendants, contracted to supply a high speed shutter system
and intentionally to Solomon individually, intentionally supplied a defective product
and intentionally obstructed and delayed its perfection.

114.    The aforementioned acts caused substantial injury to Solomon's business,
property and business reputation.

## COUNT VI
### (All Defendants)

(Scheme to Obtain Trade Secrets)

115.    From 1980 to the present, the Defendants including but not limited to Altman,
Wolfson, Plotkin, Ellis, Gadiesh, Mindich, Morse, Teledyne, Raytheon, Texas
Instruments, Vest, Actuality and Lightspace, engaged in an unlawful conspiracy to
obtain the trade secrets of Solomon by fraudulently inducing Solomon to enter into
contracts with the Defendants for goods or services using the U.S. mail and interstate
wires.

116.    In 1996, Defendants changed strategy through Mindich, Morse, Gadiesh, induced
Wolfson to engage in schemes to obtain Solomon's trade secrets related to his
pending U.S. Patent applications and other research.

117.    Said acts include, but are not limited to, plying Solomon with liquor at a private
dinner with her woman friend, Myra Huff, and suggesting sex in exchange for
designs involving TI DMD technology related to displays, 3D and lighting.

118.    On another occasion, Wolfson unlawfully obtained Solomon's house and
automobile keys by conspiring with her repairperson, and transferred the same to
other Defendants, in a scheme to obtain detailed research in the truck of Solomon's
car.

119.    On another occasion Wolfson schemed to obtain Solomon's trade secrets by
obtaining detailed information on the security systems on Solomon's notebook
computer and transferring said information to the other Defendants.

120.    The aforementioned acts caused substantial injury to Solomon's business,
property and business reputation.

## COUNT V
### (Altman)

(Breach of Contract and Declaratory Judgment Action for a Declaration of Re-
assignment of Solomon's Patent and infringement)

15

121.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

122.    Solomon has been independently involved in concert lighting and effects from the late 1960s.

123.    Solomon is the independent inventor of U.S. Patents 4,958,265, 4,897,770, 4,893,225, 4,811,182, 4,777,568, 4,729,071, 4,706,006 related to lighting systems.

124.    In 1985, Altman principally sold lighting fixtures to traditional stage, theater, film and television customers.  During the period from 1984-1990, Solomon entered into a number of contracts, all of which by explicit agreements, differentiated between traditional stage, theater, film, television applications and rock (in the broad context) concert applications.

125.    Altman fraudulently induced Solomon to license and assign said patents to Altman by explicating stating that Altman would bay a royalty of 5% of sales or lease fees, plus the preferred involvement use or equivalent income, on all use, sale or lease of Solomon's inventions for rock concerts, when in fact Altman had no intention to due so.

126.    On or about 1995, Altman unilaterally repudiated said contracts.  Thereafter, all use of the Altman fixtures represented the infringement of Solomon's patents.

127.    Said terms of said contracts were not severable.

128.    Thereafter, Altman continued to use Solomon's invention for the rock concert applications including but not limited to the band PHISH.  Altman or its agents provided an operator at all such concerts.

129.    On 6/14/2002 and other occasions, Altman used and infringed upon Solomon's inventions by transporting said Altman fixtures to the Tweeter Center in Massachusetts and using same in the performance of the band PHISH.

130.    The minimum damages for each said performance instance of infringement would be $12,000.  During the past six years, Altman has infringed at least 400 times and at least 80 times within the Commonwealth of Massachusetts.

131.    Robert Golden and Rodney Gould aided and abetted said infringement by intentionally misleading Solomon into believing that said Altman fixtures were not used by the band PHISH.

132.    Altman, Robert Golden and Rodney Gould intentionally and fraudulently conveyed the impression to this Court that Altman did not use Solomon's patent technology in the Commonwealth of Massachusetts...

133.    Altman, Robert Golden and Rodney Gould furthered conspired to damage Solomon's by organizing schemes to obtain Solomon's trade secrets.

134.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.


Declaratory Judgment: Patents


COUNT VI
(Raytheon, Texas Instruments)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of Actuality U.S. Patents)

135.   Aforementioned paragraphs are incorporated by reference as if stated fully herein.

136.   On May 31, 1994, Solomon filed a U.S. Patent Application entitled Three Dimensional Volumetric Display System with Polarizing Enclosure.  Figure 11 of said application teaches Solomon's earlier invention of a "system for increasing the control of visual intensities from digital shutter projection devices" wherein digital shutter array is sequentially illuminated by different intensities encoded "in a binary scheme of 1,2,4,8 …etc  A variation is the rotating color shutter on the light source with a binary scheme for each color."

137.   The '94 application restates material presented by Solomon to Texas Instruments and Raytheon engineers during the period from approximately March 1990 to June 1993.

138.   On December 21, 1994, Raytheon filed U.S. Patent Application 08/360,870, now U.S. Patent 5,903,323 entitled a "Full Color Sequential Image Projection System Incorporating Time Modulated Illumination."  Said '323 patent claims a binary modulation system identical to that disclosed to Raytheon by Solomon more than a year earlier.

139.   Raytheon had a duty to and intentionally failed to disclose Solomon's identical prior art to the U.S. Patent office during the prosecution of the '323 patent.

140.   Raytheon has claimed to Solomon and others that U.S. Patent '323 is valid and enforceable.

141.   Solomon has a reasonable apprehension of being subject to a suit for infringement of said patent due to the prior notice of enforceability by Raytheon.


## COUNT VII
### (Actuality)

### (Declaratory Judgment Action for a Declaration of Non-infringement, Invalidity, and Unenforceability of Actuality U.S. Patents)

142.   The aforementioned paragraphs are incorporated by reference as if stated fully herein.

143.   Favalora and Actuality claim to be the true and original inventors of the following inventions:  U.S. Patent No. 6,570,681; 6,554,430; 6,512,498; 6,489,961; 6,487,020; 6,183,088

144.   Solomon is manufacturing and offering for sale an Integrated HoloDeck Volumetric Autostereoscopic Display and Projector System

145.   Actuality has communicated that Solomon's Integrated HoloDeck Volumetric Autostereoscopic Display System infringes on Actuality patents and that it will rigorously prosecute infringers.

146.   Solomon believes that the Actuality patents read upon or incorporate his earlier-filed inventions described in his U.S. patent applications filed in 1985 and thereafter.

147.   Solomon has a reasonable apprehension that Actuality will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has

17

arisen and exists between Actuality and Solomon within the meaning of 28 U.S.C. § 2201

148.  Solomon has not infringed any valid and enforceable claim of the aforementioned patents, either literally or under the doctrine of equivalents

149.  The Actuality patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Actuality had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

150.  A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

151.  Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.


## COUNT VIII
### (Microvision, inc., Univ. of Washington, Kollin, et al)

### (Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of Actuality U.S. Patents)

152.  The aforementioned paragraphs are incorporated by reference as if stated fully herein.

153.  From 1984, Solomon disclosed his invention of retinal scanning displays with dynamic accommodation and resonant scanners to staff and faculty at MIT.

154.  Joel Kollin was a student at MIT and had access to Solomon's inventions disclosed at MIT including Solomon retinal scanning system.  On or about September, 1989, Kollin left MIT for the University of Washington, Seattle.

155.  Richard Rutkowski is the president of Microvision of Seattle, WA, a licensor of retinal scanning patents granted to Kollin.

156.  Prior to Microvision, during the late 1980s and early 1990s, Rutkowski was an officer of Data Display, Inc. of Texas, a customer of Sunrise Systems, Inc. of Pembroke, MA. whom Rutkowski regularly visited.

157.  In the early 1990s, Sunrise Systems manufactured prototypes of LED based experiments for Solomon including retinal scanning displays.

158.  Solomon's relevant inventions and experiments were known to Defendants', their staff, employees, faculty, agents and others prior to their filing the relevant patent applications.

159.  In 1995, Rutkowski paid Sunrise Systems, Inc. over $200,000 for having provided unlawful access to Solomon's trade secrets related to displays and retinal scanning.

160.  Microvision and the University of Washington claim to have the assignment of, or to be the true and original inventors of the following inventions by the Defendants:
6,768,588; 6,762,867; 6,755,536; 6,752,496; 6,734,835; 6,719,425; 6,714,331; 6,710,342; 6,700,552; 6,700,552; 6,687,034; 6,682,192; 6,674,993; 6,661,393; 6,654,158; 6,653,621; 6,650,877; 6,639,719; 6,639,570; 6,612,355; 6,605,805; 6,583,772; 6,563,105; 6,563,105; 6,560,028; 6,538,625; 6,535,325; 6,535,183; 6,525,310; 6,515,781; 6,515,278; 6,512,622;

18

6,497,649; 6,445,362; 6,433,907; 6,417,502; 6,396,461; 6,392,231; 6,388,641; 6,384,406;
6,369,953; 6,362,912; 6,352,344; 6,331,909; 6,324,007; 6,317,103; 6,294,775; 6,294,775;
6,285,505; 6,285,489; 6,281,862; 6,256,131; 6,250,755; 6,245,590; 6,243,186; 6,220,711;
6,204,832; 6,204,829; 6,196,226; 6,188,832; 6,166,841; 6,157,352; 6,157,352; 6,154,321;
6,151,167; 6,145,986; 6,140,979; 6,097,353; 6,069,725; 6,061,163; 6,049,407; 6,046,720;
6,043,799; 6,008,781; 5,995,264; 5,982,555; 5,982,528; 5,969,871; 5,958,919; 5,903,397;
5,903,397; 5,903,397; 5,719,784; 5,701,132; 5,659,327; 5,596,339; 5,560,360; 5,467,104;
5,171,267.

161.    Solomon is manufacturing and offering for sale an Integrated HMD Autostereoscopic Display and Projector System

162.    Defendants have communicated that Solomon's Integrated HMD Autostereoscopic Display System infringes on Defendants patents and that it will rigorously prosecute infringers.

163.    Solomon believes that the Defendants' patents read upon or incorporate his earlier-filed inventions described in U.S. patent applications filed in 1990 and thereafter.

164.    Solomon has a reasonable apprehension that Defendants' will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201

165.    Solomon has not infringed any valid and enforceable claim of the patents, either literally or under the doctrine of equivalents

166.    The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

167.    A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

168.    Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

COUNT IX
(Lightspace)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of U.S. Patents)

169.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

170.    Solomon is manufacturing and offering for sale an Integrated SS Autostereoscopic Display and Projector System

171.    Defendants have communicated that Solomon's Integrated SS Autostereoscopic Display System infringes on Defendants patents and that it will rigorously prosecute infringers.

172. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

173. Solomon believes that the Defendants patents read upon or incorporate his earlier-filed inventions described in U.S. patent applications filed in 1990 and thereafter.

174. Solomon has a reasonable apprehension that Defendants will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201.

175. Solomon has not infringed any valid and enforceable claim of the Defendants' patents 6,466,185, 6,377,229, 6,100,862, either literally or under the doctrine of equivalents.

176. The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

177. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

COUNT X
(Altman)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of related Altman Patents)

178. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

179. Solomon is manufacturing and offering for sale an Integrated SS Autostereoscopic Display and Projector System.

180. Altman owns U.S. Patents 6,571,005 and 6,412,972.

181. Solomon has a reasonable apprehension that Defendants will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201.

182. Solomon has not infringed any valid and enforceable claim of the Defendants' patents, either literally or under the doctrine of equivalents.

183. The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

184. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

20

### REQUEST FOR RELIEF

185.    Solomon requests this Court find the Defendants guilty of the following and other violations of law: Conspiracy In Restraint Of Trade (Title 15 Chapter 1, Section 1, Civil Action Section 15); Conspiracy To Monopolize (Title 15 Chapter 1, Section 2, Civil Action Section 15) and award treble damages, the exact amount to be determined at trial.

186.    Solomon requests this Court find the Defendants guilty of the following and other violations of law: Larceny Of Real Property Over $250 (MGL Chapter 266: Section 30(1)); Larceny Of Trade Secrets (MGL Chapter 266: Section 30(4)); Conspiracy To Commit Larceny Of Trade Secrets (Title 18, Chapter 90, Section 1832; Conspiracy To Interfere With Interstate Commerce; Mail Fraud (Title 18, Chapter 63, Section 1341); Wire Fraud (Title 18, Chapter 63, Section 1343); Tampering With A Victim (Title 18, Chapter 63, Section 1512); Retaliating Against A Victim & Witness (Title 18, Chapter 63, Section 1513); Fraud In The Sale Of Securities (Title 11, Chapter 63, Section 1513); said being predicate acts within the last ten years under the RICO Act (Title 18, Chapter 96, Section 1964). and award treble damages, the exact amount to be determined at trial.

187.    Solomon requests a judicial declaration of non-infringement, invalidity, and unenforceability of the patents listed herein.

188.    Solomon requests that this Court award him actual, compensatory and punitive damages for the Defendants' interference in his commercial activities and other unlawful acts, in an amount greater than $75,000, exact amount to be determined at trial.

189.    Solomon requests that this Court enjoin the defendants from engaging in further criminal acts against Solomon, his family and associates, including but not limited to intimidation and schemes to obtain trade secrets.

190.    Solomon requests that this Court grant other relief as it deems just and proper.

191.    Solomon requests a jury trial of all matters.


Respectfully submitted on July 24, 2006


Dennis J. Solomon
PO Box 289
Yarmouth Port, MA 02675
(508) 394 9221

21

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2006 JUL 28 P 2: 15

U.S. DISTRICT COURT
DISTRICT OF MASS.

Dennis J Solomon

_____

V.                                        CASE NO. _____

Texas Instruments, Inc. et al

_____

## NOTICE OF FILING WITH CLERK'S OFFICE

Notice is hereby given that the documents, exhibits or attachments listed below

have been manually filed with the Court and are available in paper form only:

Original Complaint

# 06 - 11307 RGS

The original documents are maintained in the case file in the Clerk's Office.

July 24, 2006                              Dennis J Solomon (pro se)
_____                        _____
Date                                      Attorney for

                                          POB 289
                                          _____

                                          Yarmouth Port, MA 02675
                                          _____

                                          (508) 394 9221
                                          _____

                                          _____

(Notice of Filing.wpd - 7/03)

EXHIBIT 5

T. 93107-00132
Office File

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

06-1041

DENNIS J. SOLOMON

Plaintiff-Appellant,

v.

CHARLES VEST,

Defendant,

and

MIT,

Defendant-Appellee,

and

LITA NELSON, RAYTHEON, INC., DENNIS PICARD,
TELEDYNE, INC., RICHARD SIMMONS, NATASHA LISMAN,
ROBERT LAWLESS, ACTUALITY SYSTEMS, INC., GREG FAVALORA,
ROBERT RYAN, THE OFFICE/ELLIS OFFICE SYSTEMS,
PRODUCTIVITY SYSTEMS, INC., DANDA DUDLEY, PAUL KILLEEN,
ALAN MORSE, STEPHEN MINDICH, ORIT GADIESH, MARY WOLFSON,
PATRICK E. MALLOY, MICHAEL MCMANUS, WERNER ERHARDT,
MARK MORDECAI, KEITH LONG, JOHN VINTON, CRAN BARRY, INC.,
ROBERT ELLIS, RICHARD PLOTKIN, ALTMAN, INC., ROBERT GOLDEN,
RODNEY GOULD, ELLIE ALTMAN, ROBERT PUJOL, LIGHTSPACE, INC.,
ALAN SULLIVAN, SUNRISE SYSTEMS, INC., MICROVISION, INC.,
RICHARD RUTKOWSKI, JOEL KOLLIN and SCOTT EDELMAN,

Defendants,

and

TEXAS INSTRUMENTS, INC.,

Defendant-Appellee,

and

UNIVERSITY OF SOUTHERN CALIFORNIA,

Defendant-Appellee.

# O R D E R

NOTE: Pursuant to Fed. Cir. R. 47.6, this order is not citable as precedent. It is a public record.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## O R D E R

The appellant having failed to pay the docketing fee required by Federal Circuit Rule 52(a)(1) within the time permitted by the rules, it is

ORDERED that the notice of appeal be, and the same hereby is, DISMISSED, for failure to prosecute in accordance with the rules.

FOR THE COURT,

*Jan Horbaly* Clk

Jan Horbaly
Clerk

11/22/05

cc:  Clerk's Office, DCT
DENNIS J. SOLOMON
EDWARD J. NAUGHTON JOEL A. FEUER

ISSUED AS A MANDATE: 11/22/05

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

NOV 2 2 2005

JAN HORBALY
CLERK

SOLOMON V VEST, O6-1041
DCT - 04-CV-12499

EXHIBIT 6

# United States Court of Appeals
## For the First Circuit

---

No. 05-1772

DENNIS J. SOLOMAN,

Plaintiff, Appellant,

v.

CHARLES VEST, ET AL.,

Defendants, Appellees.

---

Before

Lynch, Lipez, and Howard, <u>Circuit Judges</u>.

---

**JUDGMENT**

Entered: October 25, 2005


Since the jurisdiction of the district court in the instant patent related case was based in part on 28 U.S.C. § 1338, the Federal Circuit has exclusive appellate jurisdiction.  28 U.S.C. § 1295(a).  Therefore, pursuant to 28 U.S.C. § 1631, we transfer the instant case to the Federal Circuit.

<u>So ordered</u>.


By the Court:

Richard Cushing Donovan, Clerk.

**JULIE GREGG**

By: _____
Operations Manager

**EXHIBIT 7**

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

Civil Action
No: <u>04-12499-WGY</u>

SOLOMON
Plaintiff

v.

VEST, ET AL
Defendant

<u>ORDER OF DISMISSAL</u>

<u>YOUNG,C.J.</u>

After a hearing held on  3/23/05    ,this Court Orders that Defendants' Motions to Dismiss are ALLOWED  for failure of the Plaintiff to attend on the session of the court and prosecute his case  and the above entitled action be and hereby is Dismissed as against all Defendants.

Sarah A. Thornton
Clerk

By:    <u>/s/ Elizabeth Smith</u>
Deputy Clerk

March 28, 2005

Notice mailed to counsel of record.

EXHIBIT 8

UNITED STATE DISTRICT COURT
DISTRICT OF EASTERN MASSACHUSETTS

DENNIS J. SOLOMON,
Plaintiff

v.                                    Civil Action No.

CHARLES VEST
MIT
LITA NELSON
RAYTHEON, INC.                MAGISTRATE JUDGE ~JLA
DENNIS PICARD
TELEDYNE, INC.
RICHARD SIMMONS
NATASHA LISMAN
ROBERT LAWLESS
ACTUALITY SYSTEMS, INC.
GREG FAVALORA
ROBERT RYAN
THE OFFICE/ELLIS OFFICE SYSTEMS
TEXAS INSTRUMENTS, INC.
PRODUCTIVITY SYSTEMS, INC.
DANA DUDLEY
PAUL KILLEEN
ALAN MORSE
STEPHEN MINDICH
ORIT GADIESH
MARY WOLFSON
PATRICK E. MALLOY
MICHAEL A. MCMANUS
WERNER ERHARTD/EST/LES
MARK MORDECAI
KEITH LONG
JOHN VINTON
CRAN BARRY, INC.
ROBERT ELLIS
RICHARD PLOTKIN
ALTMAN, INC.
ROBERT GOLDEN
RODNEY GOULD
ELLIE ALTMAN
ROBERT PUJOL
RODNEY GOULD
LIGHTSPACE, INC.
ALAN SULLIVAN
SUNRISE SYSTEMS, INC.
MICROVISION, INC.
RICHARD RUTKOWSKI

RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED Y(2)
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. fow1
DATE 11/29/0 q

1

JOEL KOLLIN
UNIVERSITY OF SOUTHERN CALIFORNIA
SCOTT EDELMAN
JOHN AND JANE DOE 1-10
     DEFENDANTS.



---

## COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff Dennis J. Solomon hereby demands a jury trial and avers as follows:

## PARTIES

### Plaintiff

1.  Plaintiff Dennis J. Solomon is an inventor with a residence in Yarmouth Port, MA.  He attended Massachusetts Institute of Technology (MIT) as an undergraduate and the MIT Sloan Graduate School of Management Executive Program in 1988 and 1989.  During the 1980's, Solomon developed an advanced three dimensional display with broad applications including medical imaging, air traffic control and missile defense. During 1989, the Secretary of the Navy deemed Solomon's technology of critical importance, and during 1992, a United States Air Force review concluded the architecture was substantially superior to the Defendants' existing technology.

2.  Solomon was a vocal supporter of MIT Professor Theodore Postol – a major critic of Raytheon's Patriot Missile program, and independently involved in a dispute with Raytheon in 1993 over the related system for airspace object identification and missile control.  In the matter of Volumetric Imaging, Inc. v Raytheon et al., USDC 97-11817-GAO, Solomon moved [USDC Docket , Paper 38-1, Addendum Exhibit 2] to modify the protective order for the sole purpose of presenting information related to the deficiencies in Patriot control system in camera to the select United States Senate Armed Services committee.  Judge O'Toole denied the motion on June 3, 1998. Implementation of the recommendations would have prevented the "friendly fire" deaths of three coalition pilots. [See Exhibit One]. As a result of the success of Solomon's inventions, his inventions and economic efforts have been drawn into this economic, political and actual war between the corrupt Defendants and various governments and agencies.

