UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED
FEB 2 5 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

DENNIS J. SOLOMON,
Plaintiff,

v.                                            No.1:07-CV-01811-EGS

USC, et al
Defendants.

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The present case is a timely civil action filed on October 4, 2007 in response to a final decision on August 9, 2007 of the Trademark Trial and Appeals Board regarding the Plaintiff's application for the stylized mark 'HoloDeck'. The mark was granted to the Plaintiff on May 30, 2000 and opposed by the Defendant University of Southern California ("USC").

The review from the final decision of the TTAB in October of 2007 under 15 USC §1071, has never been a cause of action in any proceeding in any court. The other causes of action are mandatory under the FRCP arising from the same nexus with the same parties. It is 'black letter} law that the final decisions of the TTAB are reviewable by this Court, Dickinson v Zurko, 527 U.S. 150, 165 (1999) and that the TTAB's factual findings and conclusions of law are reviewed de novo. See n re Gartside, 203 F.3d 1305, 1315-16 (Fed Cir. 2000).

The Defendant's Motion to Dismiss alleges:

1. 'Res Judicata'

    The Plaintiff has never filed any other action seeking review of the August 9, 2007 Order of the TTAB.

    Defendants cite as 'res judicata' and cites a January 10, 2007 opinion (appeal pending) of the United States District Court in Massachusetts in the matter of Solomon v. Texas Instruments, Inc., et al., USDC 06-11307 RGS which was filed prior to any final decision of the TTAB, and seeks damages for the failure of Texas Instruments to repair and return a complex DMD electro-optic device purchased by the Plaintiff at the request of the United States Department of Defense Special Operations Command (SOCOM) for unspecified applications, a part subsequently provided to Defendant USC. As a result of Texas

2

Instruments' actions, US DOD has decided not to employ this device but use a superior European alternative.

2. 'Violation of a current Court Order'

There is no Court order barring the review of a contemporary decision under 15 USC §1071 for the mark HoloDeck.

3. 'Dismissal on the Merits'

While an M.I.T. education may be limited in matters of literature and sophistry, (not withstanding a course offered on the 'Theatre of the Absurd'), it is the Plaintiff's vague understanding that a relevant Constitution and Bill of Rights provides for a full and fair application of the law and jury trial. A legitimate 'Dismissal on the Merits' prior to discovery and summary judgment would be co-incident with the Defendant's arrival of Godot.

4. 'Vexatious Litigation'

Defendant counsel, Howard S. Hogan, Defendant Scott Edelman and other associates of Gibson, Dunn & Crutcher, hope to draw this Court into the complex web of which the late Attorney General and Harvard Professor Elliot Richardson called the "Inslaw Affair" and is better known by those who have played squash at Harvard's Harkness Hall as the "Atlantis Cartel', after the offshore sailing equipment company, ATLANTIS (now Atlantis Weatherger, Inc.), a supplier to the America's Cup Racing Yachts since 1974, founded by the Plaintiff. This corrupt political and profiteering organization, formed by a young Nixon/Ford administration attorney Michael A. McManus, Jr. and a young Ford aide, Richard Cheney, included the freeze-out of the Plaintiff and other stockholders in Atlantis, as well as a list of now convicted felons including international drug dealer Sidney Marvin Lewis, Vermont rocket scientist Gerald Bull, Sun Cruz players including attorney Jack Abramoff and 'Whitey Bulgher', and the cast of military and defense characters with headquarters next to USC in Marina del Ray. *See Los Angeles Times article on Nichols & McManus, March 23, 1993.*

While the principal actors in the present case may be related, this present case should be limited to the issues directly related to the trademark such as but not fully limited to: a) Did USC have standing to oppose, or was it a ficitious actor? b) Why was the 'secondary meaning clause' critical to the initial agreement? c) Was Edelman 'independent counsel'?

3

d) Should the amendment of the opposition have been permitted?  E) Are the trademark discovery materials provided sufficient to go to a Trademark Trial on the issue of a 'use in commerce'?

5. 'Evans and Sutherland'

The complaint properly alleges that Defendant 'Evans & Sutherland', the obvious beneficiary of the amended opposition, conspired with USC to benefit financially. Participation by USC 'independent counsel' goes to the heart of the issues under review.