### Defendants

3.  Defendants are members in an ongoing corrupt organization engaged in unlawful schemes to defraud the United States, endanger its citizens, and unlawfully interfere with the interstate commercial activities of the Plaintiff and others.  All the defendants are directly connected though the Atlantis Weathergear persons, including former Assistant to President Reagan Michael McManus, their interstate banking and medical activities, or their investments in MIT 3D holographic and display technology.

2

4. Defendant Charles Vest is a politically active administrator and holographer without any significant patents or other leading technological achievements. From 1968 to 1990 he was associates with the University of Michigan. From 1990 to the present, he has been employed by M.I.T. as president. On June 27, 1990, MIT Tech Talk published the MIT Collective investigation of Vest as "very political …a Teflon administrator … [and] nebish technocrat". He knowingly and criminally received bribes and promises of future employment in consideration for mounting an attack on the credibility and attempting the entrapment of MIT Professor Theodore Postol.

5. Defendant Massachusetts Institute of Technology (MIT) is a non-profit, educational institution. In 1990 and 1991, MIT licensed two unclaimed patents issued in 1980 and 1987, respectively, to Solomon for the remainder of their term.

6. Defendant Teledyne is believed to be a Delaware corporation with offices in Massachusetts, New Hampshire, and California.

7. Defendant Richard Simmons has been employed as in the administration of the Teledyne companies as President.

8. Defendant Microvision, Inc. is believed to be a Washington corporation with office in Seattle, Washington.

9. Defendant Richard Rutkowski has been employed as in the administration of the Microvision, Inc. of the State of Washington as President. Previously, he was an officer of Data Display Corporation of Dallas, TX.  Rutkowski paid $200,000 to Defendant Sunrise to obtain Solomon's trade secrets.

10. Defendant Joel Kollin claims to be the original patentor associated with Microvision, Inc. He previously studied at MIT under Stephen Benton where he was acquainted with agents of Morse. He is also believed to have worked with Adam Weinberg, formerly of Reebok on advertising displays. Kollin received detailed information regarding Solomon's inventions from parties' associates with Hahn, Morse and others.

11. Defendant Alan B. Morse is a former President of U.S. Trust Company of Boston, president of Harvard Community Health Plan during its bankruptcy, and Massachusetts banking commissioner doing the investigation of U.S. Trust Company. Morse was presented at meeting in 1982 where Solomon presented his HoloDeck Volumetric technology. From 1982 to the present, he has conspired with the Defendants including his niece and nephew, Katherine and Robert Hahn, children to the late Yale Mathematics Professor Otto Hahn, to obtain and convert Solomon's trade secrets.

12. Defendant University of Southern California is a non-profit, educational institution.  It does not manufacture or sell 3D displays.  USC, with no direct standing or financial interest, knowingly and willfully conspired with the other Defendants to unlawfully opposed the grant of the trademark HoloDeck when they know or should have known that a majority of its relevant staff had no prior recognition of the trademark, and amended for the unlawful purpose of obtaining Solomon's trade secrets and to interfere the business relations of Solomon.

13. Defendant Scott Edelman is believed to be an attorney with the firm Gibson, Dunn and Crutcher, representing Teledyne and USC.

14. Defendant Actuality Systems, Inc. is believed to be a Massachusetts corporation with office in Burlington, MA.

15. Defendant Robert Ryan is believed to be the principal financier and Chairman of the Board of Actuality Systems, Inc.  Prior to Actuality he was employed by Digital Equipment, Inc. and founded Ascent.

16. Defendant Greg Favolora is believed to be a resident of Massachusetts and a founder of Actuality Systems, Inc.  While a student at Yale, he received information from associates of Morse regarding Solomon's inventions and pending patents.  He fraudulently claimed and promoted Solomon's technology as his own.

3

17. Defendant Lightspace Technologies, Inc. (hereinafter referred to as "Lightspace") is believed to be a foreign corporation with employees and agents in Massachusetts and offices in Connecticut and Sweden.

18. Defendant Alan Sullivan is believed to be a founder and employee of Lightspace. Sullivan knowingly conspired with Texas Instruments, Inc. to mislead the relevant consumers regarding the origin and invention of technology developed by Solomon by fraudulently conveying, suggesting, supporting and funding an MIT thesis project incorporating Solomon's technology.

19. Defendant Raytheon is believed to be a Massachusetts corporation with offices in Waltham, MA.

20. Defendant Dennis Picard has been employed during the relevant period as president of the Raytheon.

21. Defendant Stephen Mindich of Newton, MA is believed to be the owner of the Boston Phoenix (formerly Boston After Dark), a Boston tabloid, husband to former Judge Maria Lopez and a close friend of Mary Wolfson. In the early 1970's, Solomon supported Mindich's competitors, the Cambridge Phoenix and the Real Paper. Since the 1970's, Mindich has maintained a dossier on the drug use of Boston area students, especially at Harvard's Law and Business Schools, and used the Atlantis cartel to provide drugs to politicians, judges, rock stars, and other personalities.

22. Defendant Mary Wolfson of Boston, MA is believed to be a close friend and business partner of former Judge Maria Lopez and Stephen Mindich. In 1995, Wolfson introduced herself to Solomon at a seminar on the Israeli evaluation of the Patriot Missile.

23. Orit Gadiesh is believed to be a close friend of Stephen Mindich and Maria Lopez, and the former president of Bain and Company. In 2004, Gadiesh failed to respond to a written request for clarification by Solomon. Gadiesh is believed to have used her Bain and personal contacts to unlawfully conspire to obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

24. Sunrise Systems, Inc. (hereinafter called "Sunrise") is believed to be a Massachusetts corporation manufacturing LED signs. During the 1990's, Sunrise manufactured HoloDeck Volumetric Displays and other experimental items for Solomon.

25. Defendant Michael A. McManus, Jr. is believed to have been born in Boston, MA and regularly visits the Commonwealth of Massachusetts. In 1976, McManus, an attorney, counseled his close friend, Patrick E. Malloy III in the unlawful freeze-out the Solomon and other minority shareholders in Atlantis Weathergear, a company Solomon founded. During the period from 1975-1977, McManus was special counsel to Rogers Morton, Secretary of Commerce and a Maryland boat builder. McManus has been identified as a principal player in the Inslaw software scandal involving the murder of Daniel Casolaro.

26. Patrick E. Malloy III is believed to be a resident of Southampton, N.Y. and the developer of Malloy Wharf in Sag Harbor. During the 1980's, Malloy was a major participant in the famous Amazon Club, a nightclub on Malloy Wharf, owned in part by Preston Powell, grandson to Congressman Adam Clayton Powell.

27. Mark Mordecai, raised in Newton, MA was a shareholder of Atlantis and operated the Atlantis Cartel for Malloy, a major narcotics trafficking operation involving Palestinian, Pakistani, Moroccan, and Malaysian operatives. In 1985, he instructed his parents, Herbert and Eileen Mordecai to move to Yarmouth Port, MA, less than 1 mile from a summer residence of Solomon.

28. Productivity Systems, Inc. is believed to be a Texas corporation, a wholly-controlled, subsidiary of Texas Instruments, Inc. and during the relevant period, the TI required source for the Discovery products.

29. Dana Dudley is believed to an employee of Texas Instruments, Inc. responsible for the Discovery DMD program.

4

30. Altman Stage Lighting Company (hereinafter called "Altman") is believed a New York corporation engaged in the manufacture and sale of lighting fixtures for stage, theater, television and the music industry.

31. Elle Altman is believed to be an owner of Altman.

32. Roger Pujol is believed to be an employee of Altman.

33. Werner Erhard is believed to be a foreign resident and during the relevant period conspired and directed his disciples and associates in EST and Landmark to unlawfully obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

34. Landmark Educational Corporation is believed to a wholly control corrupt organization of Erhard and a conspirator to unlawfully obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

35. John and Jane Doe 1-25 are believed to be co-conspirators and agents of the Defendants.

36. The "Atlantis Cartel" is an ongoing corrupt organization engaged in interstate narcotics trafficking, and the interference with interstate commerce by acts of violence, intimidation, theft, and destruction of property in violation of 18 USC 1961 et al.  The criminal organization evolved from the merger of the Mordecai cartel of the late 1960s involving the trafficking of hashish from Morocco through Palestinian and Lebanese affiliates, and the Malloy/McManus cartel trafficking heroin from Southeast Asia in the mid-1970s.  The principal trafficking parties, Mordecai, Malloy, McManus, Altman, Werner Erhard, and Mindich have known each other for decades. The principal industrial parties came together after McManus, former Assistant to President Reagan, and Malloy participated in the Aga Khan's Sardinia Cup sailboat race in 1980, and financed in part the Center for Islamic Architecture and the Media Lab at MIT.  McManus has been implicated in the PROMIS scandal by former Attorney General Elliot Richardson, once his superior at the Commerce Department, and the unlawful misappropriation of U.S. funds to billionaire Rafik Hariri, former prime minister of Lebanon.  In the late 1980's, members of the Atlantis Cartel were indicted and convicted of trafficking over $700 million dollars in hashish from Pakistan to the northeast United States.

## NATURE OF ACTION

37. In this action, Solomon seeks a declaratory judgment of patent noninfringement, invalidity, and unenforceability of the herein named United States Patents pursuant to the Declaratory Judgment Act, 28 U.S.C. $5 2201-02, and the Patent Laws of the United States, 35 U.S.C. 100 et seq., and such other relief as the Court deems just and proper.

38. This action also seeks a permanent injunction prohibiting the Defendants from engaging in further unlawful schemes and redress for fraudulent schemes to steal trade secrets, interfere with present and future beneficial relationships, other unfair business practices, injure to Solomon's business and property,  and such other relief as the Court deems just and proper.

39. Solomon also avers that the Defendants, knowingly and fully aware of the consequences, engaged in a conspiracy and ongoing interstate, criminal enterprise ("the Atlantis Cartel") of interference with government research, contracting and acquisition, and the unlawful acts against and intimidation of competitors by violence, theft mail and wire fraud.  This acts directly resulted in the criminally negligent murder of three U.S. and British coalition pilots by Raytheon's Patriot missiles in 2003, (reported in the CBS 60 Minutes presentation the deaths of at least 14 U.S. National Guard in Saudi Arabia in 1991, and attempted entrapment of MIT Professor Theodore Postol, and former CIA Director John Deutch. Solomon seeks a permanent injunction prohibiting the Defendants from engaging in further unlawful schemes, conspiracies, entrapments, violence and threats of violence and redress for injure suffered to his business and property.

5

## JURISDICTION

40. This Court has subject matter jurisdiction over the subject matter of this action under 28 U.S.C. § 2201-02 and 28 U.S.C. § 1331, 1332 and 1338(a).

## VENUE

41. Venue is proper in this judicial district under 28 U.S.C. § 1391, 1965. Personal jurisdiction exists in Massachusetts over MIT, Raytheon, TI, Teledyne, Actuality Systems, Vest, Picard, Favalora, Altman and other defendants by virtue of residence in or substantial commercial contact with this District.

## BACKGROUND

42. Exhibit 1 is a true and accurate copy of the transcript of a CBS 60 Minutes presentation,

43. During the early 1970s, the Plaintiff Solomon was employed by EMS, Inc. (Eastern Mountain Sports, Inc.) in various capacities including at times as Director of Research, Design, & Development, Director of Advertising, and Boston Store Co-Manager. As Director of Advertising, Solomon supported the Cambridge Phoenix newspaper as opposed to Boston After Dark, owned by Stephen Mindich. In the battle after Mindich's purchase of the Phoenix, Solomon supported its competitor, the Real Paper. Solomon's partner in Atlantis Weathergear, defendant Mordecai, supported Mindich.

44. As Director of New Products, Solomon visited Grand Rapids, MI to develop down products manufacturing – a project which came to the attention of Congressman Gerald Ford. Solomon left EMS in 1973 to found Atlantis Weathergear – whose designs received accolades from the America's Cup teams in 1974. Atlantis products were manufactured by Alb, Inc., a Somerville, MA police, fire coat and L.L. Bean outerwear manufacturer with friendly ties to the Winter Hill mob of Whitey Bulger, and Monsoon, Inc. of Richford, Vermont, an outerwear manufacturer with ties to Space Research Company owned by "Super gun" scientist, Gerald Bull. Atlantis' success came to the attention of Michael A. McManus, Boston born attorney who was special counsel to Ford's Secretary of Commerce, Rogers Morton, also a boat builder from Maryland, and then Elliot Richardson. McManus's close friend and partner, Patrick E. Malloy III, approached Atlantis to anchor a marine wharf development in the center of Sag Harbor, N.Y. Malloy subsequently invested in Atlantis.

45. During the fall of 1975, defendants Malloy, McManus, and Mordecai devised a scheme to freeze-out Solomon. Timothy Davis of Stowe, VT, the general manager of Atlantis at the time, was a Harvard Business School classmate of the present President George W. Bush. At a special stockholder's meeting called by Malloy and Mordecai on January 19, 1976, Davis reported that the company was during extremely well: growing at 400% and showing its first profit. Malloy, contradicted Davis, and claimed the company was in "dire straits" and threatened to call short term demand notes due him secretly executed by Mordecai and Malloy two months earlier to replace revolving inventory and receivables bank financing. When Solomon asked that the meeting be suspended for 10 days for an accounting, Malloy objected and with Mordecai's vote, sold all the assets to himself. Litigation ensued, and Solomon's expert witness, MIT Sloan Professor Michael van Breda testified that the company was a typical "successful start-up" with sufficient resources to continue without additional financing for at least 6 months. The Court found for Solomon and stated that the sale of assets "displayed itself as a badge of fraud."

46. Following the "freeze-out" of minority shareholders in Atlantis, Solomon returned to MIT and the Marine Biological Laboratories in Woods Hole, MA, where he studied marine biology.

47. Malloy, through his sister-in-law, contacted defendant Werner Erhardt, founder of EST and Landmark Educational Associates. Acting through a number of post-doctoral scientists at the Marine Biological Laboratories, Erhardt invited Solomon to attend with 1980 America's Cup aboard the flying bridge of famed yachtsman, Richard "Dick" Bertram. Solomon attended and an intellectual fight ensued with Erhardt.

48. At the time, Solomon was consulting to CB Sports, Inc. of Bennington, VT, a skiwear manufacturer with close ties to the Portillo Ski Resort in Portillo, Chile. The operational executive, Wayne Wetzel, a Harvard Business School graduate from Warwick, RI, maintained close ties to Raymond Patriarca, Jr., a son of the RI Mafia head. Following the success of Solomon's designs at the 1980 America's Cup, Wetzel unilaterally repudiated the royalty provision of the contract.

## The Atlantis Cartel

49. From 1973 to the present, Mordecai, and later Malloy, McManus, Kollin, Wetzel, Vinton, Plotkin and other persons, conspired in an ongoing criminal narcotic enterprise for personal enrichment including the importation of substantial amounts of hashish through Lebanon and Morocco, and, continuing during McManus's employment as Assistant to the President of the United States from 1982-1985, exchanging arms for drugs and currency support of anti-Soviet mujhadden in Afghanistan including Usama Bin Laden. From 1988 to the present, the Defendants have engaged in narcotics trafficking with U.S.-based Israeli, Palestinian, and Egyptian terrorists, including Yonkers, NY World Trade Center bombers, Mohammed Saleh, Ramzi Yosef, and Khalid Mohammed.

50. This corrupt enterprise is known as the "Atlantis cartel" and evolved from the Harvard Law School-based enterprise providing recreational narcotics to the Cambridge and Boston colleges through the Boston Tea Party, a nightclub owned by Harvard Law graduate, Circuit Judge Roy Riepen.

51. In order to prevent their indictment, the Defendants double-crossed two of their expendable satellite groups involving Sidney Lewis of Falmouth, MA and Stuart Newton of Jamestown, RI. Both Lewis and Newton were indicted and convicted of narcotics trafficking from Pakistan in excess of $100 million dollars. Principal distribution of said narcotics was through the Amazon nightclub located in the Atlantis complex on Malloy's Wharf, Sag Harbor, New York, the Compass Lounge in Yarmouth, MA, the Boston Phoenix paper distribution, the adjoining Boston Cab Company and other affiliates of the Defendants. Among the individuals indicted were persons appearing in the 1974 Atlantis Weathergear catalog. Following their release, the individuals assembled an extensive dossier on corrupt officials and their associates, including their detailed phone and bank records. Among the individuals named are: Supreme Court Justice Stephen Breyer, Boston lawyer John Rehnquist, and former Massachusetts Judge Maria Lopez.

52. The Atlantis Cartel was also responsible for the entrapment of Vermont Supreme Court Justices Gibson, Hayes and Hill and their subsequent conviction or reprimand.

53. The Defendants also operated an illegal enterprise engaged in the trafficking of cocaine from South America. Distributors included John Zaccaro (the "pharmacist"), son of Geraldine Ferraro, then a student at Middlebury College. Principal method of transport involved ocean tugs employed by the oil industry. Presently, Ferraro remains a corporate director of Goodrich Petroleum, a publicly traded oil exploration company in the Gulf of Mexico, controlled by Defendant Malloy.

54. The Defendants' criminal enterprise entwined itself with the U.S and foreign intelligence communities including the Irish UNFIL soldiers, German, Italian, Russian, Lebanon and Israeli agents. These connections were publicized by activities of the late Attorney General Elliot Richardson following the appointment of a special prosecutor in the PROMIS affair.

7

Commencing with the indictments of the Atlantis Newton cartel in the late 1980s, the Defendant's systematically double-crossed their collaborators resulting in the deaths of at least five UNIFIL Irish soldiers, numerous Israelis, Lebanese, Canadians and Americans.

55. The Defendants, including McManus, whose activities include the research and development of biological warfare agents and equipment related to cell transformation (cancer) and cardiac arrhythmias (heart attacks), has been implicated in the deaths of journalist Daniel Casolaro, arms scientist Gerald Bull, attorney Barbara Salken, Dutch intelligence officer Sjord Lundberg, and Harvard scientist Dr. J. Morris Weinberg.

56. On or about May of 1997, Solomon advised the FBI that Yonkers-related WTC terrorists were actively involved in continuing narcotics trafficking through the Atlantis Cartel and clubs such as the "Golden Nugget" in Yonkers, NY; interested Ultralight and glider aircraft motors, and developing Boston connections. Khalid Shaikh Mohammed, the disco-loving, North Carolina educated, mastermind of 9/11 was a related member of this wing, with contacts at the Boston Cab Company and in Newton Highlands, MA.

57. On or about May of 1999, Solomon advised the FBI, U.S. Representative Michael Meehan and other government officials of his knowledge and belief that adversaries of the Atlantis Cartel were assembling sophisticated missile guidance modules using Dutch and German electronic components.

58. It is the Plaintiff's belief and opinion that Defendants' criminal acts directed at MIT Professor Theodore Postol has caused the spontaneous involvement of over 80% of the academic, scientific and engineering community to independently devise methods to neutralize the Defendant corporations, Raytheon, Teledyne and Texas Instruments. Historically, among these methods has been the introduction of undocumented exceptions and "back doors" in critical software. The relevant complexity of government operations are described in the novel "Where the Sun Don't Shine" by Fred Wefer and other publications.

59. It is the Plaintiff's belief and opinion that the Mindich and the Atlantis Cartel have maintained dossiers on the recreational narcotic use by public officials, judges and attorneys , especially law students at Boston College, Harvard and Yale, including Allan Desherwitz, Stephen Breyer, John Kerry, Robert Lawless, John Zaccaro, John Buckley, George W. Bush, Jeb Bush, John Rehnquist, Eugene Scalia, William LeBlond and many others, which have been used to unlawfully influence their official actions.

60. It is the Plaintiff's belief and opinion that with the increasing the revenue stream from the narcotics trade falling under European government and intelligence community control, where certain recreational narcotics are legal and widely available, and has resulted in substantial competition for the "Atlantis Cartel". Simultaneously, the independence of the Bush administration has resulted in a substantially reducing the Defendants' ability to intimidate or influence high government officials. Further, the complicated and deadly results of the Defendants' corrupt activities involving the national and international intelligence community, have created a series of dynamic alliances which are systematically assassinating the Defendants and their co-conspirators using the most sophisticated technology available, and planning terrorist activities against the United States including sophisticated cruise missiles armed with bio-terror agents aimed at specific offices.

## Declaratory Judgment: Patents

## COUNT I (RAYTHEON, TEXAS INSTRUMENTS)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of Actuality U.S. Patents)

61. Aforementioned paragraphs are incorporated by reference as if stated fully herein.

62. On May 31, 1994, Solomon filed a U.S. Patent Application entitled Three Dimensional Volumetric Display System with Polarizing Enclosure. Figure 11 of said application teaches Solomon's earlier invention of a "system for increasing the control of visual intensities from digital shutter projection devices" wherein digital shutter array is sequentially illuminated by different intensities encoded "in a binary scheme of 1,2,4,8 ...etc A variation is the rotating color shutter on the light source with a binary scheme for each color."

63. The '94 application restates material presented by Solomon to Texas Instruments and Raytheon engineers during the period from approximately March 1990 to June 1993.

64. On December 21, 1994, Raytheon filed U.S. Patent Application 08/360,870, now U.S. Patent 5,903,323 entitled a "Full Color Sequential Image Projection System Incorporating Time Modulated Illumination." Said '323 patent claims a binary modulation system identical to that disclosed to Raytheon by Solomon more than a year earlier.