It is well-settled under full spectrum of the law, that the filings of pro se litigants as well as final decisions of the TTAB are review in clarity of daylight (Dickinson v Zurko, 527 U.S. 150, 165 (1999) and re Gartside, 203 F.3d 1305, 1315-16 (Fed Cir. 2000)).

This should be the case here - for 'A fair and accessible judicial system is essential to the functioning democracy – both for the redress of criminal allegations and for the resolution of civil disputes." -*Justice Thurgood Marshall*.

Respectfully submitted on Monday, February 21, 2008.

Dennis J. Solomon
PO Box 289
Yarnouth Port, MA 02675

Appended:
1. Los Angeles Times article on Nichols & McManus, March 23, 1993
2. Elliot Richardson on Inslaw

Certificate of Service on February 21, 2008

Counsel for USC has been served on this day by Fax to 202-467-0539.
Counsel for E & S has been served on this day by Fax to 202-466-4416

Civil Clerk
UNITED STATES DISTRICT COURT
333 Constitution Ave NW
Washington, DC 20001

4



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
WASHINGTON, DC 20350-2000

IN REPLY REFER TO

5216
Ser 982D12/9U553256
22 May 1989

Dennis J. Solomon
P.O. Box 289
Yarmouthport, MA 02675

Dear Mr. Solomon,

The Secretary of the Navy has passed your letter to me for direct response to you. Your proposal concerning development of a 3-dimensional airspace display is potentially useful in airspace control or presentation environments.

Because of the potential of your proposal, we have taken the liberty of discussing it with two other government agencies. They have encouraged us to have you correspond directly with them. Those agencies and points of contact are as follows:

Federal Aviation Administration
Research Management Control Division
AMC-200: Attn: John C. Heurtley
Washington, D.C. 20591
Tel. (202)-267-8747

Defense Advanced Research Projects Agency
Attn: ISTO – Major Sowa
1400 Wilson Blvd.
Arlington, VA 22209-2308

We appreciate your good ideas.

DIRECTOR, TACTICAL AIR, SURFACE AND
ELECTRONIC WARFARE DEVELOPMENT
DIVISION

# Misconduct charges against judges cast a shadow over Vt. judiciary

**JUDGES**
Continued from Page 41

employee phoned Hill at home to warn that "unless he changed his way when he was in the presence of Judge Wheel and unless [she] stopped her effusive praise of his intelligence, superior character and good looks, it would do serious damage to the reputation of them both," the report said. Both Hill and Wheel are married.

According to the charges, an employee once walked into Hill's chambers without knocking. "She saw Judge Wheel standing behind Justice Hill who was seated, and she saw Judge Wheel's arms around Justice Hill," the board said. "Justice Hill became furious at the unannounced entry and he hollered at this employee and berated her ... such that she broke down and wept."

Thus began a persistent rumor that Hill and Wheel were lovers. The judicial conduct report conveys the innuendo but does not address the question. Both Hill and Wheel deny it.

"There is not now and there never was a romantic relationship between the two," said Carl Lisman, who is Hill's attorney and Wheel's friend.

The relationship became relevant in 1984, when Wheel began to treat courthouse employees with "haughtiness and disrespect," and take "vindictive" actions in what the board describes as an "arbitrary" grab for power.

Then, says the judicial conduct board, Wheel and the three justices engaged in this series of unethical acts:

- Wheel refused to speak to Superior Court Clerk Francis Fee and several judges whose actions angered her, and persuaded Hayes and Hill to take her side in petty battles over courthouse turf.

- Soon the justices were interfering in pending cases as well, working behind the scenes and showing favoritism at Wheel's request.

- In a notorious local murder case, Wheel rejected a plea bargain and then allegedly threatened the attorney general with the political opposition of the judges'





AP photos
The four persons against whom charges have been filed in Vermont are, clockwise from top left: Former judge Jane Wheel and Supreme Court Justices Thomas Hayes, Ernest Gibson 3d and William Hill.

association if he did not support her decision.

When Superior Court Judge James Morse moved to disqualify Wheel, Hayes called Morse to save Wheel from that embarrassment and to warn that "complaints might be made" to the judicial conduct board if Morse did not agree.

When the case reached the Supreme Court, Hill treated the public defender "with profound hostility." When that attorney tried to have Hill disqualified, the justice threatened to file ethical complaints against him.