65. Raytheon had a duty to and intentionally failed to disclose Solomon's identical prior art to the U.S. Patent office during the prosecution of the '323 patent.

66. Raytheon has claimed to Solomon and others that U.S. Patent '323 is valid and enforceable.

67. Solomon has a reasonable apprehension of being subject to a suit for infringement of said patent due to the prior notice of enforceability by Raytheon.


## COUNT II (ACTUALITY)

(Declaratory Judgment Action for a Declaration of Non-infringement, Invalidity, and Unenforceability of Actuality U.S. Patents)

68. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

69. Favalora and Actuality claim to be the true and original inventors of the following inventions: U.S. Patent No. 6,570,681; 6,554,430; 6,512,498; 6,489,961; 6,487,020; 6,183,088

70. Solomon is manufacturing and offering for sale an Integrated HoloDeck Volumetric Autostereoscopic Display and Projector System

71. Actuality has communicated that Solomon's Integrated HoloDeck Volumetric Autostereoscopic Display System infringes on Actuality patents and that it will rigorously prosecute infringers.

72. Solomon believes that the Actuality patents read upon or incorporate his earlier-filed inventions described in his U.S. patent applications filed in 1985 and thereafter.

73. Solomon has a reasonable apprehension that Actuality will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Actuality and Solomon within the meaning of 28 U.S.C. § 2201

74. Solomon has not infringed any valid and enforceable claim of the aforementioned patents, either literally or under the doctrine of equivalents

75. The Actuality patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Actuality had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

76. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

77. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

## COUNT III
## (MICROVISION, INC., UNIV. OF WASHINGTON, KOLLIN, ET AL)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and
Unenforceability of Actuality U.S. Patents)

78. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

79. From 1984, Solomon disclosed his invention of retinal scanning displays with dynamic accommodation and resonant scanners to staff and faculty at MIT.

80. Joel Kollin was a student at MIT and had access to Solomon's inventions disclosed at MIT including Solomon retinal scanning system. On or about September, 1989, Kollin left MIT for the University of Washington, Seattle.

81. Richard Rutkowski is the president of Microvision of Seattle, WA, a licensor of retinal scanning patents granted to Kollin.

82. Prior to Microvision, during the late 1980s and early 1990s, Rutkowski was an officer of Data Display, Inc. of Texas, a customer of Sunrise Systems, Inc. of Pembroke, MA., whom Rutkowski regularly visited.

83. In the early 1990s, Sunrise Systems manufactured prototypes of LED based experiments for Solomon including retinal scanning displays.

84. Solomon's relevant inventions and experiments were known to Defendants', their staff, employees, faculty, agents and others prior to their filing the relevant patent applications.

85. In 1995, Rutkowski paid Sunrise Systems, Inc. over $200,000 for having provided unlawful access to Solomon's trade secrets related to displays and retinal scanning.

86. Microvision and the University of Washington claim to have the assignment of, or to be the true and original inventors of the following inventions by the Defendants:

6,768,588; 6,762,867; 6,755,536; 6,752,496; 6,734,835; 6,719,425; 6,714,331; 6,710,342; 6,700,552; 6,700,552; 6,687,034; 6,682,192; 6,674,993; 6,661,393; 6,654,158; 6,653,621; 6,650,877; 6,639,719; 6,639,570; 6,612,355; 6,605,805; 6,583,772; 6,563,105; 6,563,105; 6,560,028; 6,538,625; 6,535,325; 6,535,183; 6,525,310; 6,515,781; 6,515,278; 6,512,622; 6,497,649; 6,445,362; 6,433,907; 6,417,502; 6,396,461; 6,392,231; 6,388,641; 6,384,406; 6,369,953; 6,362,912; 6,352,344; 6,331,909; 6,324,007; 6,317,103; 6,294,775; 6,294,775; 6,285,505; 6,285,489; 6,281,862; 6,256,131; 6,250,755; 6,245,590; 6,243,186; 6,220,711; 6,204,832; 6,204,829; 6,196,226; 6,188,832; 6,166,841; 6,157,352; 6,157,352; 6,154,321; 6,151,167; 6,145,986; 6,140,979; 6,097,353; 6,069,725; 6,061,163; 6,049,407; 6,046,720; 6,043,799; 6,008,781; 5,995,264; 5,982,555; 5,982,528; 5,969,871; 5,958,919; 5,903,397; 5,903,397; 5,903,397; 5,719,784; 5,701,132; 5,659,327; 5,596,339; 5,560,360; 5,467,104; 5,171,267.

87. Solomon is manufacturing and offering for sale an Integrated HMD Autostereoscopic Display and Projector System

88. Defendants have communicated that Solomon's Integrated HMD Autostereoscopic Display System infringes on Defendants patents and that it will rigorously prosecute infringers.

89. Solomon believes that the Defendants' patents read upon or incorporate his earlier-filed inventions described in U.S. patent applications filed in 1990 and thereafter.

90. Solomon has a reasonable apprehension that Defendants' will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201

91. Solomon has not infringed any valid and enforceable claim of the patents, either literally or under the doctrine of equivalents

92. The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed

to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

93. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

94. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

## COUNT IV
### (Lightspace)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of U.S. Patents)

95. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

96. Solomon is manufacturing and offering for sale an Integrated SS Autostereoscopic Display and Projector System

97. Defendants have communicated that Solomon's Integrated SS Autostereoscopic Display System infringes on Defendants patents and that it will rigorously prosecute infringers.

98. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

99. Solomon believes that the Defendants patents read upon or incorporate his earlier-filed inventions described in U.S. patent applications filed in 1990 and thereafter.

100. Solomon has a reasonable apprehension that Defendants will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201.

101. Solomon has not infringed any valid and enforceable claim of the Defendants' patents 6,466,185, 6,377,229, 6,100,862, either literally or under the doctrine of equivalents.

102. The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

103. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

## COUNT V
### (Altman, Pujol, Golden Et Al)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of related Altman Patents)

104. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

105. Solomon is manufacturing and offering for sale an Integrated SS Autostereoscopic Display and Projector System.

106. Altman owns U.S. Patents 6,671,005 and 6,412,972.

107. Solomon has a reasonable apprehension that Defendants will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201.

108.    Solomon has not infringed any valid and enforceable claim of the Defendants' patents, either literally or under the doctrine of equivalents.

109.    The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

110.    A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

## COUNT V
### (Altman, Golden, Gould Et Al)

(Declaratory Judgment Action for a Declaration of Re-assignment of Solomon's Patent and infringement)

111.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

112.    Solomon has been independently involved in concert lighting and effects from the late 1960s.

113.    Solomon is the independent inventor of U.S. Patents 4,958,265, 4,897,770, 4,893,225, 4,811,182, 4,777,568, 4,729,071, 4,706,006 related to lighting systems.

114.    In 1985, Altman principally sold lighting fixtures to traditional stage, theater, film and television customers. During the period from 1984-1990, Solomon entered into a number of contracts, all of which by explicit agreements, differentiated between traditional stage, theater, film, television applications and rock (in the broad context) concert applications.

115.    Altman fraudulently induced Solomon to license and assign said patents to Altman by explicating stating that Altman would bay a royalty of 5% of sales or lease fees, plus the preferred involvement use or equivalent income, on all use, sale or lease of Solomon's inventions for rock concerts, when in fact Altman had no intention to due so.

116.    On or about 1995, Altman unilaterally repudiated said contracts. Thereafter, all use of the Altman fixtures represented the infringement of Solomon's patents.

117.    Said terms of said contracts were not severable.

118.    Thereafter, Altman continued to use Solomon's invention for the rock concert applications including but not limited to the band PHISH. Altman or its agents provided an operator at all such concerts.

119.    On 6/14/2002 and other occasions, Altman used and infringed upon Solomon's inventions by transporting said Altman fixtures to the Tweeter Center in Massachusetts and using same in the performance of the band PHISH.

120.    The minimum damages for each said performance instance of infringement would be $12,000. During the past six years, Altman has infringed at least 400 times.

121.    Robert Golden and Rodney Gould aided and abetted said infringement by intentionally misleading Solomon into believing that said Altman fixtures were not used by the band PHISH.

122.    Altman, Robert Golden and Rodney Gould furthered conspired to damage Solomon's by organizing schemes to obtain Solomon's trade secrets.

123.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

### Abuse of Process, Interference with Present and Prospective Commercial Relations, Scheme to Obtain Trade Secrets

COUNT VI
(All Defendants, USC, Edelman)

124.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

125.    On August 23, 1993, Solomon filed a U.S Trademark application for the stylized word "HoloDeck" for 3D display systems.  On May 30, 2000, the application was published for opposition and shortly thereafter the Defendant USC filed an opposition on the grounds the term was generic.

126.    USC counsel testified the Dr. Michael Macedonia, the civilian director of the U.S. Army Simulation Lab and principal grantor in the a $50 million U.S. DOD grant to USC, requested that USC filed the opposition so that he and others could form a private corporation in competition with Solomon.

127.    During discovery, a majority of the relevant staff at USC testified that they were unfamiliar with the term prior to their employment at USC.

128.    Thereafter, Defendants USC acting on behalf of certain government officials, Edelman, Lisman, Lawless, Teledyne TI/PSI and Raytheon agreed to conspire to interfere with the business relations of Solomon by inducing TI/PSI to defraud Solomon by falsely claiming full support and an ongoing solution to the Discovery timing problem.

129.    Shortly thereafter, USC filed an amended opposition claiming failure non-use in commerce and additional discovery for all business records.

130.    Defendant Edelman failed to disclose that his firm represents Defendant Teledyne, a direct competitor of Solomon.

131.    The aforementioned Defendants used the process of opposition as an unlawful scheme to obtain Solomon's trade secrets.

132.    The aforementioned Defendants used the process of opposition as to interfere with the ability of Solomon to raise funds and enter into beneficial contracts for his business.

133.    The aforementioned Defendants knew that Solomon has continuously used the mark "HoloDeck" in interstate commerce, including regular exhibiting at the major U.S. computer graphics show held biannually in Los Angles, a few block from USC.

134.    The aforementioned Defendants engaged in said unlawful activities to defraud the U.S. government of at $50 million dollars and endanger U.S. soldiers and citizens by asserting in their request to the U.S. Government for payment of funds that their display technology was the most appropriate when in fact they knew that their technology was defective and inferior to Solomon's.

135.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

### Fraud, Conspiracy, Interference with Present and Prospective Commercial Relations, Breach of Contract: All Defendants

COUNT VI
(TI, PSI)

(Conspiracy, Interference with Present and Prospective Commercial Relations)

13

136.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

137.    Paragraphs 1 through 40 are incorporated by reference as if stated fully herein.

138.    From 1987 to 1994, Solomon corresponded with Texas Instruments, Inc. regarding the applications of TI's DMD digital shutter array.   The parties exchanged non-disclosure agreements but no contract ensued at that time.

139.    Exhibit 2 is a true and accurate copy of a letter dated February 14, 1991 from Texas Instruments to Solomon regarding the development of his 3D volumetric imaging technology.

140.    During the period, Raytheon unlawfully obtained Solomon's trade secrets related to the USAF JSTAR C4I proposal for real-time missile tracking and control.  Raytheon, then teamed with TI, and used said technology in its USAF proposal. Solomon protested the project award.  As a result, neither TI nor Raytheon would engage in further business with Solomon.

141.    At some time in 2002, TI concluded that Solomon's HoloDeck Volumetric technology was superior to its present clients, Actuality and Lightspace.  TI's product manager, Dana Dudley invited and induced Solomon to develop his technology using the TI DMD product.

142.    Solomon informed Dudley of his previous contacts with TI, and explicitly stated that he (Solomon) would do so only if TI guaranteed full and equal development assistance and pricing in relation to all the other DMD projection competitors.

143.    Dudley agreed and explicitly stated to Solomon that TI was interested in fully assisting the development of new and improved technologies using the DMD.

144.    A direct result of Dudley's guarantees, Solomon contracted with TI, through its subsidiary, PSI, to construct real-time, triggerable Discovery system with an advertised rate of at least 4 KHz.

145.    Solomon paid PSI at least $25,000 for the system and expended at least $50,000 in the direct development of the DMD project.

146.    Following the payments, Solomon discovered that the TI/PSI product was defective. He informed PSI and TI of the problem, and both agreed to solve the problem.

147.    However, TI and PSI willfully and intentionally delayed providing a solution, refused to release the technical details which would permit Solomon to identify the problem, and made fraudulent and misleading statements regarding the reasons for the delay.

148.    As a direct and intentional result, Solomon was unable to conduct business with prospective client Boeing, Daimler-Benz and others. Further Solomon was unable present his system at SIGGRAPH 2003.

149.    TI and PSI continued to mislead Solomon during the fall of 2003 and into 2004.

150.    On or about June, 2004, PSI employee Becky Bell stated as a result of an internal dispute with TI, it had ordered PSI to close it doors, and required the transferred all its assets to TI.

151.    During July 2004, Solomon made demand upon TI for technical assistance or replacement. TI refused, claimed that PSI was a separate company, and that TI is not liable for PSI breach of contract.

152.    On or about August 24, 2004, Solomon received a letter from Boston attorney Paul Killeen stating that TI has requested that "any further correspondence about TI and/or its products" be directed to him.

153.    Shortly thereafter Solomon communicated with Killeen and requested the name of the authorizing party at TI.  Killeen refused to provide said information.

154.    As a direct and intentional result, Solomon was unable to present his system at SIGGRAPH 2004 and future events..

155.    During the period from July 2003 to the present, Solomon was substantially damaged by the willful and intentional fraudulent inducement and breach of contract, by TI/PSI in an amount in excess of $50,000.

156.    During the period from July 2003 to the present, Solomon was substantially damaged by TI/PSI scheme to obtain trade secrets in an amount in excess of $50,000.

157.    During the period from July 2003 to the present, Solomon was substantially damaged by TI/PSI scheme to interfere with business relations in an amount in excess of $50,000.

158.    From August, 2004 to present, Solomon's professional reputation was damaged by TI and Killeen's false statements to representatives of MIT and other public figures.

159.    TI and Killeen engaged in the aforementioned unlawful behavior in conspiracy with the other Defendants to defraud the armed services and agencies of the United States by knowingly promoting inferior products for critical defense, security and medical applications.

160.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## COUNT IV
## (TI, TELEDYNE, LISMAN, LAWLESS, MIT, VEST, RAYTHEON, ACTUALITY, LIGHTSPACE)

(Fraud, Bribery, Conspiracy, Scheme to Obtain Trade Secrets, Interference with Present and Prospective Commercial Relations, Commercial Disparagement)

161.    Aforementioned paragraphs are incorporated by reference as if stated fully herein.

162.    From 1989 to the present, Teledyne, Raytheon, Texas Instruments, Actuality and Lightspace engaged in an unlawful conspiracy to interfere with the interstate commerce of Solomon by fraudulently inducing Solomon, individually, or in his executive capacity, to enter into contracts with the Defendants for goods or services using the U.S. mail and interstate wires, intentionally breaching or repudiating said contracts, and disparaging Solomon's business reputation.

163.    In a first instance, MIT offered Solomon an exclusive license for the Kollin patent, Teledyne offered to manufacture the components, but, when success was insured which would have removed Raytheon from competition, Teledyne breached said contract by supplying defective, uncertified components, and MIT unilaterally repudiated the license on fraudulent and specious grounds.

164.    Teledyne Technologies, Inc., a 1st tier subcontractor to Raytheon, Inc. for simulation systems for the Patriot Missile.[1]

165.    Richard Simmons was the President of Allegheny Teledyne, Inc., parent company of Teledyne Technologies, Inc. During the relevant period of November of 1999, Richard Simmons donated $20 million dollars to MIT.[2]

166.    In consideration for the $20 million dollars and other consideration, Vest authorized MIT to unilaterally repudiate its licensing agreement with Volumetric Imaging, Inc., causing direct injury to Solomon.

167.    In consideration for the $20 million dollars and other consideration, Vest authorized MIT to knowingly promote the fraudulently obtained products of Favalora and Actuality Systems.

168.    In consideration for the $20 million dollars and other consideration, Vest and Morse induced Robert Ryan, Navigator Ventures, Halliburton, Apache Oil to invest in the manufacture of the fraudulently obtained products of Favalora and Actuality Systems.

169.    In a second instance in the period from 2002-2004, TI, in conspiracy with Raytheon and the other Defendants, contracted to supply a high speed shutter system and intentionally to Solomon individually, intentionally supplied a defective product and intentionally obstructed and delayed its perfection.

170.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

---

[1] Teledyne Technologies Annual Report 2003, Pg. 14-15
[2] MIT News, November 17, 1999

15

## COUNT VIX
### (All Defendants)

(Scheme to Obtain Trade Secrets)

171.    From 1980 to the present, the Defendants including but not limited to Altman, Wolfson, Plotkin, Ellis, Gadiesh, Mindich, Morse, Teledyne, Raytheon, Texas Instruments, Vest, Actuality and Lightspace, engaged in an unlawful conspiracy to obtain the trade secrets of Solomon by fraudulently inducing Solomon to enter into contracts with the Defendants for goods or services using the U.S. mail and interstate wires.

172.    In 1996, Defendants changed strategy through Mindich, Morse, Gadiesh, induced Wolfson to engage in schemes to obtain Solomon's trade secrets related to his pending U.S. Patent applications and other research.

173.    Said acts include, but are not limited to, plying Solomon with liquor at a private dinner with her woman friend, Myra Huff, and suggesting sex in exchange for designs involving TI DMD technology related to displays, 3D and lighting.

174.    On another occasion, Wolfson unlawfully obtained Solomon's house and automobile keys by conspiring with her repairperson, and transferred the same to other Defendants, in a scheme to obtain detailed research in the truck of Solomon's car.

175.    On another occasion Wolfson schemed to obtain Solomon's trade secrets by obtaining detailed information on the security systems on Solomon's notebook computer and transferring said information to the other Defendants.

176.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.


## COUNT VI
### (All Defendants)

(RICO Violence and Threats of Violence)

177.    Aforementioned paragraphs are incorporated by reference as if stated fully herein.

178.    In the aforementioned disputes, the Defendants have conspired with persons known and unknown to intimidate Solomon by threats of violence to his person or friends, damage to his property, and assault and battery. The following are major acts of intimidation, assault or theft of trade secrets and other interference with interstate commerce.

179.    On or about January, 1982, during the appeal by the defendants in the first Atlantis litigation, Solomon's co-plaintiff Dean Meledones, suffered two broken legs from a skiing assault by a John Pistilli, whose father had beneficial relations with the Defendants.

180.    Shortly thereafter in March, 1982, Solomon was assaulted in Newton, MA., by a Michael P. White, a participant in the Atlantis Cartel. Twenty-two years later, White was again arrested for assault on his girl friend, within a few miles of Solomon's present residence.

181.    On or about June, 1985, Solomon left Altman Stage Lighting Company in Yonkers, NY for a flight from LaGuardia Airport to Burlington, Vermont where he had planned to meet with Cheney and transfer information related to the futures trading activities of Malloy and others. As he approach the turn-off to the airport, he was struck in the rear by a young female, Jean C. Brana of Jackson Hts, NY with an infant driving an older Cadillac registered to Bio-Medical Clinical Laboratories, Inc., 287 Rockaway Turnpike, Lawrence, NY 11559.

182.    On or about June 1986, the Solomon was assaulted by a John Manley of Falmouth, MA. Mr. Manley later indicated that he was asked by the Atlantis to intimidate the plaintiff. Manley was arrested and accord and satisfaction agreement was reached.

183.    Another criminal act occurred on January 24, 1988 when Solomon, on the invitation of Altman, was struck by a John Thompson of New York, New York, while skiing at Sugarbush Valley, Waitsfield, Vermont. An official report was filed.

184.    Another unlawful act occurred on August 21, 1992 when a William Hennessey of Bridgeport, CN. Struck the plaintiff in the rear on North Road, Chilmark, MA driving a car owned by Edward Wise. A Rachel Wise, daughter of Edward Wise of Chilmark, MA was accompanying Hennessey. An official report was filed.

185.    Another unlawful act of the conspiracy occurred on November, 1992 at the installment of directors of B'nai B'rith when Neosignian Towing, affiliates of the Defendants, of Newton towed the Solomon's car from a lot used by the B'nai B'rith precipitating a confrontation with Boston Police Officer Tracy over photographs of the towing and witnesses. Officer Tracy called in "officer in trouble" resulting in plaintiff's detention. The President of B'nai B'rith who was across the street negotiated a resolution whereby Solomon relinquished his film. No other action was taken.

186.    Another unlawful act occurred on June 16, 1996, when a male identifying himself as a Yonkers Police Officer driving a Chevy van, plate # NY WJJ 865, pushed Solomon from behind while shopping early Sunday morning at Bosun's Marine Store, Mashpee, MA.

187.    On or about August, 1996, Solomon filed a letter complaint regarding Altman with the Boston station of the F.B.I. Shortly thereafter, the incidents of direct assault ceased.

188.    Defendants changed strategy through Mindich, induced Wolfson to engage in schemes to obtain Solomon's trade secrets related to his pending U.S. Patent applications and other research, said acts include, but are not limited to, plying Solomon with liquor at a private dinner with her woman friend, Myra Huff, and suggesting sex in exchange for designs involving TI DMD technology related to displays, 3D and lighting,  unlawfully obtaining Solomon's house and automobile keys and transferring same to other Defendants, and obtaining detailed information on the security systems on Solomon's notebook computer.