And in a case in which her friend Lisman was suing his former law partners, Wheel schemed to get Hayes to preside, in a marked departure from normal court procedure.

By the fall of 1985, complaints reached the attorney general about Wheel's behavior. The office began an investigation into allegations that she had submitted pay vouchers for days she did not work and had used $3,000 in county funds for the Hays party.

"I'm a woman of integrity," she told the inquest. But she was charged with six counts of perjury, and lost her bid for re-election last fall, finishing last in a field of seven candidates.

The Supreme Court was notified of the investigation on Nov. 20, 1985. Phone records show that Wheel talked frequently with Hill, Hayes and Gibson over the next six months.

The three justices formed an ad hoc committee to rewrite the duties for which an assistant judge can be paid "to protect Judge Wheel from the attorney general's investigation," the conduct board concluded.

Hill proposed that a Supreme Court employee be dispatched to Burlington to discredit a witness and that the attorney general be called before the court to defend his investigation. The justice also persuaded his colleagues to sign a letter expressing the court's concern, which he hand-delivered to the investigators.

But by this time, the judicial conduct board had begun its own inquiry into the actions of the Supreme Court. On Jan. 27, the board charged Wheel and the three justices with 25 counts of judicial misconduct. The four have promised to fight the allegations before a special review board later this year.

The worst aspect of the case, say the state's top lawyers, is the credence such a crisis gives to cynics who argue that the justice system is fixed — that the right connection means more than the merits of a case.

At the reception for the new attorneys, Chief Justice Frederic Allen agreed. "Before this is over," he said, looking across the room at his tarnished colleagues, "we may have to trade our black robes in for white" to once again become the good guys in the public eye.

Via The NY Transfer News Service 718-448-2358, 718-448-2683
Subject: Elliot Richardson on INSLAW

The following appeared in the 10/21/91 OP-ED section of the "New York Times," p. A15:

A High-Tech Watergate

By Elliot L. Richardson Elliot L. Richardson, a Washington lawyer, was Attorney General in the Nixon Administration.

Washington

As a former Federal prosecutor, Massachusetts attorney general and U.S. Attorney General, I don't have to be told that the appointment of a special prosecutor is justified only in exceptional circumstances. Why, then, do I believe it should be done in the case of Inslaw Inc., a small Washington-based software company? Let me explain. Inslaw's principal asset is a highly efficient computer program that keeps track of large numbers of legal cases. In 1982, the company contracted with the Justice Department to install this system, called Promis, in U.S. Attorneys' offices. A year later, however, the department began to raise sham disputes about Inslaw's costs and performance and then started to withhold payments. The company was forced into bankruptcy after it had installed the system in 19 U.S. Attorneys' offices.

Meanwhile, the Justice Department copied the software and put it in other offices. As one of Inslaw's lawyers, I advised its owners, William and Nancy Hamilton, to sue the department in Federal bankruptcy court. In September 1987, the judge, George Bason, found that the Justice Department used "trickery, fraud and deceit" to take Inslaw's property. He awarded Inslaw more than $7 million in damages for the stolen copies of Promis. Soon thereafter, a panel headed by a former department official recommended that Judge Bason not be reappointed. He was replaced by a Justice Department lawyer involved in the Inslaw case. An intermediate court later affirmed Judge Bason's opinion. Though the U.S. Court of Appeals set that ruling aside in May of this year on the ground that bankruptcy courts have no power to try a case like Inslaw's, it did not disturb the conclusion that "the Government acted willfully and fraudulently to obtain property that it was not entitled to under the contract." Inslaw, which reorganized under Chapter 11, has asked the Supreme Court to review the Court of Appeals decision.