189.    From 1998 to 2001, Defendants conspired with Plotkin to obtain Solomon's trade secrets by offering secure office space and misappropriating research related to weathergear designs, lighting systems and display technology.

190.    On July 4, 2002, Defendants, though Mindich, engaged in renewed assaults and intimidation including an attempted assault with an automobile in Provincetown, MA prompting Solomon to contact local police.

191.    On August 26, 2004, Defendants caused the operator of a vehicle, plate NY # CPW 3427 to follow, tailgated and intimidate Solomon near his residence in Yarmouth Port, MA.

192.    On or about October 14, 2004 Defendants caused two individuals, one a car dealer named "Cookie", to push and shove Solomon and suggest that he not interfere with Altman, during the performance of the TICKS, a popular comedic, all woman trio, at a restaurant near Solomon's residence in Yarmouth Port, MA.

193.    These events have occurred with greater frequency during critical periods of litigation.

194.    Defendants are engaged in an ongoing unlawful scheme to obtain Solomon's trade secrets. The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

195.    As a direct result, Solomon has been substantially damaged in an amount greater than $75,000, to be determined at trial.

## COUNT VII
## (All Defendants)

### (False Designation – Lantham Act)

196.    Aforementioned paragraphs are incorporated by reference as if stated fully herein.

17

197.    Defendants are engaged in an ongoing unlawful scheme to mislead the public as to the inventorship and origin of their products.

198.    Actuality engaged in a series of fraudulent or misleading statements which have misled the consumer as to the relevant origin, quality, and value of said display products.

199.    Microvision engaged in a series of fraudulent or misleading statements which have misled the consumer as to the relevant origin, quality, and value of said display products.

200.    Altman engaged in a series of fraudulent or misleading statements which have misled the consumer as to the relevant origin, quality, and value of said lighting products.

201.    Vinton, CranBarry and Atlantis Weathergear engaged in a series of fraudulent or misleading statements, including numerous postings to their website, publications to industry press, and publications to the industry buyers, which have mislead the consumer as to the relevant origin, quality, and value of said weathergear products.

202.    As a direct result, Solomon has been substantially damaged in an amount greater than $50,000, to be determined at trial.

## REQUEST FOR RELIEF

203.    Solomon requests a judicial declaration of non-infringement, invalidity, and unenforceability of the patents listed herein.

204.    Solomon requests that this Court award him actual, compensatory and punitive damages for the Defendants' interference in his commercial activities and other unlawful acts, in an amount greater than $75,000, exact amount to be determined at trial.

205.    Solomon requests that this Court enjoin the defendants from engaging in further criminal acts against Solomon, his family and associates, including but not limited to intimidation and schemes to obtain trade secrets.

206.    Solomon requests that this Court grant other relief as it deems just and proper.

207.    Solomon requests a jury trial of all matters.


Respectfully submitted,

Dennis J. Solomon
PO Box 289
Yarmouth Port, MA 02675

EXHIBIT 9

## THE UNITED STATES PATENT AND TRADEMARK OFFICE

## THE TRADEMARK TRIAL AND APPEAL BOARD

**TTAB**

IN THE MATTER OF:

|  |  |
|---|---|
| University of Southern California,<br>                    Opposer | OPPOSITION NO. 119,754 |
|  | SERIAL NO. 74/428,299 |
| V | MARK: HOLODECK (Stylized) |
| Dennis J. Solomon<br>Applicant. |  |

## APPLICANT'S REQUEST FOR RECONSIDERATION

The singular and well-established goal which distinguishes American jurisprudence is the requirement that, above all else, one must "do substantial justice." In the present matter, there is no controversy that the Applicant was the first to file and use the stylized trademark "HoloDeck" and continues its "use in commerce." Therefore, the Applicant requests that this Board reconsider its Order of August 6, 2004.

## THE PROPER RECIPIENT

On this question, it is not necessary to introduce the fact that the Applicant's sailing ketch "Starship" was a prominent visitor to Annapolis in the early 1970s, or that virtual reality was first coined by an accountant on the swimming pool deck of the Annapolis Hilton. Nor is it necessary to introduce the fact that the Applicant, who studied at MIT, was friendly with MIT's holographers in the early 1980s, when all objects were called "holo this, holo that."



09-07-2004
U.S. Patent & TMOfc/TM Mail Rcpt Dt. #22

Nor is it necessary to introduce the fact that half the Opposer's [USC] own staff at ICT [Institute for Contemporary Technology] where not familiar with the term "holodeck", or that the U.S. Army major computer graphics company, Evans & Sutherland, thought the term was a suitable trademark for its line of U.S. Army simulators.

In this case, the Applicant was clearly the first to file and use, and thus, the proper recipient of the trademark grant.

## THE "OUTSIDEDNESS" OF ATTORNEY EDELMAN AND GDC

The Applicant's product, the line of HoloDeck display, set the future standard for advanced medical, scientific and military imaging.[1]  These products evolved over a ten year period – from the first related patent applications in 1982, [represented by Wolf, Greenfield & Sacks of Boston], to their public introduction in the late 1980s.  Early on they spawned a number of competitors – one Boston group known as the "Morse" group was directed by Alan B. Morse, a prominent Jewish banker with close political ties to the Applicant's principle adversary, attorney Michael A. McManus, Jr., U.S. Army and former Assistant to President Reagan in the early 1980s, and Werner Erhard, founder of the controversial EST organization.  As part of their effort to conduct industrial and political espionage, Morse arranged for the Applicant's introduction to his niece, Katherine Hahn, a prominent USC alumnus and daughter of the late Yale math professor, Otto Hahn.  Ms. Hahn and the Applicant engaged in a close friendship over a subsequent six month period.  During the relationship, the Applicant discovered that Ms. Hahn was

---

[1] See IEEE, May 1993, DVDD

2

facilitating access to his pending research and patent applications, and sought a 'cease and desist' order in 1989 in the U.S. District Court in New Haven.

McManus engaged a bevy of attorneys in his quest – from former Vermont Attorney General Kimberly Cheney who had to fire Peter Sidel to protect McManus' schemes and the late law professor, Barbara Salken, to the former MIT lawyer Jean Weidemier and then present Scott Edelman. McManus himself was nearly indicted in the Iran-Contra affair (his actual role was funneling money and arms to the Afghan rebels [now Al Qaeda] through Pakistan) and later, identified in the suspect group in the murder of journalist Daniel Casolaro by the late Attorney General Elliot Richardson.

The enmity between McManus and the Applicant stems from his successful scheme to freeze out the shareholders of a small prominent company he founded in his youth, Atlantis Weathergear, purveyors to the America's Cup teams. By the time, he had moved the company to Vermont, the company, through the acts of its president, Mark Mordecai, became caught in a complex web of arms, drugs and intrigue involving Space Research Corporation, founded by super-gun scientist, Gerald Bull and funded by Word Jewish Congress President Edgar Bronfman. While this Board may find this conspiracy "shadowy", the late Elliot Richardson found it "sinister"/

On the other side of aisle, the Applicant enjoyed excellent relations with a community of McManus adversaries, including the late dean of Yale Law School Kingman Brewster and circles closely associated with Elliot Richardson family. The Applicant has been active in Jewish political and philanthropic affairs including membership in AIPAC, the American-Israel Political Affairs Committee, and operating the command computer for Harvard attorney Steven Grossman, former DNC chairman,

3

during his 2002 run for Governor of Massachusetts. This, of course, placed the Applicant directly in the line of fire of Evans & Sutherland, and Salt Lake City's famous son, Mitt Romney, and his understudy, Orit Gadiesh, the Israeli-born president of Bain & Company.

As mentioned earlier, a major application of the HoloDeck Volumetric Display project was the development of the best analysis and control system for time critical target prosecution and air tactics analysis. By the March 1990 unsolved assassination of Gerald Bull at the door of his luxury apartment in Brussels (one of the safest cities in the world), this project had attracted the attention of McManus, Morse, Bronfman and others whose political or business interests were adverse the Applicant.

Central to McManus efforts to interfere with the commercial activities of the Applicant related to the HoloDeck displays was the role of ICT neighbor in Marina Del Rey, Teledyne Microelectronics, Inc. Teledyne received a sub-contract from the Applicant for the base LED electronics for a 1993 USAF funded HoloDeck display project. Teledyne, as part of a scheme to gain control of the project, attempted to deliver sub-standard components, which were discovered during quality control. Litigation ensued which was dismissed on prior to the merits. The US DOD compensated the Applicant, and future projects were continued under classified auspices.

## COMPETITORS

The competitors at that time present were Evans & Sutherland, Raytheon, Texas Instruments, Teledyne and their US DOD supporters. Based on testimony of ICT Director, this opposition arose as the result of a request by an individual, a Dr. Michael Macedonia of the U.S Army, who was planning to retire and with others, start a private

firm using licensing USC-ICT technology developed under the $50,000,000 U.S. Army contract.

## DIRECT FINANCIAL INTERESTS

Attorney Edelman and Gibson, Dunn & Crutcher have a direct and continuing beneficial interest in the outcome of this opposition through their ongoing advice and representation of USC, Teledyne and close personal ties to Evans & Sutherland. At no time did Edelman attest under oath that his professional relationship with USC in this Opposition and its personnel is strictly one of legal counsel. That he, and his firm are not involved in competitive decision making as discussed in U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed. Cir. 1984), for or on behalf of USC, any entity that is an interested party to this protest, or any other firm that might gain a competitive advantage from access to the material disclosed under the protective order. Further that he and his firm does not provide advice or participate in any decisions of such parties in matters involving similar or corresponding information about a competitor. This means that he and his firm does not, for example, provide advice concerning or participate in decisions about marketing or advertising strategies, product research and development, product design or competitive structuring and composition of bids, offers, or proposals with respect to which the use of protected material could provide a competitive advantage.

Still further, he has not identified here those attorneys in my firm who, to the best of his knowledge, cannot make the representations set forth in the preceding paragraph, or any member of his immediate family who is an officer or holds a management position with an interested party in the protest or with any other firm that might gain a competitive advantage from access to the material disclosed under the protective order.

5

It is the Applicant's belief and opinion that Edelman and Gibson, Dunn & Crutcher do not meet the minimum standards required by most government agencies and the law to receive protected documents, and in accordance with the widely accepted practice of the PTO, should be disqualified. If Edelman and GDC disagree, the Applicant respectfully requests this Board to require a verified affidavit in accordance with U.S. Steel Corp. and Federal regulations.

## SUSPENSION OF PROCEEDINGS

On August 13, 2003, USPTO attorney David Mermelstein, suspended proceedings pending the disposition of the Opposer's motions, stating that "any paper … not relevant to this motion … will be given no consideration. The Applicant, pro se, has assumed that this 'suspension' limited filings to the Applicant's Reply Briefs under FRCP.

Further, the depositions of ICT indicated that this Opposition was undertaken solely at the request of a U.S. Army civilian director, Michael Macedonia, who was completing retirement and founding a commercial enterprise using Evans & Sutherland equipment and ICT technology to compete the Applicant. ICT director Lindhelm stated "that he was not interested in continuing this Opposition" and it was the Applicant's belief that the Opposition would be withdrawn.

Immediately prior to the August 13 order in the summer of 2003, the Applicant was contacted at SIGGRAPH 2003 by a Kurosh Valanejad who stated that ICT directors and staff were behind the Applicant, wanted to incorporated the Applicant's HoloDeck displays, and was sure that the Opposition.would be withdrawn.

## CRIMINAL SCHEME TO OBTAIN TRADE SECRETS

The present opposition is a criminal attempt by the Opposer and its consortium, the dominant group in the U.S. Army simulation field, to obtain trade secret information from other services, specifically including U.S. Air Force and the Intelligence community, which they choose not to share; and to interfere with the ability of the Applicant to raise sufficient funds to complete a major public product upgrade.

It is clearly an abuse of process and under 18 USC 1831 a criminal scheme.

Their efforts have succeeded in reducing the U.S. Army's technology goals to less that required by Japanese schoolchildren. Their efforts, with the help of USC attorneys and this Board, has all of the trapping of the Maginot Line.

*"The line was named in honor of André Maginot, war hero, beloved Minister of Veteran's Affairs, and Minister of War from 1928 to 1932. It could just as easily have been called the "Painlevé Line" after the Minister of War who was responsible for introducing debate on the line in Parliament, or the "Pétain Line," after the man who thought of the concept. But it was named after Maginot, whose contribution was his gift of oration which persuaded parliament, both the right and the left, to allocate the money for the project. Time treats few things more cruelly than the futuristic fantasies of past generations, particularly when they are actually realized in concrete and steel. Hindsight makes it abundantly clear that the Maginot Line was a foolish misdirection of energy when it was conceived, a dangerous distraction of time and money when it was built, and a pitiful irrelevance when the German invasion did come in 1940." Its supposed impregnability lulled army leaders into complacency. (Excerpts from History of the Maginot Line)*

## ERRORS BY THIS BOARD

This Board has applied a "harsh and drastic" sanction based on erroneous conclusions concerning the Applicant's attitude. This Board has stated that Applicant's response displayed "obstreperous behavior" and "inappropriate and unsubstantiated personal and professional aspersions" on Edelman and GDC, and was unlikely "to mend

7

his ways" without this serious sanctions. This wholly misapprehends the Applicant's intentions and filings.

First, on the issue of Edelman and GDC, the Applicant has received significant, unsolicited information from the Opposer's executives, staff and others who find this Opposition criminal or unjust.

The Applicant has attempted to independently verify certain relationships and did so successful regarding the competitive financial interests[2] of GDC and therefore Edelman specifically regarding the HoloDeck displays. Further, Edelman lives in a glass house, surrounded by the Applicant's personal friends and extended family, including an advisor to the trust with a beneficial interest in this mark, one of Hollywood's more famous Emmy Award winning lawyers, albeit de facto, who share a number of philanthropic boards. Edelman is simply not qualified to receive competitive protected trade secrets in this matter. This conclusion by the Board is contrary to the well-established <u>requirement</u> that assertions be considered "in the light most favorable to the non-moving party."

Secondly, the Applicant agreed and offered to provide answers to this Board in camera as well as independent "outside counsel". The Board's conclusion to the contrary is baffling.

---

[2] As defined in § 1839, a trade secret means: "...all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically or in writing

Thirdly, the Applicant stated that among the first purchasers of the HoloDeck display was the United States Department of Defense through a joint program directed by USAF intelligence. Further, this project remains on-going, though in different form. It was the Applicant intention and belief that by presenting evidence of actual sales, and its continuing "use in commerce" a meritorious and factual reply to the Amended Opposition was presented.

Finally, the timing of this Board order has apparently caused a substantial stir within the computer geek community in Washington, D.C. and across the river. The Applicant enjoyed being in the first group of MIT freshmen geeks to have an interactive computer terminal. It led, for at least the past twenty years, to the Applicant, personally or collectively, participating in the design and invention of this Nation's deadliest weapon systems – at least one involving the HoloDeck display and known publicly in 1993 as being 100x faster that competing technology from Raytheon, Texas Instruments, and the others.[3] The opinion is that the Board's decision is an example of "Eisenhower's Nightmare" – a corrupt military-industrial-academic axis gone amok. Rather then take an impartial conservative course by requiring Edelman to attest to his status, limiting Applicant's testimony related to the "use of the mark" to those elements produced, or requiring that the answers be produced in camera, the Board appears to have placed itself as a co-conspirator in a Constitutional perversion designed to promote ineffective and sub-standard technology for our Nation's defense.

---

[3] Ibid

## CONCLUSION & REQUEST

The Applicant requests that this Board reconsider and rescind its sanction of the refusal of registration, require attorney Edelman to attest to having met the well-established United States standards for 'outside counsel', and permit the Applicant pro se to fully and formally answer the Amended Opposition and respond to appropriate discovery. It is a conservative and just course which avoids the tragic alternative that at some future date, the Board will have unpleasant opportunity to be confronted by the young American soldier who rightfully blames you for the death of his compatriots.

Submitted on this the 3rd day of September, 2004.

Dennis J. Solomon
P.O. Box 289
Yarmouth Port, MA 02675
508 394 9221

Attachment:

1. Here Comes The Holodeck, USC, 2001-05-10

*Source:* **University Of Southern California**

*Date:* 2001-05-10

*URL:* http://www.sciencedaily.com/releases/2001/05/010510072050.htm

Print this page

# Here Comes The Holodeck: Virtual Reality + Artificial Intelligence = New Training Tool

The use of virtual reality or arcade games to practice hand-eye coordination or quick reaction, or even to teach factual information is easy to understand and well accepted. But can such techniques also teach sound judgement and clear thinking in an emergency?

New programs developed by the University of Southern California's Information Sciences Institute (ISI) and two other cooperating USC institutes are designed to do just this by melding advances in artificial intelligence with state of the art work in rendering virtual environments in animation and sound.

A "Mission Rehearsal Exercise" developed for the U.S. Army by ISI, the USC Institute for Creative Technology (ICT), and the USC Integrated Media Systems Center (IMSC) takes soldier-trainees on a virtual reality mission in a troubled town in Bosnia. There, they must deal with a situation threatening to spin out of control.

It uses a movie-theater-sized (8 -feet tall, 31-foot wide) curved screen that looms around trainees. Combining with the screen images is highly directional and lifelike "immersive sound," creating a convincing illusion of being present at the scene, rather than observing a show.

The scene is populated with animated figures that exist only as computer programs, but are nevertheless autonomous agents who can interact with human trainees in real time.

An article about the Mission Rehearsal Exercise (MRE) program appeared in the documentation for AAAI Spring Symposium on Artificial Intelligence and Interactive Entertainment, at Stanford University March 26-28 2001. Presentation of another paper, along with partial demonstration of the system is scheduled for the Agents 2001 conference in Montreal, Que. May 28-June 1, 2001.

The army simulation is an early attempt to reach toward the "holodeck," the virtual reality training and recreation facility seen in "Star Trek: The Next Generation," according to project leader Jeff Rickel of ISI.

In one simulation scenario, a lieutenant enters the village to deal with one problem -- a weapons inspection team being threatened by an angry crowd -- and finds another one as well: an American jeep has accidentally struck and injured a local child.

Should the lieutenant split his forces to deal with both situations? If so, how? Meanwhile, a TV camera crew arrives, further complicating the situation.

The scene of the village uses 3-D computer modeling to create basic shapes visible from any angle enhanced by texture mapping. The group used commercial software from Boston Dynamics to add

animations of people, and an extremely sophisticated sound system -- with multiple sound tracks (up to 64 tracks for some effects) played through no less than 12 speaker channels. Chris Kyriakakis of the IMSC created this system.

Two kinds of autonomous software agents inhabit this complex and convincing environment. Most are basic robotic programs that carry on a limited range of pre-scripted, routinized behavior -- milling in the background, standing around, etc.

Three -- the detachment medic and sergeant, and the anxious mother -- are more complex. These are software actors who have substantial abilities to react to what the trainee does. Their faces change expression, thanks to software from the Santa Cruz, CA-based Haptek Corporation. They move, and most strikingly, they can respond to speech.

Scripted characters are relatively easy to create, explains Rickel, "but have limited flexibility, making them well suited for bit parts." AI characters are more difficult to program, but can interact with people and with their environment in more flexible ways, making them well suited for key roles such as the mother, sergeant, and medic, who all have to interact with the human lieutenant.

Research by Rickel and his colleagues, who also include Jonathan Gratch, Randall Hill, and William Swartout of ICT and Stacy Marsella of ISI, has built on earlier work at ISI by Rickel and W. Lewis Johnson developing a teaching agent called "Steve."

Steve instructed Navy recruits in a virtual-reality world presented through VR glasses, responding to their simple questions. The Sergeant and the Medic are more advanced versions of Steve. Steve's appearance has been updated from the legless floating presence in the early version to a more lifelike form.

The third AI character, the Mother, adds another layer: she goes beyond words to the expression of emotions. Gratch and Marsella were responsible for this feature.

Another major addition to the Steve agent is the use of a dramatic story line, with continuing incidents driving the action. To keep score at the end, a television story reported by the news crew on the scene records the result of the trainee's responses to the situation, chronicling either an abandoned boy in critical condition, or a boy out of danger because of timely action.

"The work we have done in one way shows how far away the holodeck is -- but in another shows how useful it may be," Rickel said. "The project represents a grand challenge for both AI and virtual reality, but the potential payoff is a powerful new medium for experiential learning."

"What makes the Mission Rehearsal Exercise project unique is that we are bringing together for the first time a set of technologies including immersive audio, large scale graphics, and virtual humans and linking them to an interactive story line to create a compelling experience." added William Swartout of the ICT.

"The synergies that result are powerful. We were surprised to find that even though the system is still at its beginnings, some people came away from the simulation emotionally moved. I don't think this effect is due to any one element alone, but rather it is due to all of them working together."

*This story has been adapted from a news release issued by University Of Southern California.*

EXHIBIT 10

Mermelstein

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
2900 Crystal Drive
Arlington, Virginia 22202-3513

Mailed: August 6, 2004

Opposition No. 91119754

University of Southern
California

v.