After the first court's judgment, a number of present and former Justice Department employees gave the Hamiltons new information. Until then, the Hamiltons thought their problems were the result of a vendetta by a department official, C. Madison Brewer, whom Mr. Hamilton had dismissed from Inslaw several years before. How else to explain why a simple contract dispute turned into a vicious campaign to ruin a small company and take its prize possession? The new claims alleged that Earl Brian, California health secretary under Gov. Ronald Reagan and a friend of Attorney General Edwin Meese 3d, was linked to a scheme to take Inslaw's stolen software and use it to gain the inside track on a $250 million contract to automate Justice Department litigation divisions. (In Mr. Meese's confirmation fight, it was revealed that Ursula Meese, his wife, had borrowed money to buy stock in Biotech Capital Corporation, of which Dr. Brian was the controlling shareholder. Biotech controlled Hadron Inc., a computer company that aggressively tried to buy Inslaw.) Evidence to support the more serious accusations came from 30 people, including Justice Department sources. I long ago gave the names of most of the 30 to Mr. Meese's successor as Attorney General, Dick Thornburgh. But the department contacted only one of them, a New York judge. Meanwhile, the department has resisted Congressional investigations. The Senate Permanent Subcommittee on Investigations staff reported that its inquiry into Inslaw's charges had been "hampered by the department's lack of cooperation" and that it had found employees "who desired to speak to the subcommittee, but who chose not to out of fear for their jobs." The department also hindered the interrogation of employees and resisted requests for documents by the House Judiciary Committee and its chairman, Representative Jack Brooks. Under subpoena, Mr. Thornburgh produced many files but the department said that a volume containing key documents was missing. In letters to Mr. Thornburgh in 1988 and 1989, I argued for the appointment of an independent counsel. When it became obvious that Mr. Thornburgh did not intend to reply or act, Inslaw went to court to order him to act. A year ago, the U.S. District Court ruled, incorrectly I think, that a prosecutor's decision not to investigate, no matter how indefensible, cannot be corrected by any court. In May 1988, Ronald LeGrand, chief investigator for the Senate Judiciary Committee, told the Hamiltons, and confirmed to their lawyers, that he had a trusted Justice Department source who, as Mr. LeGrand quoted him, said that the Inslaw case was "a lot dirtier for the Department of Justice

than Watergate had been, both in its breadth and its depth." Mr. LeGrand now says he and his friend were only discussing rumors.

Then, in 1990, the Hamiltons received a phone call from Michael Riconosciuto, an out-of-fiction character believed by many knowledgeable sources to have C.I.A. connections. Mr. Riconosciuto claimed that the Justice Department stole the Promis software as part of a payoff to Dr. Brian for helping to get some Iranian leaders to collude in the so-called October surprise, the alleged plot by the Reagan campaign in 1980 to conspire with Iranian agents to hold up release of the American Embassy hostages until after the election. Mr. Riconosciuto is now in jail in Tacoma, Wash., awaiting trial on drug charges, which he claims are trumped up. Since that first Riconosciuto phone call, he and other informants from the world of covert operations have talked to the Hamiltons, the Judiciary Committee staff, several reporters and Inslaw's lawyers, including me. These informants, in addition to confirming and supplementing Mr. Riconosciuto's statements, claim that scores of foreign governments now have Promis. Dr. Brian, these informants say, was given the chance to sell the software as a reward for his services in the October surprise. Dr. Brian denies all of this. The reported sales allegedly had two aims. One was to generate revenue for covert operations not authorized by Congress. The second was to supply foreign intelligence agencies with a software system that would make it easier for U.S. eavesdroppers to read intercepted signals. These informants are not what a lawyer might consider ideal witnesses, but the picture that emerges from the individual statements is remarkably detailed and consistent, all the more so because these people are not close associates of one another.

It seems unlikely that so complex a story could have been made up, memorized all at once and closely coordinated. It is plausible, moreover, that preventing revelations about the theft and secret sale of Inslaw's property to foreign intelligence agencies was the reason for Mr. Thornburgh's otherwise inexplicable reluctance to order a thorough investigation.

Although prepared not to believe a lot they told him, Danny Casolaro, a freelance journalist, got many leads from the same informants. The circumstances of his death in August in a Martinsburg, W.Va., hotel room increase the importance of finding out how much of what they have said to him and others is true. Mr. Casolaro told friends that he had evidence linking Inslaw, the Iran-contra affair and the October surprise, and was going to West Virginia to meet a source to receive the final piece of proof. He was found dead with his wrists and arms slashed 12 times.