Dennis J. Solomon

**Before Quinn, Hairston, and Holtzman, Administrative Trademark Judges.**

**By the Board:**

On March 6, 2003, the Board issued orders denying applicant's motion for sanctions and granting opposer's motions to amend its notice of opposition and to compel discovery. The Board also entered an order providing for the protection of confidential, trade secret or commercially sensitive information. Applicant was allowed thirty days to (1) file an answer to the amended notice of opposition; and (2) respond fully to opposer's requests for the production of documents Nos. 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, and 14, and opposer's interrogatory Nos. 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, and 16.[1]

---

[1] Applicant was further ordered to make himself available for a deposition within forty-five days following his service of written discovery responses.

Opposition No. 91119754

Now before the Board is opposer's motion for default judgment and for discovery sanctions, filed June 18, 2003. Opposer argues that applicant has neither filed an answer to the amended notice of opposition, nor served discovery responses pursuant to the Board's order.  The motion has been fully briefed.

Applicant admits that he has not answered the amended notice of opposition and has not served further discovery responses as ordered by the Board.  Nonetheless, applicant opposes the motion for seven enumerated reasons, which we consider in turn:

    1.  The applicant has never been noticed by the Opposer in any manner, formally or informally, for the continuance of his deposition.

As noted above, applicant was ordered to make himself available for a deposition within forty-five days of his service of amended discovery responses.  The fact that opposer has not noticed applicant's deposition is irrelevant, and has no bearing on whether <u>applicant</u> has complied with the Board's orders.

    2.  The Applicant has never been noticed by the Opposer in any manner, formally or informally, that he was in default of any agreement between the parties.

Opposer's current motion does not require any prior notice.  As noted, the gravamen of opposer's motion is that applicant has not complied with the Board's orders regarding the filing of an answer to the amended complaint and the

Opposition No. 91119754

service of discovery responses.  Neither issue is subject to a requirement of further notice, and it is not an agreement of the parties which has allegedly been breached, but an <u>order</u> of the <u>Board</u>.

In the case of the discovery responses, the Board's order compelling discovery was all the "notice" to which applicant was entitled.  It is unclear why applicant believed he was allowed to disregard the Board's order compelling discovery until he had received some kind of further notice.

As for opposer's motion for default judgment, it is true that default judgment will not be entered without notice and an opportunity to cure the default.  *See* Fed. R. Civ. P. 55(a)(notice of default).  However, when the issue of default is raised by motion (as opposed to a notice of default issued by the Board), the motion serves the same function as a notice of default, providing notice to the applicant and an opportunity to demonstrate good cause for discharge of his default.  TBMP § 508 (2d ed. rev. 1 2004).

3.  It was the understanding of the Applicant that the University of Southern California through the Office of the President had suspended the proceedings during the ongoing discussion to resolve this issue.

Applicant's stated belief that this proceeding has been suspended is puzzling.  The parties are advised that the Board sets trial dates and decides when proceedings are

Opposition No. 91119754

suspended.  There is no contention that either party filed a motion to suspend, and the Board has issued no such order.

Applicant's statements on this issue are far from clear.  Applicant states that "neither the opposing counsel nor the Opposer has voiced or communicated any objection to the suspension of prosecution during the continued direct discussions on settlement."  However, applicant does not disclose with whom these "direct discussions" have been held, or when.  For its part, opposer denies that any such discussions have taken place, including any agreement to suspend proceedings.

On the record presented, the Board cannot find that the parties had an unequivocal agreement to suspend for settlement.  It appears doubtful that any settlement discussions have been held.  But even if they had been, applicant does not even allege that the parties <u>agreed</u> to suspend this proceeding, only that opposer "has [not] voiced or communicated any <u>objection</u> to the suspension of prosecution."  (emphasis added)  As we have found in the past, relying on an assumption that a motion to suspend would be filed by an opposing party is insufficient to relieve a party of his obligation to proceed pursuant to the Board's trial schedule.  *Hewlett-Packard Co. v. Olympus Corp.*, 18 USPQ2d 1710, 931 F.2d 1551 (Fed. Cir. 1991).

    4.  Opposing counsel has yet to identify independent outside counsel to receive materials under the

Opposition No. 91119754

> Protective Order issued by this Board as he
> indicated was preferable than [sic] submission en
> [sic] camera to the Board.

This is the most convoluted – and incomprehensible – of applicant's assertions.  Applicant apparently contends that opposer's counsel, Scott Edelman, and his law firm, Gibson, Dunn & Crutcher, are part of a shadowy web of "corrupt organization[s]" bent on wresting from applicant his trade secrets.  Suffice it to say that applicant's account of this conspiracy is sketchy, at best, and is accompanied by no evidence whatsoever.[2]

Again, we cannot conclude on this record that any of applicant's allegations are true.  But even if it is correct – as applicant alleges – that opposer's lawyers represent other clients with similar interests or that other interested parties have a business relationship with opposer, it is far from clear that opposer's counsel should be disqualified from receiving confidential materials pursuant to the Board's protective order.

Under the protective agreement issued by the Board on March 6, 2003, the most sensitive material, designated as "Trade Secret/Confidential," is "available for review by outside counsel for the parties…."  In this case, opposer's

---

[2] Applicant's does "attest[] that all factual statements in this brief made of his own knowledge are true and those based on information are believed to be true."  However, such a statement – at best – establishes nothing more than applicant's subjective belief in his statements.

Opposition No. 91119754

attorney is a member of an independent law firm, and not an employee of opposer. As such, he is an "outside counsel," and therefore entitled to receive any confidential, trade secret, or commercially sensitive materials in this case.[3] Applicant's objections to disclosure of protected materials to opposer's counsel are accordingly overruled.

   5. The Applicant has and will continue to fully comply with each and every order of this Board.

   6. The Opposer's Motion For Default Judgment is part of a scheme to prevent the adjudication of this matter on the merits by attempting to prevent the entry of substantial evidence and documents related to Applicant's use in commerce of the HoloDeck trademark and by portraying the Applicant unresponsive to the order of this Board.

Here, applicant alleges that opposer is trying to prevent him from introducing evidence on his use of the mark. On the contrary, it was applicant who refused originally to produce such information, resulting in the Board's order compelling discovery. Opposer's current complaint is that notwithstanding the Board's order, applicant has yet to produce the required information. Applicant's current contention that opposer is trying to prevent him from introducing this very information is nothing short of bizarre.

---

[3] We note that applicant apparently has suggested to opposer that sensitive discovery material be submitted for *in camera* inspection by the Board. Such a procedure is not an option under the Board's protective order, and will not be further considered. *See* Trademark Rule 2.127(b)("Any request for reconsideration or

Opposition No. 91119754

> 7. The Opposer's claim under oath that this opposition was initiated at the suggestion of the United States Army is fraudulent. The United States Department of Defense has no interest in this opposition.

This statement is another *non-sequitur*. Applicant is correct that the Department of Defense is not a party to this proceeding. However, it is unclear what this statement has to do with the issues at bar,[4] namely whether applicant has failed to timely file an answer or serve discovery responses.

**Motion for Default Judgment**

We next turn to opposer's motion for default judgment.

The issue of default may be raised by the Board by the issuance of a notice of default or, as in this case, by motion. In order to discharge his default, applicant must show "good cause" for relief. Fed. R. Civ. P. 55(c). In this context, good cause will be found when (1) applicant's failure to answer was not the result of willful conduct or gross neglect; (2) the delay will not unduly prejudice the opposer; and (3) applicant has a meritorious defense to opposer's claims. *Fred Hayman Beverly Hills Inc. v. Jacques Bernier Inc.*, 21 USPQ2d 1556 (TTAB 1991).

---

modification of an order or decision issued on a motion must be filed within one month from the date thereof.)
[4] To the extent that applicant seeks sanctions against opposer for this allegedly "fraudulent" statement, we direct applicant's attention to the Board's order of March 6, 2003, denying

Opposition No. 91119754

The Board granted opposer's motion to amend its notice of opposition on March 6, 2003.  Applicant was allowed thirty days in which to answer.  The Board's file does not indicate that applicant has filed an answer, and applicant does not contend that he has done so.

To begin with, there is no evidence that opposer has suffered undue prejudice by applicant's delay in answering.  *See, Old Nutfield Brewing Co. v. Hudson Valley Brewing Co.*, 65 USPQ2d 1701 (TTAB 2002)(mere passage of time generally not considered prejudicial).

However, as to the remaining questions in the *Fred Hayman* analysis, applicant has provided little or no information in support of his position.  Applicant's response has essentially ignored opposer's motion for default judgment.

Demonstration of a meritorious defense is usually made by the filing of "a plausible response to the allegations contained in the notice of opposition."  *DeLorme Publishing Co. v. Eartha's Inc*., 60 USPQ2d 1222, 1224 (TTAB 2000).  But as opposer points out, applicant has not responded to the amended notice of opposition at all, even after opposer moved for default judgment.[5]  While the meritorious defense

_____

applicant's previous motion for sanctions.  Applicant's current motion is clearly not a properly-filed motion for sanctions.
[5] "When a defendant who has not yet filed an answer to a complaint files a response to a notice of default, or to a motion for default judgment, the late answer normally should be

8

Opposition No. 91119754

standard is not particularly exacting, *id.* (evaluation of legal merits of defendant's position not appropriate), applicant here has demonstrated little willingness to actually litigate this matter on the merits, pursuant to the Board's rules and orders.

Finally, we consider whether applicant's failure to answer was the result of willful conduct or gross neglect. Applicant's only argument with any possible bearing on this question is his alleged belief that this proceeding had been suspended during applicant's settlement negotiations with opposer. As noted above, however, applicant has not submitted anything other than a vague allegation that such talks even took place, let alone that applicant possessed a reasonable belief that these proceedings were suspended pending such discussions.

Applicant's own words on this subject are highly equivocal. Applicant does not say that either party filed a motion to suspend, or that opposer promised that it would file a motion to suspend, or even that applicant requested that opposer do so. Rather, applicant states only that "neither the opposing counsel nor the Opposer has voiced or communicated any objection to the suspension of prosecution during the continued direct discussions on settlement." We

---

submitted with the response." TBMP § 312.01 (2d ed. rev. 1 2004).

Opposition No. 91119754

find applicant's belief that this proceeding was suspended
to be unreasonable, and that applicant's failure to file an
answer – even after being served with a motion for default
judgment – to have been the result of willful conduct or
gross neglect.

Opposer's motion for default judgment is accordingly
GRANTED.  Fed. R. Civ. P. 55(b).

**Motion for Discovery Sanctions**

Trademark Rule 2.120(g) provides that

[i]f a party fails to comply with an order of the …
Board relating to discovery, including a protective
order, the Board may make any appropriate order,
including any of the orders provided in Rule 37(b)(2) of
the Federal Rules of Civil Procedure.

As described above, on March 3, 2003, the Board entered
an order compelling applicant's responses to opposer's
requests for the production of documents and
interrogatories.  The Board also entered an order for the
protection of confidential, trade secret or commercially
sensitive information.  Applicant was allowed thirty days to
respond fully.  Applicant does not deny that he has not
responded, even after receipt of opposer's motion for
discovery sanctions.

Again, we find applicant's main argument – that opposer
should appoint a second outside counsel to receive documents
subject to the protective order – to be specious.  Opposer's
counsel is undeniably entitled under the protective order to

10

handle such materials.  If applicant disagreed with this provision of the protective order, he did nothing to seek timely reconsideration or modification of that order. Accordingly, we conclude that discovery sanctions are appropriate.  Trademark Rule 2.120(g)(1).

The relief requested by opposer, namely, sanctions in the nature of judgment is within the range of discovery sanctions which may be imposed by the Board.  Fed. R. Civ. P. 37(b)(2)(C).  "Default judgment is a harsh remedy, but may be justified where no less drastic remedy would be effective and there is a strong showing of willful evasion." TBMP § 527.01 (footnote omitted).

We find entry of judgment in favor of opposer to be an appropriate sanction in this case.  Applicant has raised numerous meritless objections to opposer's valid discovery requests and has failed to fulfill his discovery obligations, even when ordered to do so, all the while casting inappropriate and unsubstantiated personal and professional aspersions upon opposer and its counsel. Applicant's obstreperous behavior has significantly increased the pendency of this case, and has unnecessarily increased the burden of this litigation upon both the opposer and the Board.

Most importantly, however, there is no indication that, if given a lesser sanction, applicant would mend his ways

and comply fully with the Board's rules and orders.
Applicant's response to opposer's motion for sanctions is
entirely unapologetic, and merely attempts to shift the
blame for applicant's own failures to opposer.  These facts
clearly amount to a "strong showing of willful evasion,"
justifying entry of judgment.

Opposer's motion for discovery sanctions in the nature
of judgment is accordingly GRANTED.  Trademark Rule
2.120(g)(1).

**Conclusion**

In view of the foregoing, judgment is hereby entered
against applicant, the opposition is sustained, and
registration to applicant is refused.

.oOo.

EXHIBIT 11

06-18-2003

U.S. Patent & TMOfc/TM Mail Rcpt Dt. #22

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| University of Southern California, | Opposition No. 119,754 |
| Opposer, | Serial No. 74/428,299 |
| v. | Mark: HOLODECK (Stylized) |
| Dennis J. Solomon, | |
| Applicant. | |

## MOTION FOR DEFAULT JUDGMENT AND MOTION FOR DISCOVERY SANCTIONS; SUPPORTING DECLARATION OF SCOTT A. EDELMAN

Opposer, the University of Southern California, hereby moves the Board to enter judgment in favor of Opposer and against Applicant, Dennis J. Solomon, for two separate and independent reasons.  First, Applicant has totally failed to abide by the Board's March 6, 2003 Order setting the time for Applicant to answer Opposer's amended opposition.  Second, Applicant has totally failed to abide by the Board's March 6, 2003 Order compelling discovery. That Order required Applicant to answer Opposer's amended opposition and compelled responses to the outstanding discovery by April 7, 2003.  To date Applicant has neither served Opposer with an answer to the amended opposition nor responded to the outstanding discovery.

## MOTION FOR DEFAULT JUDGMENT BASED ON FAILURE TO ANSWER OPPOSITION

Pursuant to 37 CFR § 2.106(a), Opposer the University of Southern California hereby moves for entry of a default judgment against Applicant.  The Board ordered Applicant to answer Opposer's amended opposition by April 7, 2003.  (*See* TTAB Order at 5, attached to the Declaration of Scott A. Edelman ("Edelman Decl.") at Ex. 1.)  The Board's order is clear.

Moreover, it is clear that Applicant received a copy of the order. (Edelman Decl., ¶ 3.) Because Applicant clearly received the Board's order but has not bothered to answer or otherwise respond to Opposer's amended opposition, Opposer respectfully requests that this Motion be granted and a default judgment be entered against the Applicant. (TBMP § 508.) Default judgment is especially appropriate in this case since Applicant's refusal to file an answer is simply the latest episode in a pattern of misbehavior.

## MOTION FOR ENTRY OF JUDGMENT AS A DISCOVERY SANCTION

If a party fails to comply with an order of the Board compelling discovery, the Board may order appropriate sanctions as defined in Trademark Rule 2.120(g)(1) and Fed. R. Civ. P. 37(b)(2), including entry of judgment. *Baron Philippe de Rothschild S.A. v. Styl-Rite Optical Mfg. Co.*, 55 U.S.P.Q.2d 1848 (TTAB 2000); *Unicut Corp. v. Unicut, Inc.*, 222 U.S.P.Q. 341 (TTAB 1984); *MHW, Ltd. and PepsiCo, Inc. v. Simex, Aussenhandelsgesellschaft Savelsberg KG*, 59 U.S.P.Q.2d 1477 (TTAB 2000); TBMP § 527.01. In *MHW, Ltd.*, the Board stated that "[t]he law is clear that if a party fails to comply with an order of the Board relating to discovery, including an order compelling discovery, the Board may order appropriate sanctions as defined in Trademark Rule 2.120(g)(1) and Fed. R. Civ. P. 37(b)(2), including entry of judgment." (*emphasis added*). In *Unicut*, the Board granted petitioner's motion for sanctions and entered judgment against respondent where respondent "repeatedly acted in a manner to evade discovery properly attempted by petitioner."

In this proceeding, both the Board and Opposer have extended every reasonable accommodation to Applicant. Specifically, Opposer granted Applicant a 38-day extension to respond to written discovery, granted *after* the Board ordered Applicant to respond to the outstanding discovery.

2

The Board noted in its March 6, 2003 Order that Applicant's objections were "highly questionable" and described Opposer's suspicion that Applicant would not respond to outstanding discovery requests as "well-founded." (TTAB Order at 11, attached to the Declaration of Scott A. Edelman ("Edelman Decl.") at Ex. 1.) The Board granted Opposer's motion to compel discovery, and instructed Applicant to provide the following discovery within thirty days (*i.e.*, by April 7, 2003):

1.      Applicant was ordered to produce documents responsive to Opposer's request for production numbers 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, and 14.

2.      Applicant was ordered to make full and complete responses to Opposer's interrogatory request numbers 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, and 16.

3.      Applicant was ordered to make himself available for deposition within forty-five days following Applicant's service of responses to Opposer's written discovery.

While ordering Applicant to respond to the discovery, the Board denied Opposer's request for sanctions, stating "Applicant is entitled to an opportunity to respond to Opposer's discovery requests in accordance with this order." (TTAB Order at 12.) Applicant failed to take advantage of that opportunity, and indeed has completely ignored it.

On March 17, 2003, Applicant contacted Scott A. Edelman, counsel for Opposer, and asked for an extension of time until May 15, 2003 in which to respond to Opposer's written discovery. Applicant informed Mr. Edelman that many of the responsive documents were in Belgium, and that he would be going to Belgium in early May to retrieve them. Applicant further informed Mr. Edelman that the documents in Belgium contain the information that he needed to respond to Opposer's interrogatories. (*See* Edelman Decl. at ¶ 3 and Ex. B thereto.) Based on Applicant's representations, Mr. Edelman granted Applicant's request for an extension

3

of time until May 15, 2003 to respond to Opposer's written discovery requests. *Id.* Opposer's grant of the extension was expressly conditioned upon Applicant's agreement to fully respond to the discovery, without objection, by May 15, 2003. *Id.* In fact, Applicant subsequently confirmed in a March 25, 2003 e-mail to Mr. Edelman that he would not contest the Board's Order. (Edelman Decl. at ¶ 4 and Ex. C thereto.) In addition, Applicant informed Mr. Edelman that he had misplaced the written discovery propounded by Opposer. As a courtesy, Mr. Edelman promptly sent another set of the written discovery to Applicant. (*See* Edelman Decl. ¶ 5 and Ex. D thereto.)

More than three weeks have past since Applicant's written discovery was due. Applicant is clearly aware of the deadline because he sought, and was granted, a 38-day extension of time to respond. (*See* Edelman Decl. ¶ 6.)

Applicant has previously filed frivolous pleadings and asserted (in the Board's words) "meritless" objections, all in an effort to stall the proceedings for as long as he can. (*See, e.g.,* TTAB Order at 12.) Applicant's failure to respond to the Board's discovery order is yet another attempt to drag this opposition out for as long as possible. He has, until now, manipulated the discovery system to do just that. As the Board noted in its strongly worded order, "[a]ny refusal to respond to the questions may justify the imposition of discovery sanctions under Trademark Rule 2.120(g)(2)." (*See* TTAB Order at 14.)

Applicant's refusal to participate in discovery has prejudiced Opposer. Many of the discovery requests seek information surrounding Applicant's alleged first use of the mark. That evidence, if it exists at all, is only available to Applicant. Opposer cannot meaningfully prepare for trial without it. Moreover, Applicant's discovery failures have forced Opposer to spend far more money and attorney-time than necessary. Opposer's attorney traveled from California to

4

Boston to depose Applicant. He refused to answer clearly appropriate questions, and refused to meaningfully participate in a discussion with the interlocutory attorney that Opposer's attorney placed during the deposition in a good-faith effort to resolve the dispute. (Edelman Decl., ¶ 7.) Any remedy short of entering judgment in favor of Opposer will simply allow Applicant to continue his unilateral war of attrition, without any real prospect for trying this case on the merits.

For all the foregoing reasons, Opposer respectfully requests that the Board order judgment against Applicant.

Dated: June 18, 2003

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _____
                Scott A. Edelman

2029 Century Park East, Suite 4000
Los Angeles, California 90067-3026
Phone: (310) 557-8061
Fax: (310) 552-7041
ATTORNEYS FOR OPPOSER

Ref. No. 93107-00114

## DECLARATION OF SCOTT A. EDELMAN

I, Scott A. Edelman, declare:

1.      I am partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel of record in this matter for Opposer University of Southern California (hereafter "Opposer"). I am licensed to practice law in the State of California. I am one of the attorneys principally responsible for the representation of Opposer in this action. I have personal knowledge of the facts set forth in this declaration, unless indicated otherwise, and if called as a witness, I could and would competently testify thereto. I am submitting this declaration in support of Opposer's Motion for Discovery Sanctions.

2.      On March 6, 2003, the Board issued an order granting both Opposer's motion to amend the opposition and Opposer's motion to compel discovery. In its order the Board instructed Applicant, Dennis Solomon, to answer the amended opposition and respond to the outstanding discovery by April 7, 2003. A true and correct copy of the Board's March 6, 2003 Order is attached hereto as Exhibit A.