The Martinsburg police ruled it a suicide, and allowed his body to be embalmed before his family was notified of his death. His briefcase was missing. **I believe he was murdered, but even if that is no more than a possibility, it is a possibility with such sinister implications as to demand a serious effort to discover the truth.**

This is not the first occasion I have had to think about the need for an independent investigator. I had been a member of the Nixon Administration from the beginning when I was nominated as Attorney General in 1973. Public confidence in the integrity of the Watergate investigation could best be insured, I thought, by entrusting it to someone who had no such prior connection to the White House. In the Inslaw case the charges against the Justice Department make the same course even more imperative. When the Watergate special prosecutor began his inquiry, indications of the President's involvement were not as strong as those that now point to a widespread conspiracy implicating lesser Government officials in the theft of Inslaw's technology. The newly designated Attorney General, William P. Barr, has assured me that he will address my concerns regarding the Inslaw case. That is a welcome departure. But the question of whether the department should appoint a special prosecutor is not one it alone should decide. Views from others in the executive branch, as well as from Congress and the public, should also be heard.

-

LOS ANGELES TIMES     Sunday, March 21, 1993

Section: PART A
Page: A-3

**Trial Offers Murky Peek Into World of Intrigue; Testimony: Presenting himself as a CIA operative, a mystery man sues the LAPD for alleged false arrest that he says cost him his gun permit and millions of dollars.**

By: HENRY WEINSTEIN and PAUL FELDMAN TIMES STAFF WRITERS

A tale of international intrigue is unfolding in a tiny Burbank courtroom where a San Fernando Valley man is seeking damages from the Los Angeles Police Department for allegedly ruining a multimillion-dollar deal to sell a high-tech, hand-held machine gun to foreign governments.

While most police abuse cases center on beatings or bullets, the Burbank trial focuses on the credibility of Robert Booth Nichols, a mysterious figure whose name first surfaced in a late 1980s FBI investigation of alleged mob penetration into the entertainment industry.

Again, last year, his name surfaced in a House Judiciary Committee report on possible malfeasance in the Justice Department during the Reagan era. The report also linked Nichols to an aborted business venture at the Cabazon Indian Reservation in Indio which, he said on the witness stand, dealt with the manufacture of machine guns to sell to the Nicaraguan Contras.

By taking the city to court for false arrest, Nichols, 50, could earn a multimillion-dollar damage award. But the lawsuit, stemming from a 1986 incident at The Palomino nightclub in North Hollywood, has also served to draw Nichols out of the shadows and onto the witness stand under oath for the first time. Nichols says the Police Department caused him to lose his concealed weapon permit, which in turn cost him financing to manufacture the machine gun. Nichols, who served as a technical adviser on anti-terrorism and had a bit part in the recent Hollywood blockbuster "Under Siege," is a mustachioed 6-foot, 3-inch man who is often described as a Clark Gable look-alike.

Beyond that, opinions about him sharply diverge. During four days of frequently heated testimony last week, Nichols presented himself as a dashing, globe-trotting businessman and intelligence operative. Armed with letters on White House stationery and snapshots of himself posing with foreign political and military dignitaries, Nichols told jurors that he toiled quietly and selflessly for nearly two decades on behalf of shadowy CIA keepers in more than 30 nations from Central America to Southeast Asia.

However, a far different portrait of Nichols was painted by Assistant City Atty. Robert Seeman, who is fighting to save the city from a major payout for damages. Seeking to portray Nichols as a phony, Seeman got Nichols to admit on the stand that he is not certain that the people who paid him for his "intelligence work" were employed by the Central Intelligence Agency. Seeman also sought to discredit Nichols' stature as an entrepreneur by drawing out testimony that Nichols has never sold a gun nor made a penny of profit from his firms' business ventures. A CIA spokesman, in a telephone interview, would not comment on whether Nichols was employed or affiliated with the agency. Nichols came under suspicion by the Federal Bureau of Investigation of international money laundering in 1978, according to a 1987 federal court wiretapping affidavit. The affidavit, prepared by FBI Agent Thomas G. Gates, states that "FBI investigative files further reveal that Nichols may have been associated with the Gambino LCN (organized crime) family in New York City." Nichols has never been indicted and has sued Gates for defamation. But his lawsuit has been dismissed twice in federal court.