3.      On March 17, 2003, after receiving a copy of the Board's March 6, 2003 order, Applicant Dennis Solomon telephoned me and asked for an extension of time until May 15, 2003 in which to respond to Opposer's written discovery. Mr. Solomon informed me that many of the responsive documents were in Belgium and said that he would be going to Belgium in early May to retrieve them. Mr. Solomon also told me that the documents in Belgium contain the information that he needed to respond to my client's interrogatories. Based on Mr. Solomon's representations, I granted his request for an extension of time until May 15, 2003 to respond to Opposer's written discovery requests. I granted the extension expressly conditioned upon Mr. Solomon's agreement to fully respond to the discovery, without objection, by May 15, 2003.

Attached hereto as Exhibit B is a true and correct copy of a letter that I sent to Mr. Solomon on March 25, 2003 memorializing our March 17, 2003 conversation.

4.       In response to my March 25, 2003 letter memorializing our agreement, a copy of which I provided to Mr. Solomon via e-mail, Mr. Solomon sent me an e-mail in which he stated "we are not going to contest the Board's order nor our other obligations." A true and correct copy of Mr. Solomon's March 25, 2003 e-mail to me is attached hereto as Exhibit C.

5.       In addition, Mr. Solomon informed me that he had misplaced the written discovery propounded by Opposer. As a courtesy, I promptly arranged for another set of the written discovery to be sent to Applicant. Attached hereto as Exhibit D is a true and correct copy of an e-mail dated March 26, 2003 from my paralegal to Mr. Solomon attaching Opposer's discovery requests.

6.       More than three weeks have past since Applicant's written discovery was due. Applicant is clearly aware of the deadline because he specifically asked me for a 38-day extension of time to respond, and I granted his request.

7.       Mr. Solomon's refusal to participate in discovery has prejudiced my client. In addition, Applicant's discovery failures have forced my client to spend far more money and attorney-time than necessary. For example, one of Opposer's in-house attorneys traveled from California to Boston to depose Mr. Solomon, where he refused to answer clearly appropriate questions and refused to meaningfully participate in a discussion with the interlocutory attorney during a conference call that I placed during the deposition in a good-faith effort to resolve the dispute.

I have been warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements and the like may jeopardize the validity of the document, and declare that all statements made of my own knowledge are true; and all statements made on information and belief are believed to be true.

Dated: June 18, 2003

_____
Scott A. Edelman

Opposition No. 119,754
Serial No. 74/428,299
Mark: HOLODECK (Stylized)

## CERTIFICATE OF EXPRESS MAILING 37 CFR § 1.10

    I, Mandy Robertson-Bora, do hereby certify that the foregoing **MOTION FOR DEFAULT JUDGMENT AND MOTION FOR DISCOVERY SANCTIONS; SUPPORTING DECLARATION OF SCOTT A. EDELMAN** is being deposited with the United States Postal Service as Express Mail, postage prepaid, in an envelope addressed to Box TTAB, Assistant Commissioner for Trademarks, 2900 Crystal Drive, Arlington, Virginia 22202-3513, on the date indicated below.

_____
Signature

**EE588593199US**
_____
Express Mail Label Number

June 18, 2003
_____
Date

    I hereby certify that on June 18, 2003, a copy of the foregoing **MOTION FOR DEFAULT JUDGMENT AND MOTION FOR DISCOVERY SANCTIONS; SUPPORTING DECLARATION OF SCOTT A. EDELMAN** is being deposited with the United States Postal Service as first-class mail in an envelope addressed to:

    Dennis J. Solomon
    P.O. Box 289
    Yarmouth Port, MA 02675

_____
Mandy Robertson-Bora

20158492_1.DOC

EXHIBIT 12

UNITED STATES PATENT AND TRADEMARK OFFICE
**Trademark Trial and Appeal Board**
2900 Crystal Drive
Arlington, Virginia 22202-3513

Mailed: March 6, 2003

Opposition No. 119,754

University of Southern
California
        v.
Dennis J. Solomon

**David Mermelstein, Attorney:**

By order of the Board dated July 5, 2001, the Board suspended this proceeding pending disposition of opposer's motion to compel discovery.  Now before the Board[1] are the following matters:

- Opposer's motion to amend the notice of opposition, filed June 21, 2001;

- Opposer's motion to compel discovery and for discovery sanctions, filed June 21, 2001;

- Applicant's "consent"[2] motion for an extension of time in which to respond to opposer's motions to amend and compel, filed July 9, 2001;

- Opposer's motion to strike applicant's sur-reply, filed September 26, 2001.

The motions to amend and compel have been fully briefed.

---

[1] Issued concurrently herewith in separate orders are a confidentiality order and an order respecting opposer's motion to strike applicant's motion for Rule 11 sanctions.
[2] Although applicant's motion contains an allegation of opposer's consent to the motion, the motion was contested by opposer in a paper filed July 23, 2001.

Opposition No. 91119754

### Procedural History

Opposer filed a notice of opposition alleging that applicant's mark,[3] is (1) descriptive and has not acquired secondary meaning, (2) generic, and (3) that the mark does not function as a trademark.  By its answer, applicant denied the salient allegations of the notice of opposition and asserted various affirmative defenses.[4]

On June 12, 2001, opposer sought to initiate a telephone conference in this matter to resolve a dispute which had arisen during the course of a discovery deposition.  However, when applicant insisted that a transcript of the telephone conference be made, the Board terminated the conference.  (The Board's rules specifically provide that such proceedings may not be recorded by the Board or the parties.)  Opposer was directed to file

---

[3] Application Serial No. 74/428,299, for the mark HOLODECK for "3D display apparatus comprising an optical scanner, a collimating device and a video monitor for use in a variety of fields, including medicine, science and education."  The application alleges dates of first use and use in commerce of January 1993 and April 1993, respectively.

[4] Applicant's answer includes under the heading "Affirmative Defenses & Counterclaims," sixteen numbered paragraphs, none of which constitutes a counterclaim.  "The only type of counterclaim which may be entertained by the Board is a counterclaim for cancellation of a registration owned by an adverse party.  *See Pyttronic Industries Inc. v. Terk Technologies Corp.*, 16 USPQ2d 2055 (TTAB 1990), and *International Telephone and Telegraph Corp. v. International Mobile Machines Corp.*, 218 USPQ 1024 (TTAB 1983)."  TBMP § 319.01.  Since applicant has not sought the cancellation of any registration owned by opposer, applicant's statements have been construed as affirmative defenses, although the we do not examine the validity or sufficiency of any such statements at this time.

Opposition No. 91119754

whatever motion it believed appropriate.  Order, June 12, 2001.

**Motion to Amend**

As a preliminary matter, we note that applicant filed a motion to extend its time to respond to opposer's motions to amend and compel on July 2, 2001, and included a statement alleging that "[o]pposer has consented directly for an extension to August 6, 2001, and conditionally until August 20, 2001, unless advised otherwise by July 5, 2001, for the purpose of obtaining proper counsel on this complex matter."[5]  Opposer filed an opposition to applicant's motion, alleging that it did not agree to an extension beyond August 6, 2001.  Opposer attached copies of correspondence and a declaration in support of its position.

We agree with opposer that it appears the only consent given was for an extension until August 6.  Nonetheless, it is difficult to understand what was meant by the "conditional" consent for the extension mentioned in applicant's motion, and it is far from clear that the statement was intended to mislead the TTAB.  And even if the motion for extension was not based entirely on consent, the Board would be inclined to grant it.

Accordingly, we have considered applicant's response as timely.  On the other hand, we have not considered opposer's

---

[5] It does not appear that applicant has retained counsel.

3

Opposition No. 91119754

"short reply in support of" its motions to amend and compel,
because it is not necessary to do so.  Trademark Rule
2.127(a)(consideration of reply brief discretionary with the
Board).

Finally, we note that applicant filed a "concise
response to opposer's reply…."  On September 26, 2001,
opposer filed a motion to strike applicant's response to
opposer's reply.  Opposer's motion to strike is GRANTED,
Trademark Rule 2.127(a)(Board may consider reply brief; no
further papers will be considered by the Board).[6]
Accordingly, applicant's "concise response…" has not been
considered.

Concerning the substance of the motion to amend, once a
responsive pleading has been filed thereto, a party may
amend its pleading only by written consent of the adverse
party or by leave of the Board, "and leave shall be freely
given when justice so requires."  Fed. R. Civ. P. 15(a);
Trademark Rule 2.107.  The Board will not, however, allow an
amendment that would violate settled law or be prejudicial
to the rights of the adverse party.  *See generally,* TBMP
§ 507.02, and cases cited therein.

Opposer's amended pleading seeks to add nonuse and
abandonment as grounds for opposition.  As opposer points

---

[6] Opposer's motion was unnecessary.  The Board will not consider
a sur-reply, even in the absence of a motion to strike.

out, the proceeding is still in discovery.  In response, applicant argues essentially that opposer's claims of nonuse and abandonment are untrue in that applicant is in fact using the mark and has not abandoned it.

Applicant's argument puts the cart before the horse. The relevant question at this stage of the proceeding is whether opposer should be allowed to assert its new claims, not whether the new claims will be proven.  The latter question may be answered during discovery and trial.

Moreover, other than its general claims of harassment, applicant has not made any serious claim of prejudice resulting from allowance of the amendment.  Finally, applicant does not argue that the amended claims are legally insufficient, only that opposer knows or should know that they are untrue.  As indicated, however, applicant will have the opportunity to introduce whatever evidence he believes appropriate at trial.

Accordingly, opposer's motion to amend is GRANTED. Applicant is allowed until THIRTY DAYS from the mailing date of this order in which to file an answer to the amended notice of opposition.

**Motion to Compel**

We turn next to opposer's motion to compel applicant's responses to written discovery and deposition questions.

Opposition No. 91119754

### Confidential Material

Applicant objected to a number of interrogatories and document requests as calling for confidential information. Nonetheless, applicant has apparently resisted opposer's attempts to negotiate a stipulated order for the protection of such information.  Opposer requests that the Board enter such an order.

Applicant did not specifically resist opposer's motion for a protective order, stating only that "information of substantial competitive value, including customers, market size, product design, discount policies are not normally discoverable in a Trademark proceeding, unless the foundations for relevance have been established."

Issued concurrently with this order is an order protecting the confidentiality of information revealed in this proceeding.  Applicant's objections on this basis are accordingly overruled.

### Claims of Privilege

As for applicant's claims of privilege, it is clear that applicant has not followed the appropriate procedure. When objecting to a discovery request on the basis of privilege, the objecting party must provide the requesting party (and the Board) with information sufficient to determine the nature and applicability of the privilege asserted.  Additionally, when production of any document is

objected to on the basis of privilege, the objecting party must also identify the document or thing which is being withheld.  Without such information supporting the claim of privilege, the Board cannot determine whether disclosure is being properly denied.  The Board will not guess at the validity of applicant's objections.

Applicant's objections are overruled.  However, because the Board is reluctant to find waiver of privilege, opposer's motion to compel production is DENIED as to these materials, *without prejudice*.  Applicant will be allowed assert its claims of privilege, so long as he clearly sets out what privilege is being asserted as to which information.  If any document is withheld pursuant to a claim of privilege, that document must be clearly identified.  If applicant fails to do so, the Board will entertain a renewed motion to compel.

### Relevance

Applicant has likewise objected to the discovery requests at issue on the ground that they are not relevant to this dispute.  We consider the question of relevance in light of the claims set out in the notice of opposition, as amended.

We begin by noting that the concept of relevance is broad at the discovery stage of a proceeding:

> Parties may obtain discovery regarding any matter, not
> privileged, that is relevant to the claim or defense of

Opposition No. 91119754

> any party….  For good cause, the [Board] may order
> discovery of any matter relevant to the subject matter
> involved in the action.  Relevant information need not
> be admissible at trial if the discovery appears
> reasonably calculated to lead to the discovery of
> admissible evidence.

Fed. R. Civ. P. 26(b).[7]

The Board has carefully read the relevant discovery requests, applicant's responses thereto, opposer's motion (discussing in detail the information sought and its relevance), and applicant's more general opposition to the motion to compel.

While applicant's objections are vague, they seem to be based on the notion that (1) "information of substantial competitive value … [is] not normally discoverable in a Trademark proceeding, unless the foundations for relevance have been established; (2) the information requested is not directly related to the claims of genericness or descriptiveness; and (3) the claim of abandonment "is clearly not legitimate."

The Board generally views a confidentiality order, such as that entered herewith, as disposing of applicant's first concern.

---

[7] We further note that the Board has not adopted the automatic disclosure provisions of Fed. R. Civ. P. 26(a).  Discovery (including interrogatories, requests for the production of documents, and depositions) thus typically provides the only opportunity for a party to a Board proceeding to learn of information which may exist relevant to the pleaded claims and defenses, as well as any potential claims.

As for applicant's second issue, we first note that we have granted opposer's motion to amend its complaint. Accordingly, even under applicant's formulation, much of the requested evidence is directly relevant.[8]

In any event, it would appear that applicant misapprehends the *discovery* concept of "relevance" as opposed to the evidentiary concept of relevance. Relevance of evidence is a prerequisite to its admissibility at trial. *See* Fed. R. Evid. 401, *et seq.* The evidentiary question is whether the proffered information "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable…." Fed. R. Evid. 401.

The threshold question in discovery, however, is whether the information sought is related to the matters at issue in the proceeding, and is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(a). The scope of permissible discovery is accordingly

---

[8] Even if we did not permit amendment of the complaint, applicant has raised a number of issues regarding its own use of the mark by the affirmative defenses set out in its answer. For instance, its reference to "damage or confusion," Defense ¶ 1, "Applicant has promoted and used the mark commercially and scientifically in the field of advanced imaging for over twenty years. Any identity by the relevant commercial public with advanced imaging is a result of applicant's use." Defense ¶ 11, "Solomon has used the mark exclusively for the designated product for over five years." Defense ¶ 14, "The alleged commercial and public customers are principally computer geeks…." Defense ¶ 16. Having raised the issues of use, the relevant market, and the nature of the applicant's goods, applicant cannot now complain that they are not relevant for purposes of discovery.

Opposition No. 91119754

far broader than the range of evidence that may be
introduced at trial.  Indeed, as opposer points out, the
Board has long permitted parties to conduct discovery which
may reveal an additional claim or defense. *See, e.g., Endo
Laboratories, Inc. v. Fredericks*, 197 USPQ 560, 561 (TTAB
1977); *J. B. Williams Co., Inc. v. Pepsodent G.m.b.H.*, 188
USPQ 577, 580 (TTAB 1975).

    After careful review, it appears that all of opposer's
interrogatories, requests for the production of documents,
and deposition questions at issues are within the
appropriate scope of discovery.

    Finally, applicant argues that opposer's claim of
abandonment is not legitimate.  As noted above, however, the
very point of discovery is to clarify the facts.  Again, we
are not concerned here with the merits of opposer's claim,
but with whether opposer is to be permitted to find out
whether (and what) facts support its claim.  If opposer's
claims of nonuse and abandonment are without merit, the
applicant need only provide the information which opposer
seeks.  Such information will, presumably, demonstrate that
applicant has used and is using the mark.

### "Applicant Does not Assert Validity"

    Notwithstanding opposer's argument that "[t]his
objection is unintelligible…," applicant has not seen fit to
explain this objection which he has asserted in response to

a number of discovery requests.  Like opposer, we do not
understand this objection, and it is accordingly overruled.

**Motion for Discovery Sanctions**

As part of its motion to compel, opposer moves the
Board to impose discovery sanctions pursuant to Trademark
Rule 1.120(g)(2).  Opposer bases its motion for discovery
sanctions on the fact that applicant has not responded at
all to some of its requests for production, despite having
been reminded that such requests remained outstanding.

Notwithstanding opposer's well-founded suspicion that
applicant may not respond to the still-outstanding requests
for production and applicant's interposition of highly
questionable objections to most of opposer's other
discovery, the Board will not treat applicant's behavior as
tantamount to a positive refusal to respond to discovery.
The applicable rule provides that

> [i]f a party … fails to provide any response to a set
> of interrogatories or to a set of requests for the
> production of documents and things, and such party or
> the party's attorney … *informs* the party seeking
> discovery that no response will be made thereto, the
> Board may [impose an appropriate sanction].

Trademark Rule 2.120(g)(2) (emphasis added).

It would appear that this rule – which permits the
imposition of discovery sanctions without first issuing an
order compelling discovery – is reserved for the extreme
cases in which the responding party positively "informs" the
other party that no response will be made.  In such cases,

**Opposition No. 91119754**

even if an order compelling discovery were issued, it would
be disregarded.

On the other hand, in the instant case, applicant has
responded to most of opposer's discovery requests.  While
most of those responses consisted of objections (many of
which are meritless), and some of the requests have not been
answered at all, it does not appear that applicant has
flatly refused to participate in discovery.  Applicant is
entitled to an opportunity to respond to opposer's discovery
requests in accordance with this order.

Opposer's motion for discovery sanctions is accordingly
DENIED.

### Conclusion

As set out in detail above, applicant's objections to
opposer's discovery are overruled, and opposer's motion to
compel discovery is GRANTED.  Applicant is allowed **THIRTY
DAYS** from the date of this order in which to provide
discovery as follows:

Applicant is ordered to produce documents responsive to
opposer's request for production Nos. 3, 4, 5, 7, 8, 9, 10,
11, 12, 13, and 14.

Applicant is ordered to make full and complete
responses to opposer's interrogatory request Nos. 3, 4, 5,
6, 7, 9, 10, 11, 12, 13, 14, 15, and 16.

Opposition No. 91119754

Applicant may assert any available privilege against the foregoing discovery requests.  However, such privilege will be deemed waived unless applicant (1) identifies the existence of any responsive information withheld in such a manner as to enable opposer and the Board to determine the applicability of the privilege; and (2) specifies the legal and factual basis for the assertion of privilege as to each interrogatory response or document withheld.

Finally, within **FORTY-FIVE DAYS** following applicant's service of responses to opposer's interrogatories and document requests, applicant shall make himself available for a discovery deposition pursuant to Trademark Rule 2.120(b)  The Board hopes that the parties will be able to agree to a mutually satisfactory time and place for the deposition.[9]  In any event, however, opposer's notice of deposition shall be served on applicant no less than fifteen days prior to the date of the deposition.

To be clear, the Board has overruled applicant's objections on the basis of relevence and confidentiality to questions regarding applicant's products offered or sold under the mark, applicant's sales and other commercial activity relating to such products, applicant's actual or

---

[9] Note that Trademark Rule 2.120(b) provides that "[t]he deposition of a natural person shall be taken in the Federal judicial district where the person resides or is regularly employed or at any place on which the parties agree by

**Opposition No. 91119754**

potential customers, and applicant's knowledge of third-
party use of the mark HOLODECK.  Any refusal to respond to
such questions may justify the imposition of discovery
sanctions under Trademark Rule 2.120(g)(2).

Pursuant to the parties' consent motion of March 26,
2001, discovery is otherwise CLOSED.

\* \* \* \* \* \* \* \* \* \* \*

.oOo.

---

stipulation."  Further, "the Board will not … award any expenses
to any party."  Trademark Rule 2.120(g(1).