More recently, Nichols became the subject of public scrutiny in the wake of the mysterious August, 1991, death of Washington investigative reporter Danny Casolaro. A House Judiciary Committee report released in September said Nichols had frequent contact with Casolaro just before the journalist, who was probing a web of conspiracies ranging from the Iran-Contra affair to alleged Justice Department skulduggery, was found with his wrists slashed in a West Virginia motel room. The report, titled "The INSLAW Affair," said the Justice Department had failed to adequately investigate charges that high-level officials had stolen and misused a private firm's sophisticated computer software designed to help track criminals. The report also called for further investigation into Casolaro's death, which was declared a suicide by West Virginia officials. Nichols acknowledged to committee investigators that he had spoken to Casolaro often and served as a sounding board for him, but would not provide a sworn statement to the House committee. There has been no discussion about the INSLAW case or Casolaro in the

Burbank courtroom. But in four days of testimony, Nichols has provided a colorful, complex and often conflicting portrait of his past.

The trial, which enters its second week of testimony Monday, stems from a 1986 incident in which Nichols, armed with a concealed pistol, was taken into custody by Los Angeles police at The Palomino. Nichols said he and his brother-in-law, James Hopko, had stopped by the club after a business meeting on the production of machine guns. While seated at the bar and later at a table, Nichols said he drank two bottles of beer and caused no trouble before LAPD officers, responding to a complaint of a disturbance, burst into the crowded room. Without warning, Nichols testified, he was flung to the ground and two revolvers were pointed at his head. Nichols, who was carrying a concealed weapons permit from the Santa Clara County Sheriff's Department, was disarmed, handcuffed and transported to the North Hollywood LAPD station. While in the police squad car, Nichols said he asked Officers Keith Wong and Israel Medina to loosen his handcuffs. In response, "they said they'd blow my f------ head off," Nichols testified. The officers also threatened to shoot him, he told jurors, when he insisted that his weapons permit was valid. Nichols, who has lived in Arleta and Sherman Oaks in recent years, was released from custody after several hours and never charged.

His concealed weapons permit was revoked by Santa Clara officials after they received a report of the incident from the Police Department. Nichols' suit charges that the loss of the permit led to a withdrawal of Swiss financing for his firm, Meridian Arms Corp., to manufacture a new machine gun in South Korea. According to Nichols' court papers, the low-cost lightweight weapon, known as the G-77, was developed in 1977 in a Covina machine shop and was designed for use by U.S. allies "as an economical method of responding to Soviet efforts at arming their various insurgent clients." Nichols told jurors he demonstrated the G-77 first in Manila in 1977, and again in the early 1980s at the Cabazon Indian Reservation. There, he said, leaders of the tiny Indian band, in a joint venture with Wackenhut Corp., proposed manufacturing the weapon for shipment to Nicaragua to arm the Contras. However, the proposed business deal, which was briefly referred to in the INSLAW report, fell through because State Department written approvals for exporting the weapon could not be obtained, Nichols said.

To buttress his client's credibility as a businessman, Nichols' lawyer introduced in court a flood of paper indicating that he had worked on numerous ventures with prominent individuals. They included Robert A. Maheu, Howard Hughes' former right-hand man; Michael A. McManus, an aide to President Ronald Reagan; Clint W. Murchison, then the owner of the Dallas Cowboys, and George K. Pender, an executive with a worldwide engineering company. Nichols testified about discussions he had with a White House aide on the rebuilding of Lebanon while he was affiliated with Meridian's predecessor firm, Santa Monica-based First Intercontinental Development Corp. That firm supposedly specialized in secret foreign construction projects for the U.S. government.

On cross-examination, however, Nichols admitted that his firm never completed a deal to sell a single G-77 or other products. While Nichols' suit against the police was wending its way toward the courtroom of Superior Court Judge Thomas C. Murphy, the FBI bumped into Nichols during an aborted investigation into alleged mob infiltration of Hollywood. Gates' wiretapping affidavit states that during a July 15, 1987, stakeout on the Sunset Strip, agents saw Eugene Giaquinto, then president of MCA Inc.'s Home Video Division, who was under investigation, hand a box to an unidentified man--later identified as Nichols. Appended to Gates' affidavit was an Oct. 8, 1987, document stating that the FBI was investigating whether Giaquinto, Nichols and others were "buying and/or selling stocks by the use of manipulative or deceptive practices." In 1988, after reports of the FBI's Hollywood investigation surfaced, Giaquinto resigned from the board of the Nichols-controlled Meridian International Logistics Inc. MCA subsequently placed Giaquinto on leave of absence and he later left the company. Giaquinto was never charged with a crime. Giaquinto introduced Nichols to Jack Valenti, president of the Motion Picture Assn. of America, and suggested that Nichols could help the industry in its effort to combat piracy abroad. In a telephone interview from Washington last week, Valenti said that he met with Giaquinto and Nichols for about 20 minutes in his room at the Beverly Hills Hotel. "Nichols said he was part of the CIA, that he had done all this work in Asia," Valenti said. But Valenti did not hire him. "My instinct was I didn't feel comfortable about some of the things he was saying," Valenti said. "When a fellow tells you a lot of things are top secret . . . well I know a lot about the CIA from my time in the White House" as a special assistant to President Lyndon B. Johnson.