EXHIBIT 13

 **United States Patent and Trademark Office**

Home|Site Index|Search|Guides|Contacts|eBusiness|eBiz alerts|News|Help



**TTABVUE. Trademark Trial and Appeal Board Inquiry System**                **v1.4**

# Opposition

| | |
|---|---|
| **Number:** 91119754 | **Filing Date:** 07/28/2000 |
| **Status:** Pending | **Status Date:** 09/24/2004 |

**Interlocutory Attorney:** JENNIFER KRISP

**Defendant**

**Name:** DENNIS J. SOLOMON

**Correspondence:** DENNIS J. SOLOMON
P.O. BOX 289
YARMOUTH PORT, MA 02675

**Serial #:** 74428299                **Application File**

**Application Status:** Opposition Pending

**Mark:** HOLODECK

**Plaintiff**

**Name:** UNIVERSITY OF SOUTHERN CALIFORNIA

**Correspondence:** SCOTT A. EDELMAN
GIBSON DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, CA 90067

## Prosecution History

| # | Date | History Text |
|---|---|---|
| 41 | 01/17/2008 | PAPER RECEIVED AT TTAB |
| 40 | 09/10/2007 | DEFENDANT'S MOTION |
| 39 | 08/09/2007 | REQUEST FOR RECONSIDERATION DENIED |
| 38 | 02/23/2007 | P'S OPPOSITION/RESPONSE TO MOTION |
| 37 | 02/08/2007 | PLAINTIFF'S MOTION |
| 36 | 10/07/2004 | DEF'S REPLY TO PL'S OPP TO MOTION FOR RECONSIDERATION |
| 35 | 09/07/2004 | DFS REQ FOR RECON |
| 34 | 09/17/2004 | PLS OPP TO DF'S REQ FOR RECON |
| 33 | 08/06/2004 | TERMINATED |
| 32 | 08/06/2004 | BOARD'S DECISION: SUSTAINED |
| 31 | 08/13/2003 | SUSPENDED PENDING DISP OF OUTSTNDNG MOT |
| 30 | 07/07/2003 | APPLICANT'S RESPONSE BRIEF TO DEFAULT JUDGMENT AND SANCTIONS. |
| 29 | 07/14/2003 | OPPOSER'S SHORT REPLY IN SUPPORT OF OPPOSER'S MOTION FOR DEFAULT JUDGMENT AND MOTION FOR DISCOVERY S |
| 28 | 06/18/2003 | Pls mot for default judg and mot for sanctions and declaration |
| 27 | 03/19/2003 | trial dates reset |
| 26 | 02/03/2003 | Dfs mot for sanctions and memo |
| 25 | 04/04/2003 | DELETE ENTRY |
| 24 | 03/06/2003 | P's mots to Amend & Compel gtd. |
| 23 | 03/06/2003 | Protective Order |

22 03/06/2003 <u>Motion for Sanctions Denied</u>
21 06/21/2001 P'S MOTION TO COMPEL DISCOVERY
<u>20</u> 10/24/2001 <u>P'S MOTION TO STRIKE</u>
19 10/12/2001 DELETE ENTRY
<u>18</u> 09/04/2001 <u>P'S REPLY RE: MOT. TO AMEND AND MOT TO C OMPEL</u>
<u>17</u> 09/17/2001 <u>D'S CONCISE RESPONSE TO OPPOSER'S REPLY</u>
<u>16</u> 09/26/2001 <u>P'S MOTION TO STRIKE</u>
<u>15</u> 09/04/2001 <u>OPPOSER'S REPLY IN SUPPORT OF MOTS. TO A MEND & COMPEL</u>
<u>14</u> 07/23/2001 <u>P'S OPPOSITION TO #12</u>
<u>13</u> 08/23/2001 <u>D'S OPP. TO MOTS. TO AMEND & COMPEL</u>
<u>12</u> 07/09/2001 <u>D'S MOT FOR EXTEN. OF TIME W/ CONSENT</u>
11 07/09/2001 DELETE ENTRY
10 07/09/2001 DELETE ENTRY
9  07/05/2001 PROC ARE SUSP PENDING DISPOSITION OF MOT TO COMPEL
8  06/21/2001 PLN'S MOT TO AMEND NOTICE OF OPPOSITION
7  06/12/2001 Order re: Telephone conference
6  03/26/2001 PLN'S MOT TO EXT TIME W/C
5  02/20/2001 P'S MOT FOR EXTEN. OF TIME W/ CONSENT
4  09/07/2000 ANSWER
3  08/10/2000 PENDING, INSTITUTED
2  08/10/2000 NOTICE & TRIAL ORDER SENT ANSWER DUE SEPTEMBER 19, 2000
1  07/28/2000 FILED AND FEE

Results as of 01/24/2008 06:44 PM                            **Search:**

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

EXHIBIT 14

**Thank you for your request. Here are the latest results from the TARR web server.**

**This page was generated by the TARR system on** 2008-01-24 18:46:16 ET

**Serial Number:** 74428299 Assignment Information       Trademark Document Retrieval

**Registration Number:** (NOT AVAILABLE)

**Mark**

   HoloDeck

**(words only):** HOLODECK

**Standard Character claim:** No

**Current Status:** An opposition is now pending at the Trademark Trial and Appeal Board.

**Date of Status:** 2004-08-06

**Filing Date:** 1993-08-23

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 110

**Attorney Assigned:**
RUPP TERESA M Employee Location

**Current Location:** 845 -TTAB

**Date In Location:** 2004-10-29

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. SOLOMON, DENNIS J.

**Address:**
SOLOMON, DENNIS J.
P.O. Box 289

Yarmouth Port, MA 02675
United States
**Legal Entity Type:** Individual
**Country of Citizenship:** United States

---

## GOODS AND/OR SERVICES

**International Class:** 009
**Class Status:** Active
3D display apparatus comprising an optical scanner, a collimating device and a video monitor for use in a variety of fields including medicine, science and education
**Basis:** 1(a)
**First Use Date:** 1993-01-00
**First Use in Commerce Date:** 1993-04-00

---

## ADDITIONAL INFORMATION

(NOT AVAILABLE)

---

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2004-08-06 - Opposition terminated for Proceeding

2004-08-06 - Opposition terminated for Proceeding

2004-08-06 - Opposition sustained for Proceeding

2000-08-10 - Opposition instituted for Proceeding

2000-06-14 - Extension Of Time To Oppose Received

2000-05-30 - Published for opposition

2000-04-28 - Notice of publication

2000-03-21 - Approved for Pub - Principal Register (Initial exam)

2000-01-31 - Communication received from applicant

1999-10-18 - Final refusal mailed

1999-08-04 - Communication received from applicant

1999-03-08 - Non-final action mailed

1998-10-07 - Petition To Revive-Granted

1998-09-02 - Petition to Revive - Incomplete petition letter mailed

1998-08-05 - Petition to Revive - Incomplete petition letter mailed

1997-11-14 - Petition to Revice - Letter of inquiry mailed

1997-07-07 - Petition To Revive-Received

1996-02-17 - Abandonment - Failure To Respond Or Late Response

1995-07-05 - Non-final action mailed

1995-07-03 - Assigned To Examiner

1995-05-15 - Communication received from applicant

1994-11-14 - Non-final action mailed

1994-09-08 - Communication received from applicant

1994-03-03 - Non-final action mailed

1994-03-01 - Assigned To Examiner

1993-12-16 - Assigned To Examiner

---

## ATTORNEY/CORRESPONDENT INFORMATION

**Correspondent**
DENNIS J. SOLOMON
P.O. BOX 289
YARMOUTH PORT, MA 02675

EXHIBIT 15

1

2                          UNITED STATES DISTRICT COURT

3                          FOR THE DISTRICT OF WASHINGTON

4

5   Dennis J. Solomon                     )
    HoloDeck Trust                        )
6              Plaintiffs,                )
         vs.                              )
7                                         )
    Microvision                           )
8   University of Washington              )   Case No.: C98-0258D
    Joel Kollin                           )
9   Thomas Furness                        )
    MIT                                   )
10  Jean Weidemier                        )
    Teledyne Display Technologies         )
11  William Kennedy                       )
    Brian Hart                            )
12  Altman Stage Lighting Company         )
    Morris Weinberg                       )
13             Defendants.                )
    _____)

14

15

16                          PRELIMINARY STATEMENT

17      The present case avers that the defendants, with a locus about

18  defendant Joel Kollin have and are engaged in a series of interstate

19  conspiracies to obtain the trade secrets of the plaintiff, a former

20  MIT student and researcher. Using the unlawfully obtained information,

21  the defendants have and are continuing to engage in a unlawful

22  combination and conspiracy to monopolize, interfere with, and restrain

23  interstate commerce and competition through acts of fraudulent U.S.

24  patent and government contract procurement, interference with business

25  relations, and intimidation, extortion, physical attacks of persons

    and property of the plaintiff and other unfair competitive practices.

                                    1

1  Further, the defendants have been unjustly enriched through these

2  unlawful activities, by fraudulently promoting and issuing interstate

3  securities based on the fraudulently procured inventions, thereby

4  establishing a corporate market value of in excess of $80,000,000 and

5  soliciting U.S. government contracts in excess of $2,300,000.

6      The plaintiff, Dennis J. Solomon, a research biological

7  microscopist at MIT beginning in 1977, independently developed a

8  series of inventions in the field of visual imaging. In the early-mid

9  1980s, these inventions came to the attention of research groups

10 including the air tactics group of Naval Air Station, Weymouth, MA and

11 USAF Rome Labs, NY., and the holographic imaging group at the Media

12 Lab, MIT under Stephen Benton.

13     In the mid 1980s, defendant Kollin became a member of Benton's

14 Lab at MIT. Subsequently, a number of incidents occurred involving

15 the theft, copying or removal of the plaintiff's invention papers, and

16 the monitoring of plaintiff's business contacts.

17     During the past thirteen years, defendants Altman, Kollin and

18 other persons known but unidentified by name, have engaged in a

19 conspiracy to unlawfully monopolize scanning stage and imaging systems

20 by using a series of schemes to obtain the plaintiff's trade secrets,

21 and by using intimidation, extortion, and threats of personal injury

22 to obtain the assignment of U.S. patents and impede interstate

23 commerce and competition.

24     During the past ten years, defendants Kollin and Furness, using

25 unlawfully obtained trade secrets, have fraudulently procured four

   U.S. patent applications which read closely on plaintiff's earlier

1  filed applications.  At least two of the applications are invalid

2  under the prior art and issued as a result of a clerical error by the

3  U.S. Patent Office for failing to assign an earlier application filing

4  date to a subsequent continuation-in-part.

5      From 1992 to the present, the defendants Kollin, Weidemier,

6  Teledyne, Kennedy and Hart formed a conspiracy to interfere with a

7  settlement license over fraudulently procured U.S. Patent '769 between

8  the plaintiff and MIT.  In 1995, the defendant Teledyne sought to gain

9  monopolistic control over patent '769, and knowingly interfered with

10  the business relationship between the plaintiffs and the U.S.

11  Department of Defense by delaying and failing to provide contracted

12  electronic components.

13      The defendants Kollin, Furness, University of Washington and

14  Microvision formed a second conspiracy to engage in unlawful

15  monopolistic practices and unlawfully enrich themselves by

16  fraudulently procuring at least two U.S. patents '104 & '339, based on

17  the plaintiff's inventions.  The defendants used these patents as the

18  foundation for the promotion of the registered securities of

19  Microvision, Inc., a State of Washington corporation currently listed

20  on the NASDAQ, and to obtain government contracts.

21      The aforementioned acts are violations of Section 2 of the Sherman

22  Act (15 USCS § 2) and Section 1964 of the RICO Act (15 USCS 1964) as well as

23  numerous US and State laws.

24      Prior to the institution of this complaint, the plaintiff attempted to

25  reach a mediated settlement with Microvision and requested a notarized

1  statement under penalties of perjury from defendant Kollin denying the

2  specific allegations.  Both parties rejected these requests.

3

4                              COMPLAINT

5  1. Plaintiffs, bring this civil action against defendants under Section

6     2 of the Sherman Act (15 USCS § 2), the RICO Act (15 USCS 1964) and

7     other State and Federal laws, for treble damages suffered by the

8     plaintiffs as a result of violations by the defendants of the

9     antitrust and corrupt organization laws of the United States.

10    Plaintiff demands a jury trial.

11

12                         JURISDICTION AND VENUE

13 2. This Court has jurisdiction of this cause under the provisions of

14    the Sherman and Clayton Acts, specifically under 15 USC § 1 & 2, 28

15    USC § 1338 and venue under 28 USC § 1400(b) and 1391(c).

16

17                              PARTIES

18 3. The plaintiff, Dennis J. Solomon, is a resident of Yarmouth Port,

19    Massachusetts.  He received his formal education at MIT and the

20    Woods Hole Marine Biological Laboratories in the fields of optical

21    microscopy.  In 1978 and 1979, he co-authored a number of scientific

22    articles with Dr. Stephanie Sher, the wife of Dr. Larry Sher,

23    inventor of BBN's SpaceView, a 3D variable focus scanning display.

24    During the 1980s, Solomon continued to experiment and invent in the

25    field of visual science.  In 1989, Solomon founded Volumetric

      Imaging, Inc.  During or before 1991, he began exploring joint

                                    4

1  projects with ISCAN, a manufacturer of head-mounted, eye tracking

2  systems.

3  4. The plaintiff, HoloDeck Trust is an unincorporated association of

4  parties who have been granted a beneficial interest in the imaging

5  projects of plaintiff Solomon.

6  5.  The defendant, Joel S. Kollin, is believed to be a resident of

7  Seattle, Washington.  He is believed to be an employee of the HITL

8  Laboratory of the University of Washington, and to have received and

9  currently have a beneficial financial interest through the licensing

10  of said patents covering virtual retinal displays to and through an

11  equity interest in Microvision, Inc., and an assignment agreement

12  with University of Washington.

13  6. The defendant, Thomas Furness, is believed to be a resident of

14  Seattle, Washington, and an employee of the HITL Laboratory of the

15  University of Washington. He is believed to have received and

16  currently have a beneficial financial interest in the licensing of

17  patents covering virtual retinal displays, and through the

18  interstate securities sales of equity in Microvision, Inc., and an

19  assignment agreement with University of Washington.

20  7. The defendant, University of Washington, hereinafter called "HITL",

21  is believed to be a non-profit, educational institution situated in

22  Seattle, Washington and organized under the Laws of the State of

23  Washington.  The University is believed to operate a for-profit

24  licensing agency which distributes license fees to the University

25  and the inventors of record.

1  8. The defendant, Microvision, Inc., hereinafter called "Microvision",

2  is believed to be a public Washington corporation traded on the

3  NASDAQ under the symbol MVIS, with principal offices at 2203 Airport

4  Way South, Seattle, Washington.  It is believed that defendants

5  Furness and Kollin participated in the development and promotion of

6  Microvision and received financial and other benefits from the

7  $5,000,000 licensing agreement of virtual retinal patents with the

8  University of Washington.

9  9. The defendant, Jean Weidemier, is believed to be a resident of

10  Massachusetts and was formerly employed as an attorney by the

11  Massachusetts Institute of Technology.  Weidemier specifically

12  negotiated and composed the specific licensing agreement for the

13  Kollin Patent '769 between MIT and Solomon executed on April 22,

14  1992.

15  10.   The defendant, Massachusetts Institute of Technology, hereinafter

16  called "MIT", is a private, non-profit, educational institution

17  incorporated under the Laws of Massachusetts with principal offices

18  at 77 Massachusetts Avenue, Cambridge, Massachusetts.  MIT was

19  assigned the Kollin '769.

20  11.   The defendant, Teledyne Display Technologies, Inc., hereinafter

21  called "Teledyne", is believed to a New Hampshire corporation, a

22  subsidiary of Teledyne, Inc., engaged in the manufacture and sale of

23  LED display systems with principal offices at *****************.

24  12.   The defendant, William Kennedy, is believed to a California

25  resident, was an employee of Teledyne, Inc., contacted and conspired

1   with both Teledyne Display Technologies and Brian Hart in connection

2   with US Patent '769.

3   13.   The defendant, Brian Hart, is believed to be a California

4   resident and to have received assistance and support from Teledyne

5   for the development of a volumetric imager in competition with the

6   plaintiffs.  Brian Hart visited MIT in an attempt obtain a license

7   from MIT on patent '769.

8   14.   The defendant, Morris Weinberg, is believed to a resident of

9   Cambridge and Centerville, Massachusetts and owner of America Now, a

10  technology development company. Weinberg was the president of

11  Fibronics International, Inc. of Hyannis until his removal in 1988.

12

13                          UNLAWFUL ACTS

14  15.   Beginning in 1986 and continuing up to including the date of

15  filing of this complaint, the defendants have monopolized and

16  attempted to monopolize the interstate trade and commerce in low

17  inertial visual scanning systems, autostereoscopic systems and

18  retinal imaging systems using scanning system, in violation of

19  Section 2 of the Sherman Act (15 USCS § 2), Section 1962 of the RICO

20  Act (18 USCS § 1962)and Section 42 of Trade Act of the Commonwealth

21  of Massachusetts on Trade Secrets (93 MGL § 92).  Such violations

22  are continuing and will continue unless relief hereinafter requested

23  is granted.

24  16.   Pursuant to and in furtherance of the aforesaid monopolization,

25  attempt to monopolize, and other unlawful acts and practices,

    defendants have engaged in a ongoing series of schemes and

7

conspiracies that has prevented competing inventors and

organizations in the field of retinal imaging systems for having an

adequate opportunity effectively to compete for business and

government contracts, and has done, among other acts the following:

(a) During a period from at least May, 1983 and continuing to the

present, persons known to or associated with Katherine Hahn, in

coordination with persons connected in part to Alan B. Morse,

Altman's and a MIT group associated with Kollin, engaged in a

conspiracy to obtain the trade secrets of the plaintiff included in

part in continuation-in-part application of U.S. Patent application

06/699,905, filed February 8, 1985.

(b) Defendant Kollin received this and other information and used

said unlawfully obtained information to fraudulently procure U.S.

Patent 4,853,769, filed June 16, 1987.

(c) On or about the winter of 1987-88, Altman invited plaintiff to

attend an album release party for music star Cyndi Lauper at a

Yonkers nightclub.  The plaintiff was introduced to a well-dressed

advertising account associate, Michot (last name unknown), who

accompanied the plaintiff to a private reception at the Altman

facility.  During negotiations related to the agreement of

assignment of the plaintiff's patents '568 to defendant Altman,

Randall Altman with affirmation from Elie Altman, suggested that

said woman was under legal age and pictures of the plaintiff leaving

the facility had been taken.  Plaintiff had had no contact with said

woman subsequent to said reception and had no independent knowledge

of the veracity of defendants' assertion.

8

(d) On or about the spring of 1988, defendant Kollin published and publicly presented at the scientific meeting, the subject matter of autostereoscopic patent '769;

(e) On or about the summer of 1991, the plaintiff noted unauthorized access by persons known and unknown of the plaintiff's files, mail, and computer materials at plaintiff's office at 2200 One Kendall Square;

(f) Defendants Kollin and Furness used said unlawfully-obtained information to fraudulently procure U.S. Patent 5,467,104, filed October 22, 1992;

(g) Defendant Teledyne, cognizant and desirous of obtaining control of Kollin AS patent '769, knowingly and deliberately delayed providing certification of performance characteristics in LED modules contracted to VI in which plaintiff had a beneficial interest and was believed to derive personal income. Defendant Hart, in conspiracy with defendant Teledyne, attempted unsuccessfully in May, 1994 to obtain a license from MIT over the patents licensed to VI. Thereafter, in furtherance of said conspiracy, defendant Teledyne knew and believed that said delay of such certification would effectively put plaintiff in financial straits and reputation with the U.S. government, jeopardize existing government contracts, and cause the plaintiff to lose its competitive advantage including but not limited to Kollin MIT patent licenses .

(h) On or about the winter of 1994-95, the plaintiff noted unauthorized access by persons known and unknown of the plaintiff's

files, mail, and computer materials temporarily housed at 110

Sherman Ave, Chestnut Hill, MA, an apartment complex indirectly

controlled by Alan B. Morse, uncle of Hahn.  Defendant Weinberg, in

conspiracy with Morse, and on behalf of Kollin and other defendants,

had demanded a upfront payoff of $50,000 to do business with the US-

Israel Bilateral Science Grants, and when the plaintiff refused to

pay upfront, did and continues to engage in a unlawful enterprise to

obtain trade secrets and interfere with business relations.  Among

other acts, Weinberg instructed his associate, Emily Shain, to

attempt to obtain the plaintiff's latest improvements of the Kollin

Patent '769 and forward them to the Publicity Department of Reebok

International run by Weinberg's son, Adam.

(i) Defendant Furness used said information unlawfully obtained to

fraudulently procure U.S. Patent 5,596,339, filed May 9, 1995;

(j) Defendants Microvision, Furness, Kollin & University of

Washington, cognizant of the claims of the plaintiff and the Notice

of Allowance '066 (see exhibit 1) fraudulently and unfairly procured

contracts with the U.S. government including but not limited to a

contract for $4,000,000 with the U.S. Army.

17.  Section 42 of the Massachusetts General Laws, Chapter 93 (93 MGL

§ 42) states in part that: "Whoever embezzles, steals or unlawfully

takes, carries away, conceals, or copies, or by fraud or by

deception obtains, from any persons or corporation, with intent to

convert to his own use, any trade secret, regardless of value, shall

be liable in tort to such person or corporation for all damages

resulting therefrom."

18.    United States Letters Patent No. 4,853,769; 5,467,104; 5,569,339 are invalid and void for the reasons that the applicants did not themselves invent the subject matter sought to be patented.

## BACKGROUND FACTS

19.    During the early winter of 1979-80, Charles Szabo, M.D., a professor at Harvard Medical School and Vivian Moss, a television producer for The Body Human, funded by the Discover arm of Robert Guccione, approached plaintiff through his lab at MIT to film for television footage using photomicrography of human biological specimens.    The footage appeared in a CBS Science series.    Of particular interest to Moss were methods of microscopic and endoscopic imaging.

20.    In 1981, a M. Landsman, part of a University of Rochester-MIT-Vermont technology group, expressed an interest in developing certain 3D inventions of the plaintiff.    Certain technologies of plaintiff were transferred to parties associated with Dimension Technologies, Inc and the US Air Force, Rome Labs.    No direct long-term project evolved.

21.    During the early winter of 1983-84, MIT associates of Stephen Benton, a professor of spatial imaging at MIT, invited plaintiff to a Benton lecture at the Cambridge Academy of Arts & Sciences. Plaintiff was seated next to Benton's wife, who engaged him in conversation concerning his activities.    Following the lecture, Benton, associates and Plaintiff engaged in further conversations during which the associates repeatedly attempted to induce Plaintiff

11

1    to discuss in depth he presented work related to 3D holographic

2    television.

3    22.   In 1984, Plaintiff presented an idea for a computer-generated,

4    holographic, stage backdrop for a music production. The backdrop

5    proposed was a matrix panel constructed of holographic "pixels",

6    each being a printed, computer-generated hologram.   The concept was

7    presented to a number of music groups but was considered too

8    expensive at the time.  Also in 1984 or thereafter, Plaintiff was

9    asked to present his idea for a 3D holographic backdrop to Altman

10   Stage Lighting Company.  Certain associates of Altman's from

11   Seattle, Washington with a direct and specific interests in

12   Plaintiff's inventions met with Plaintiff at the Altman Yonkers, NY

13   facility.