In June, 1989, Nichols went on the offensive against the FBI. On behalf of his company, Meridian International, he filed an $11-million damage suit alleging that Gates libeled the company and illegally interfered with potential business ventures. The suit alleges that Gates made slanderous statements to Australian law enforcement accusing Meridian and its officers of involvement with organized crime and a stock swindle. U.S.

District Judge Richard Gadbois in Los Angeles dismissed the case twice. Nichols is appealing the ruling. In the current case, the most intriguing testimony last week concerned Nichols' claims of taking part in intelligence gathering. Nichols cited a plethora of details about decade-old meetings with leaders of Third World nations and aides to Reagan. But time and again, he swore he had no recollection of how much he was paid for his intelligence or the names of those he worked for. Nichols also testified that he had no visible income for more than 15 years except for the living expenses he claimed he was receiving from his unnamed CIA keepers. The Los Angeles native, who has used the aliases Robert Summers and Robert Chabray, said he was first approached by a CIA officer while living in Hawaii in the late 1960s. Nichols testified that he could recall only the man's first name--Ken--and that Ken told him that instead of joining the U.S. military, he could serve his country in other ways. Nichols said his first assignment was to "to associate with a foreign female in Honolulu" for two days. Ken then instructed him to take a job with a Hawaiian security firm and later to move to Glendale to operate a construction company. Nichols testified that he was paid no money by either firm, living instead on funds provided by Ken. Nichols said that he "participated in gathering information" for Ken and his associates until 1986 in nations including Nigeria, Saudi Arabia, Thailand, India, Japan, Mexico, Costa Rica, Haiti, Norway and France. The work, Nichols claimed, was dangerous. He said in 1972 he was stabbed in the left hand in Australia. In a mission to remote regions of Cameroon, Nichols said he was shot in the left leg after gathering intelligence on sawmills. Seeman repeatedly objected to Nichols' vague answers concerning his employers and payments. Seeman asked: "Are you sure the CIA was paying you all these years?" Nichols replied: "I'm not sure, no."

As in the courtroom, widely contrasting views about Nichols persist elsewhere. INSLAW owner William Hamilton said that he had dozens of conversations with Nichols and considered him "extremely knowledgeable" on intelligence matters. "I have not found that he overstates things to you," Hamilton said. The first time he spoke to Nichols in May, 1990, Hamilton said, Nichols discussed the FBI allegations of his ties to the Gambino family and denied them. "His suggestion was that (government) agents were out to get him because he had stopped working for them," he said. Soon after, Hamilton said, he introduced Casolaro to Nichols. Hamilton said that Casolaro learned during his reporting that "Nichols had contact with intelligence agencies in 80 countries." But Maheu, a former FBI agent who also worked with the CIA, presented a very different view. Maheu said he first met Nichols while he was serving on the board of First Intercontinental Development Corp. "He told me he had access to funds, presumably limitless, and he was going to make it available to me to take back my position . . . in the Hughes empire. "But after one session with him (Nichols), it was obvious to me he had no knowledge at all of the Hughes world," Maheu said. "My reaction is he is a 14-carat phony."

PHOTO: Plaintiff Robert Booth Nichols with his wife, Ellen, outside the Burbank courthouse last week.
PHOTOGRAPHER: MIKE MEADOWS / Los Angeles Times

Descriptors: NICHOLS, ROBERT BOOTH; LOS ANGELES -- SUITS; TRIALS; LOS ANGELES POLICE DEPARTMENT; FALSE ARRESTS; CONCEALED WEAPONS

Copyright (c) 1993 Times Mirror Company