14   23.   During 1986, Plaintiff filed a U.S. Patent C-I-P application of

15   '905 related the integration of autostereoscopy, holography and

16   volumetric imaging.  The application disclosed that the "concepts

17   could be applied to limited field-of-view displays".

18   24.   In the late fall of 1986, Plaintiff met Katherine Hahn of New

19   Haven, CN.  Members of Hahn's family were involved in 3D virtual

20   reality and stage lighting at Litton Fairchild in Florida and

21   Connecticut.  Alan B. Morse, Hahn's uncle, was the President of the

22   US Trust Company of Boston, a major Somerville, MA bank, had a few

23   years earlier opposed the US Trust's participation in the

24   plaintiff's imaging project, and was secretly attempting to wrest

25   control of US Trust from certain friendly acquaintances of the

12

1    plaintiff. Certain associates of Hahn were active in the imaging

2    field in Seattle, Washington.

3  25.    During December, 1986, following a meeting with Plaintiff's

4    patent advisors, Hahn invited Plaintiff to a party in Somerville,

5    Massachusetts.  In attendance were business associates in the field

6    of architecture and photography.  Plaintiff fell asleep during the

7    party.  During January, 1987, it became apparent that certain

8    information related to Plaintiff's pending applications had been

9    removed.  Plaintiff confronted Hahn, who claimed to have no

10   knowledge of any specific related acts.

11  26.    During 1988, Plaintiff filed an action against Hahn in

12   Massachusetts District Court.  Hahn did not deny the allegations.

13   The court awarded Plaintiff damages and injunction against further

14   unlawful activities by Hahn and associates.

15  27.    In 1987, Kollin, then of Somerville, Massachusetts, and connected

16   to the laboratory of Benton at MIT filed a patent application

17   entitled "Time-Multiplexed Autostereoscopic Display", now U.S.

18   Patent 4,853,769.  The first claim, related to the integration of

19   volumetric imaging and autostereoscopic displays, presented a narrow

20   case of Plaintiff's earlier filed 1986 application 06/699,905.

21  28.    On October 10, 1991, Plaintiff filed U.S. patent application no.

22   07/779,066 entitled "Stereo Visual Display System with Scanning

23   Focal Adjustment" hereinafter called the "Plaintiff First

24   Application" (see Exhibit 1).

25  29.    On or about the spring of 1992, the Kollin patent, #4,853,769,

     filed in 1987 and publicly presented at the SID meetings in 1988,

1   remained unlicensed.  Plaintiff inquired about obtaining an

2   exclusive license. Plaintiff was directed to Attorney Weidemier of

3   MIT. Ms. Weidemier attempted to delay the licensing on at least two

4   occasions.  During the summer of 1992, after negotiations related to

5   the various claims and actions, MIT licensed the Kollin patent

6   exclusively to Volumetric Imaging, Inc.  An agreement was later

7   reached which permitted the transfer to Dennis J. Plaintiff or

8   another group in which he was involved.

9   30.   During late 1991, Plaintiff began developing a project with

10  ISCAN, a Massachusetts manufacturer of eye position detector

11  systems.

12  31.   On October 22, 1992, Furness and Kollin filed a US patent

13  application for a "Virtual Retinal Display", now U.S. Patent

14  5,467,104, issued 11/14/95.

15  32.   Both the Plaintiff's earlier '066 (1991) and the Furness (1992)

16  applications disclose a source of photons scanned directly onto the

17  user's retina and a means for varying the focus of said scanned

18  photons to control the depth perceived for each picture element from

19  infinity to an arbitrary close distance, and constitutes prior

20  pending art to the Furness application.

21  33.   On March 9, 1993, Plaintiff's application, US Patent Appl.

22  #07/779,066, was allowed. Prior to the abandonment of US patent

23  appl. 07/776,066 Plaintiff filed a continuation-in-part application

24  adding new and important improvements.  The claims of the prior

25  application were recited. (See Exhibit 2.) Said application remains

14

1   pending under a petition for the correction of a clerical error to

2   the Commissioner of Patents.

3   34.  On May 9, 1995, Furness, Melville, Tidwell filed a US patent

4   application '818 for a "Virtual Retinal Display with a Fiber Optic

5   Point Source."

6   35.  Plaintiff's 1991 Appl.'066 disclose a fiber optic light source

7   for the same purpose as the Furness 1995 application '818, and

8   constitutes prior pending art to the Furness application.

9   36.  On November 14, 1995, the first Furness-Kollin application was

10  allowed, now U.S. Patent 5,467,104.

11  37.  On January 21, 1997, the second Furness application was allowed,

12  now U.S. Patent 5,596,339.

13  38.  During 1997, Plaintiff became aware of that the Furness-Kollin

14  patents recited confidential material invented by or disclosed in

15  Plaintiff's patent applications filed over one year prior to the

16  first Furness patent.

17  39.  During the summer of 1997, Plaintiff sent Microvision a letter

18  generally describing the similarities together with a copy of the

19  Plaintiff's Patent Notice of Allowance.  Plaintiff offered to

20  disclose the full patent application under a non-disclosure

21  agreement between the parties. Plaintiff also proffered a settlement

22  offer which included binding arbitration or mediation.

23  40.  After a number of discussions, Microvision drafted and responded

24  with a signed non-disclosure agreement which included the right to

25  disclose said information to government contracting authorities and

    the U.S. Patent Office. See Exhibit 10.

41.    Plaintiff responded by suggesting certain modifications which would initially only permit the disclosure to be used for the purpose of Microvision determining the validity of Plaintiff's claims.

42.    On November 4, 1997, Microvision sent Plaintiff a letter rejecting any offer of settlement. (See Exhibit 11).

COUNT I

Defendants Conspired to Obtain and Use Trade Secrets

43.    Plaintiffs reallege aforementioned paragraphs above as if fully set forth herein.

44.    From 1986 to the present, defendants Kollin, Furness, Altman, Weinberg, Kennedy, Teledyne in coordination with other persons known and unknown developed an unlawful and corrupt organization of individuals who planned and executed two or more unlawful schemes to obtain proprietary technical information and inventions of the plaintiff related to imaging systems, research details, business and research contacts and other trade secrets of the plaintiff.

45.    Defendants Kollin and Furness unlawfully used said proprietary trade secrets and information of the plaintiff for the purpose of fraudulent procuring applications for U.S. Patents, used the US mails and interstate wires to impede and unlawfully solicit interstate business and U.S. government contracts, and filed fraudulent statements with the U.S. Patent Office and the Securities and Exchange Commission.

46.   Said acts are violations of M.G.L. 93 § 42 and other State and Federal laws.

## COUNT II

Defendants Ongoing Conspiracy to Engage in Restraint of Trade and Unfair Competition in Interstate Commerce and Government Contracting

47.   Plaintiffs reallege aforementioned paragraphs above as if fully set forth herein.

48.   Defendants Kollin, Furness, HITL, Microvision and others, jointly and severally, had developed an ongoing corrupt organization which has used unlawfully obtained trade secrets to impede interstate commerce, and used fraudulently procured patents on the VRD inventions of the plaintiff for the purposes of soliciting interstate business, U.S. government contracts and the registration and sale of interstate securities.

49.   Said acts have impeded and prevented Plaintiff from obtaining funding, U.S. government and other contracts for the development of his inventions.

50.   Said acts are violations of M.G.L. 93 § 42 and 18 USC § 1962.

## COUNT III

Defendants Conspiracy to Engage in Unlawful Monopolistic Practices in Interstate Commerce

51.   Plaintiffs reallege aforementioned paragraphs above as if fully set forth herein.

17

52.  Defendants Kollin, Furness, HITL, Microvision and others, jointly and severally, unlawfully engaged in unfair competition and monopolistic practices by using said fraudulent procured patents on the inventions of the plaintiff for the purposes of creating a monopolistic position, restraining competitive interstate business, obtaining U.S. government contracts and the registration and sale of interstate securities.

53.  Said acts are violations of 15 USC § 2 and other state and federal laws.

COUNT VI

Defendants Conspiracy to Intimidate and Attempted Extortion
to Restrain Trade in Interstate Commerce

54.  Plaintiffs reallege aforementioned paragraphs above as if fully set forth herein.

55.  Defendants Altman, Kollin, Weidemier, Weinberg and others used and communicated trade secrets information to third parties and used intimidation, threats of extortion and physical violence to plaintiff's person, family and property to restrain competition and impede interstate commerce.

56.  Defendants Altman engaged in unlawful monopolistic practices by using intimidation, threats of extortion, and physical violence to obtain the assignment of plaintiff's patents.

57.  Defendants Altman engaged in unlawful monopolistic practices by using intimidation, threats of extortion, and physical violence to prevent the plaintiff's efforts to obtain U.S. Patents, offer said

1    inventions for sale to the public, and impede the plaintiff's effort

2    to engage in interstate competition in the field.

3   58.   Said acts are violations of 15 USC § 2, 18 USC § 1962 and other

4    state and federal laws.

5

6                              COUNT V

7   Defendants Unlawful Monopolistic Practices and Interference with

8                          Business Relations

9   59.   Plaintiffs reallege aforementioned paragraphs above as if fully

10    set forth herein.

11  60.   Defendants conspired to engage, and engaged in unlawful

12    monopolistic practices by using a fraudulently procured patent to

13    attempt to monopolize and to monopolize the market in time lapse

14    autostereoscopic imaging systems.

15  61.   Defendant Weidemier fraudulently asserted to MIT officers that no

16    binding modification of VI-MIT license have been effected.  Said

17    fraudulent assertion caused MIT to unilaterally revoked said

18    license, causing substantial damage to the plaintiffs and

19    subsequently permitting MIT to further to engage, and engaged in

20    unlawful monopolistic practices by using a fraudulently procured

21    patent to attempt to monopolize and to monopolize the market in time

22    lapse autostereoscopic imaging systems.

23

24

25

REQUEST FOR RELIEF

1. That the Court adjudge and decree that the defendants have combined and conspired to monopolize, have attempted to monopolize and have monopolized interstate trade and commerce in head mounted displays with infinite and focal adjustments, in violation of Section 2 of the Sherman Act;

2. That the Court adjudge and decree that the defendants have combined and conspired to fraudulently procure U.S. patents, engaged in a scheme and conspiracy to obtain trade secrets, engaged in unfair competition including but not limited to: (a) causing or attempting to delay the manufacture of the plaintiffs products for the purpose of perpetuating or gaining a competitive advantage, (b) using unlawful obtained trade secrets for the purpose of furthering the defendants' research, development and manufacturing, and the fraudulent and advantageous procurement of U.S. patents constructed to be questionably differentiable, and (c) using said unlawfully obtained trade secrets to cause the plaintiff to waste and dissipate assets;

3. That the Court adjudge and decree that the defendants have combined and conspired to monopolize, have attempted to monopolize and have monopolized, and attempt to interfere and have interfered with interstate trade and commerce in said imaging systems, and stage special effects, in violation of 18 USCS § 1962, by threats, intimidation, and extortion, through the fraudulent use of interstate mail and travel, through fraud in the sale of securities, through tampering and retaliating against a witness,

20

1    and be engaging in monetary transactions in property derived from

2    specified unlawful activity;

3    4. That each of the defendants, their officers, directors, agents,

4    employees and all persons, firms or corporations acting on behalf

5    of defendants or any one of them be perpetually enjoined from

6    continuing to carry out, directly or indirectly, the aforesaid

7    combination and conspiracy to monopolize, attempt to monopolize,

8    and monopolization of the aforesaid interstate trade and commerce

9    in imaging systems;

10   5. That the actual damages to plaintiffs' business and property

11   proximately resulting from such violations be determined;

12   6. That plaintiffs have judgment against the defendants for three

13   times the amount of actual damages so determined, together with its

14   costs and reasonable attorneys' fees as provided by law;

15   7. That the tradename, business, goodwill and assets of Microvision

16   derived, enhanced or obtained as a proximate result of the

17   fraudulent procurement of patent and other intellectual property

18   rights, and misrepresentation in the sale of interstate securities,

19   and government contracting be transferred to the plaintiffs;

20   8. That the defendant Microvision be required to transfer

21   manufacturing and other assets sufficient to insure competition in

22   the manufacture and sale of said imaging systems;

23   9. That this Court order the defendants, their employees, agents, and

24   associates to immediately and permanently desist from all unlawful

25   activities, including but not limited to acts of intimidation, and

     issue an immediate order prohibiting the defendants, their

1    employees, agents, and associates from contacting, or causing

2    themselves to be placed with 300' of the plaintiff or members of

3    the plaintiffs family.

4    10.That the plaintiff have such other and further relief as the nature

5    of the case may require and as the Court may deem just and proper;

6    11.That the plaintiff recover the costs of this action.

7                    PLAINTIFF DEMANDS A JURY TRIAL.

8

9    Signed and Dated this 17th day of February, 1998.

10

11

12

13   Dennis J. Solomon, plaintiff pro se

14   PO Box 289

15   Yarmouth Port, MA 02675

16   508 394 9221

17

18

19

20

21

22

23

24

25

**EXHIBIT 16**

# Select A Person

**There were 3 matching persons.**

<u>Solomon, Dennis</u>    (pty)

<u>Solomon, Dennis J.</u>    (pty)

<u>Solomon, Dennis J.</u>    (aty)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2008 11:56:49 | | | |
| **PACER Login:** | gi0002 | **Client Code:** | 93107-00143 |
| **Description:** | Search | **Search Criteria:** | Last Name: solomon First Name: dennis |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

**1:00-cv-12560-GAO** Solomon v. Puritan Clothing, In, et al
George A. OToole, Jr, presiding
**Date filed:** 12/15/2000
**Date terminated:** 11/03/2003
**Date of last filing:** 10/22/2004

**Query**

Alias
Associated Cases
Attorney
Case Summary
Deadlines/Hearings...
Docket Report ...
Filers
History/Documents...
Party
Related Transactions...
Status
View a Document

# Select A Case

**This person is a party in 6 cases.**

| | | | |
|---|---|---|---|
| 1:00-cv-12268-RBC | Solomon v. Lawless, et al | filed 11/02/00 | closed 08/13/02 |
| 1:04-cv-12499-WGY | Solomon v. Vest et al | filed 11/12/04 | closed 03/28/05 |
| 1:06-cv-11307-RGS | Solomon v. Texas Instruments, Inc. et al | filed 07/28/06 | closed 01/10/07 |
| 1:90-cv-11251-ADM | Solomon v. Altman Stage Light, et al | filed 05/09/90 | closed 05/20/93 |
| 1:96-cv-11377-PBS | Solomon v. Cheney, et al | filed 07/05/96 | closed 11/08/96 |
| 1:97-cv-11817-GAO | Solomon, et al v. Raytheon Company, et al | filed 08/11/97 | closed 11/13/98 |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2008 11:59:10 | | | |
| **PACER Login:** | gi0002 | **Client Code:** | 93107-00143 |
| **Description:** | Search | **Search Criteria:** | Last Name: solomon First Name: dennis |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

# Select A Case

**This person is a party in 2 cases.**

1:00-cv-12268-RBC    Solomon v. Lawless, et al                    filed 11/02/00    closed 08/13/02

1:97-cv-11817-GAO    Solomon, et al v. Raytheon Company, et al    filed 08/11/97    closed 11/13/98

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2008 11:59:26 | | | |
| **PACER Login:** | gi0002 | **Client Code:** | 93107-00143 |
| **Description:** | Search | **Search Criteria:** | Last Name: solomon First Name: dennis |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

Case 1:07-cv-01811-EGS    Document 4-17    Filed 01/28/2008    Page 6 of 13

# Select A Case

**This person is a party in 2 cases.**

| | | | |
|---|---|---|---|
| [1:96-cv-10613-REK](#) | Volumetric Imaging, et al v. Teledyne Micro, et al | filed 03/25/96 | closed 11/13/98 |
| [1:97-cv-11817-GAO](#) | Solomon, et al v. Raytheon Company, et al | filed 08/11/97 | closed 11/13/98 |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2008 17:08:34 | | | |
| **PACER Login:** | gi0002 | **Client Code:** | 93107-00143 |
| **Description:** | Search | **Search Criteria:** | Last Name: volumetric |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

# Select A Case

**This person is a party in 2 cases.**

<u>1:88-cv-00405-SD</u>   Solomon v. Foster, et al   filed 09/29/88   closed 12/06/90

<u>1:91-cv-00189-SD</u>   Solomon v. Labbe, et al   filed 05/06/91   closed 09/23/91

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2008 12:01:51 | | | |
| **PACER Login:** | gi0002 | **Client Code:** | 93107-00143 |
| **Description:** | Search | **Search Criteria:** | Last Name: solomon First Name: dennis |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |



## Party/Attorney Selection Page

| COA Case No. | Lower Court Case No. | Party/Attorney Name | Short Title |
|---|---|---|---|
| 00-1970 | 96-10613 | Solomon , Dennis J. | Volumetric Imaging v Teledyne Technologie |
| 02-2236 | 00-12268 | Solomon , Dennis J. | Solomon v Lawless |
| 03-2649 | 00-12560 | Solomon , Dennis J. | Solomon v Puritan Clothing |
| 05-1772 | 04-12499 | Solomon , Dennis J. | Solomon v Vest |
| 92-1661 | 91-00189 | Solomon , Dennis J. | Solomon v Labbe, et al. |
| 92-1705 | 91-00189 | Solomon , Dennis J. | Solomon v Labbe, et al. |
| 97-1464 | 96-11377 | Solomon , Dennis J. | Solomon v Cheney |
| 99-1157 | 97-11817 | Solomon , Dennis J. | Solomon v Raytheon Company |
| 99-1562 | 96-10613 | Solomon , Dennis J. | Imaging, Inc. v Microelectronics, In |
| 99-1854 | 97-11817 | Solomon , Dennis J. | Solomon v Raytheon Company |
| 99-1901 | 97-11817 | Solomon , Dennis J. | Solomon v Raytheon Company |



| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2008 16:51:41 | | | |
| PACER Login: | gi0002 | Client Code: | 93107-00143 |
| Description: | pty select | Search Criteria: | Solomon, Dennis |
| Billable Pages: | 1 | Cost: | 0.08 |

**2:98-cv-00258-RSL** Solomon v. University of WA, et al
Robert S. Lasnik, presiding
**Date filed:** 03/02/1998
**Date terminated:** 04/13/2000 **Date of last filing:** 06/30/2003

## Query

Alias
Associated Cases
Attorney
Case File Location...
Case Summary
Deadlines/Hearings...
Docket Report ...
Filers
History/Documents...
Party
Related Transactions...
Status
View a Document

Search for Case

Help

## Party/Attorney Selection Page

| Case No. | Party/Attorney Name | Short Title |
|----------|---------------------|-------------|
| 00-35430 | Solomon , Dennis J. | Solomon v Microvision |
| 00-35430 | Solomon , Dennis J. | Solomon v Microvision |
| 00-35431 | Solomon , Dennis J. | Solomon v Microvision |
| 00-35431 | Solomon , Dennis J. | Solomon v Microvision |
| 00-35570 | Solomon , Dennis J. | Solomon v Microvision |
| 00-35570 | Solomon , Dennis J. | Solomon v Microvision |
| 99-35827 | Solomon , Dennis J. | Solomon v Microvision, et al |
| 99-35827 | Solomon , Dennis J. | Solomon v Microvision, et al |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2008 09:10:06 | | | |
| **PACER Login:** | gi0002 | **Client Code:** | 93107-00143 |
| **Description:** | pty select | **Search Criteria:** | Solomon, Dennis |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

Search for Case

Help

Case 1:07-cv-01811-EGS    Document 4-17    Filed 01/28/2008    Page 11 of 13

**1:00-cv-07132-JGK** Solomon v. Altman Stage, et al
John G. Koeltl, presiding
**Date filed:** 09/21/2000
**Date terminated:** 06/29/2004
**Date of last filing:** 02/01/2006

**Query**

Alias
Associated Cases
Attorney
Case File Location...
Case Summary
Deadlines/Hearings...
Docket Report ...
Filers
History/Documents...
Party
Related Transactions...
Status
View a Document



Home   PACER                                                   Help

## Party/Attorney Selection Page

| Case No. | Party/Attorney Name | Short Title |
|---|---|---|
| 01-9390 | Solomon , Dennis J. | v |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2008 12:04:08 | | | |
| PACER Login: | gi0002 | Client Code: | 93107-00143 |
| Description: | pty select | Search Criteria: | Solomon, Dennis |
| Billable Pages: | 1 | Cost: | 0.08 |

Home   PACER                                                   Help

Displaying matches 1 through 4 of 4 total matches.

---

**Solomon, Dennis J.** - Plaintiff/Appellant                                    2004-P-0464
Case status: Closed: Rescript issued
DENNIS J. SOLOMON & another vs. ROBERT C. LAWLESS & others

---

**Solomon, Dennis J.** - Plaintiff/Appellant                                    2003-P-1553
Case status: Closed: Rescript issued
DENNIS J. SOLOMON vs. PATRICK E. MALLOY, III & others

---

**Solomon, Dennis J.** - Plaintiff/Appellant                                    1993-P-0402
Case status: Closed: Rescript issued
DENNIS J. SOLOMON vs. ATLANTIS DEVELOPMENT INC.

---

**Solomon, Dennis J.** - Plaintiff/Appellant                                    FAR-07220
Case status: FAR denied
DENNIS J. SOLOMON vs. ATLANTIS DEVELOPMENT, INC. & others

---